# EXHIBIT A

1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4    JAMES JIRAK and ROBERT          )

5    PEDERSEN,                       )

6              Plaintiffs,           )

7              vs.                   )    No. 07 C 3626

8    ABBOTT LABORATORIES, INC.,      )

9              Defendants.           )

10

11            The deposition of MICHAEL RANCOURT,

12   called for examination, taken pursuant to the

13   Federal Rules of Civil Procedure of the United

14   States District Courts pertaining to the taking

15   of depositions, taken before Lynn A. McCauley, CSR

16   No. 84-003268, RPR, a Certified Shorthand Reporter

17   of the State of Illinois, at 77 West Wacker Drive,

18   Suite 3500, Chicago, Illinois, on August 26, 2009 at

19   9:02 a.m.

20

21

22

23

24

2

```
 1    PRESENT:

 2         JOSEPH & HERZFELD, LLP, by
           MR. MICHAEL DI CHIARA
 3         757 Third Avenue, 25th Floor
           New York, New York 10017
 4         212-688-5640
           md@jhllp.com
 5              Appeared on behalf of Plaintiffs;

 6
           JONES DAY, by
 7         MS. AMANDA M. OSE
           555 California Street, 26th Floor
 8         San Francisco, California 94104
           415-626-3939
 9         aose@jonesday.com
                Appeared on behalf of Defendant;
10
                     and
11
           JONES DAY, by
12         MR. BRENT D. KNIGHT
           77 West Wacker Drive, 35th Floor
13         Chicago, Illinois 60601
           312-782-3939
14         bknight@jonesday.com
                Appeared on behalf of Defendant.
15

16

17

18

19

20

21

22

23

24
```

1   directly on -- you know, they wouldn't -- the

2   physician would not have written it otherwise unless

3   that rep convinced them of that script, not for every

4   script, but for certainly the majority of scripts

5   it's pretty -- it's well understood in our industry

6   that the representative plays a very large part in

7   determining -- in driving those sales by the way of

8   convincing the customers to prescribe those products.

9        Q.   Now, if I'm correct in primary care sales

10  you have multiple reps calling on the same

11  physicians; correct?

12       A.   Yes.   In most territories there are two

13  to four representatives in a sort of team selling

14  environment.

15       Q.   Okay.   So in those cases how do you know

16  which rep is persuading the physician to write the

17  script?

18       A.   Yeah --

19       MS. OSE:   Same objection.

20       THE WITNESS:   Does this mean I still answer?

21       MS. OSE:   (Indicating.)

22  BY THE WITNESS:

23       A.   Okay.   That's difficult to tell.   It

24  takes then the sales manager, right, that's why we

1   have district managers is that we measure the

2   quantitative results from our sales results, from our

3   sales reports, but we also have district managers who

4   ride along with these representatives on a regular

5   basis so they can put two and two together in terms

6   of -- you know, based on the results, you know, if

7   let's say one product is being sold by two different

8   people on that team, those qualitative assessments

9   that the manager makes in those ride-alongs can

10  determine, you know, if Representative A is having a

11  more pronounced effect on the results than

12  Representative B.

13              So it is a combination.  It very

14  much is a combination of the quantitative results

15  along with the qualitative assessment that a district

16  manager does in coaching their representatives in the

17  field.

18  BY MR. DI CHIARA:

19      Q.    And a doctor can write a script for a

20  Abbott product if that product has a favorable

21  formulary position on a managed care plan; correct?

22      A.    They can write it whether -- if it's an

23  unfavorable as well.

24      Q.    Okay.  But formulary position on a

32

```
1    idea of DTC is that it appeals to patients directly

2    offering a potential solution for a condition they

3    may have, and it generates a discussion with a

4    physician.

5              The physician, however, is still the

6    ultimate decision maker.

7    BY MR. DI CHIARA:

8         Q.   Does Abbott keep track, if you know, of

9    prescriptions that are written but not filled?

10        MS. OSE:  This is the same objection.  Just

11   to clarify, it's outside the scope of the 30(b)(6).

12             Mr. Rancourt can testify on his

13   personal knowledge but not as representative of the

14   company.

15        THE WITNESS:  Can you repeat the question?

16   BY MR. DI CHIARA:

17        Q.   Does Abbott have a way of tracking the

18   number of prescriptions that are written but not

19   filled?

20        A.   No.

21        Q.   Do all pharmacies report their

22   prescribing information?

23        A.   No.

24        Q.   Which pharmacies don't to your knowledge?
```

1    be a credible source of information because

2    physicians do rely on the information we provide to

3    make those decisions.

4                      And I've seen the same type of

5    verbal, you know, coaching to other representatives

6    when I've been a manager.  You know, physicians

7    reminding the representative that they play an

8    important part in their decision making process.

9         Q.    Does Abbott keep separate sales

10   performance reports to reflect whether a prescription

11   is written because of a rep's efforts or because of

12   direct-to-consumer advertising or because of a

13   favorable formulary position?

14        MS. OSE:   Same objection.

15   BY THE WITNESS:

16        A.    No, that's not possible.

17   BY MR. DI CHIARA:

18        Q.    How long were you in the position of Area

19   Sales Director for the Southeast Region?

20        A.    One-and-a-half years.

21        Q.    And what timeframe are we talking about?

22        A.    It was January 2008 to June 2009.

23        Q.    And were you employed by Abbott prior to

24   June of 2008?

1    responsibilities as a Regional Manager for Primary

2    Care.

3         A.    Yes.

4                   Primary responsibility was to

5    increase the sales of the products that my sales team

6    covered and had responsibility for in selling to

7    their customers within that geography and those

8    customers mainly being primary care physicians.

9         Q.    And how would you go about increasing

10   sales of your product?

11        A.    From visiting customers on a daily -- my

12   representatives would visit customers on a daily

13   basis and discuss with them our products and ask for

14   their verbal commitment to prescribe our products.

15        Q.    Now, if a physician gave a commitment

16   that they were going to prescribe an Abbott product,

17   is that a binding commitment?

18        A.    No.

19        Q.    Anything else that you did to try to

20   increase sales of your products when you were a

21   Primary Care Regional Manager?

22        A.    That was the primary mechanism by which

23   we drove sales.

24                   Secondarily, we also reviewed our

1    often travel to BI to sit in with them on meetings of

2    stategizing how to market the product, working with

3    our advertising agencies, working with in-house

4    departments to pull together our sales materials.

5                        But then on the Abbott side I would

6    be responsible for connecting with our sales force

7    and educating them on the product so that they were

8    prepared to sell it in our sales force.

9         Q.    Now, in a situation like you just

10   described where Abbott is co-promoting a product with

11   Boehringer Ingelheim, are there situations where

12   there are Abbott reps and Boehringer Ingelheim reps

13   in the same territory calling on the same physicians?

14        A.    Yes.

15        Q.    And in those situations can Abbott make a

16   distinction as to what scripts are written because of

17   the Abbott's rep's efforts or from the Boehringer's

18   rep's efforts?

19        MS. OSE:   Same objection as before.   It is

20   outside the scope of Mr. Rancourt's 30(b)(6) topics.

21   He can testify on his personal knowledge.

22   BY THE WITNESS:

23        A.    So from my knowledge it's a challenge,

24   it's not a quantitatively precise mechanism, but it

52

1    goes back to what we talked about before around, you

2    know, this is where the qualitative aspect of the

3    district managers working with the representatives

4    directly observing what they do and those DMs

5    connecting with their DM peers from the other

6    company, having those kind of discussions, help to

7    diagnose who really are more effective than others to

8    help remedy those situations and coach the

9    representatives to be more effective.

10                   So it was a combination of the

11   qualitative and quantitative to help best determine

12   the answer -- or the question that you asked.

13       Q.   Would a Abbott district manager do

14   ride-alongs with a Boehringer Ingelheim rep?

15       A.   Occasionally.  That was up to the local

16   managers to decide.

17       Q.   Okay.  Before you became Product Manager,

18   what was your position with Abbott?

19       A.   Prior to Product Manager?

20       Q.   Yes.

21       A.   So prior to Product Manager, I was a

22   District Sales Manager in New Jersey.

23       Q.   Which part?

24       A.   I was in Union County, and I covered the

1    we could just identify it by Bates number what the

2    document is.

3    BY MR. DI CHIARA:

4         Q.   Now, reps can't enter into contracts;

5    right, with doctors?

6         A.   You have to clarify which type of

7    representative you're talking about.

8         Q.   Primary care.

9         A.   Primary care reps do not.

10        Q.   What reps can enter into contracts if

11   any?

12        A.   Yeah, some do.   There are certain

13   specialty reps that do.   Like I have not worked in

14   this sales force, but like our Lupron sales force,

15   it's a hormone.   I think it's an injected product.

16                   I've not personally worked with it,

17   but I know historically that that's been a product

18   that they've sold directly to physicians.

19                   And then we have our managed care

20   team that enters into contracts with managed care

21   companies that involve rebates and such.

22        Q.   Are reps part of the managed care team?

23        A.   I'm sorry?

24        Q.   Are pharmaceutical reps part of the

66

```
 1   managed care team?

 2        A.   It's a separate sales force, managed care

 3   sales force.

 4        Q.   So other than that one category of reps

 5   that you said can enter into contracts with

 6   physicians, do you know of any pharmaceutical reps

 7   that can enter into contracts with physicians?

 8        A.   Not within Abbott's pharmaceutical

 9   products division.

10        Q.   Again, we're just focusing on the

11   pharmaceutical products.  I just want to clarify.

12             Do the pharmaceutical reps that call

13   on physicians have the ability to negotiate prices

14   with physicians?

15        A.   No.

16        Q.   Do they have the ability --

17        A.   Not the primary care representatives.

18        Q.   Are there any other -- outside of the

19   managed care sales force --

20        A.   Well, again, I'm not an expert to speak

21   on behalf of the Lupron sales force, so that would

22   be -- I can't answer to that.

23             My knowledge of that sales force is

24   that it is negligible, but I -- I'm really speaking
```

1   that a physician would tell a representative, you

2   know, I want to write your product, but the local

3   pharmacy tells me that they're out of it, so in that

4   indirect way the representative circles back at the

5   pharmacy to make sure the pharmacy orders it because

6   they've been told the physician wants to use it.

7                    So if that's an indirect way, it's

8   not a direct order taking, but there is sort of that

9   mechanism by which we do gain information from

10  customers and relay that to the pharmacy to make sure

11  that the order is placed if you will.

12                   Does that make sense?

13       Q.   Okay.

14       A.   So it's indirect, not direct, but it's

15  related to your question, so I wanted to clarify

16  that.

17       Q.   So a rep can walk into a pharmacy and

18  say, you know, a doctor's telling me you don't have

19  this product stocked.  You need to order it?

20       A.   Would you please order it.  Request that,

21  yes.

22       Q.   Okay.  And who would the pharmacy order

23  the product through?

24       A.   It depends on the pharmacy.  You know,

1    certain chains, you know, would order through their

2    chain distributor.   Independents would order through

3    their wholesaler.

4         Q.   Do pharmaceutical reps get involved in,

5    you know, taking orders or orders from pharmacies?

6         A.   Let me think about this.

7              No, but we have another group called

8    our national trade executives and that other separate

9    sales force does get involved with the actual

10   ordering of product to the -- through the

11   distribution channel, from Abbott to the wholesaler

12   to the distributors.

13        Q.   And who negotiates the prices of Abbott

14   products with wholesalers or pharmacies?

15        MS. OSE:   Objection.   This is outside the

16   scope of Mr. Rancourt's 30(b)(6).

17   BY THE WITNESS:

18        A.   Yeah, I haven't directly worked with

19   those groups, but it's part of managed care and trade

20   sales groups.

21        Q.   Okay.   Now, if a rep say leaves Abbott in

22   January, will they be paid their bonus for the -- say

23   they leave in January of 2010, will they be paid

24   their bonus for the last quarter of 2009?

1   BY MR. DI CHIARA:

2        Q.   Let's talk about the job duties and

3   responsibilities for pharmaceutical reps.

4              What are they?

5        A.   Well, in summary it's to visit their

6   healthcare practitioner customers and present them

7   information about our products and use convincing

8   conversational skills to ask for their commitment to

9   use our products instead of competitors.

10       Q.   Anything else?

11       A.   That is -- that's their mission.

12       Q.   Okay.  Now, is that -- those duties and

13  responsibilities that you just described, is that the

14  same for all pharmaceutical reps that you know of?

15       A.   In that description that I just gave,

16  yes.

17       Q.   And that would be regardless of whether a

18  rep's promoting products in New Jersey or Wisconsin?

19       A.   Yes.  Everybody knows this gig -- you're

20  hired to hit your numbers.

21       Q.   Okay.

22       A.   How you go about that within each

23  franchise there are different activities and such,

24  but that description I gave you fits across the

1    part of the folks that we interface with.

2        Q.   Understood.

3              Now, are reps allowed to have any

4    contact with consumers about the Abbott products?

5        A.   Not -- well, again, it depends on the

6    franchise you're talking about like -- in primary

7    care the representatives generally don't interface

8    with customers or patients I should say, the end

9    customer being the patient.  HIPAA guidelines, you

10   know, privacy protection forbids us to do that.

11            There are certain levels of indirect

12   engagement with patients that take place in certain

13   specialty sales forces like say HIV or immunology

14   where representatives commonly sponsor patient

15   advocacy programs where they would bring in a

16   physician speaker and talk to the patients, and I'm

17   sure that there's chitchat that occurs sometimes

18   between patient and the rep just in the course of

19   getting refreshments at those events, so in that type

20   of context reps do sometimes interface with patients.

21        Q.   Well, in the context of promoting the

22   product reps don't call?

23        A.   Correct.

24        Q.   Won't call on the patients; correct?

79

1          A.     Correct.

2          Q.     Now, what would you say then is the rep's

3    primary duty?

4          A.     I thought I mentioned before that the

5    rep's primary duty is to sell the products that they

6    carry and use convincing logic to convince the

7    physician to use more of the product, the Abbott

8    product versus a competitor.

9          Q.     And the customers, as you described them,

10   that the reps call on that's given to the reps by

11   Abbott; correct?

12         A.     Yeah, we help them by giving them the

13   data that we've purchased, right, of who the

14   physicians are because this isn't like a cold calling

15   business where anybody can use these products.

16         Q.     Right.

17         A.     You have to have a medical license, so we

18   know who these physicians are, so we do provide them

19   that list to make their job easier.  It certainly

20   saves them time from having to cold call, and we're

21   able to give them data of those physicians who have a

22   higher historical proscribing history.

23         Q.     Is that called a call list?

24         A.     Called different things, target lists,

1    call list, eventually -- you know one term you may be

2    getting at is a call plan.

3         Q.   Okay.  And does Abbott require reps to

4    call on doctors with a certain frequency?

5         A.   It really depends.  I mean each sales

6    force operates with a call plan, so, in other words,

7    at the beginning of a selling period the home office

8    would send the representative a call list -- whatever

9    you want to call it, a target list or a call list,

10   it's a larger list -- and the representatives select

11   which physicians they will select to be on their call

12   plan which are the ones that they're committing to

13   see regularly over that selling period, and they have

14   an ability to add and drop physicians and, you know,

15   make some changes within that call list.

16              Again, the master call list,

17   whittling that down to the actual call plan, the rep

18   plays a part in determining which ones end up on the

19   final call plan.

20        Q.   Okay.  So the first call list that's

21   given to a rep by Abbott, does that rank physicians

22   as far as high prescribers, low prescribers?

23        A.   Yeah.

24        Q.   Now, does Abbott want the reps to focus

1    on the high prescribers?

2        A.    Yes.

3        Q.    So when a rep develops their call plan

4    which is the whittling down of the call list --

5        A.    Yeah.

6        Q.    -- that call plan is going to have on it

7    the high prescribers; correct?

8        A.    Primarily, but there are other factors

9    that go into the rep decision making process to

10   decide who gets add and who gets dropped.

11            The rep's judgment is critical in

12   this process because the home office only knows the

13   quantitative history of those physicians.

14            The representatives would know the

15   additional really critical qualitative info like who

16   is accessible, who is and up-and-coming physician,

17   right.  They may have low history, but they're a

18   young physician who is part of a busy practice and

19   they're liable to be a high prescriber.

20            Those representatives have the

21   ability to use their judgement to add those

22   physicians.  That's why we give them the add-drop

23   process to use their judgment to affect that final

24   call plan.

1    that call plan to help the rep make those judgment

2    calls where they're adding and dropping.

3         Q.    Now, so a rep can't -- well, can a rep go

4    to the district manager after they get their initial

5    call list and on their call plan have all either low

6    or non-prescribers on it and say, here managers,

7    these are the doctors I'm going to be calling on.

8         A.    That would be very rare for that to

9    happen.  If a representative came to me with a list

10   of all low prescribing physicians that they've added

11   and they've dropped all these high prescribing

12   physicians, I would have a very serious discussion

13   with them about why they've done so because they're

14   calling on lower producing customers in that case.

15              So typical a call plan would be a

16   mix of some high prescribers which are pretty clear

17   as to why they would be on there, and some low

18   performers, low prescribers that would be based on

19   the rep's judgment, but it should be probably more of

20   like an 80/20, right, high to low.  It shouldn't be

21   this big list of low providers.  I would really

22   question a rep's judgement in that case.

23        Q.    And would Abbott expect that a rep would

24   call on the high prescribers more frequently than the

84

1    low or non-prescribers?

2         A.    Yeah, and that just makes common sense

3    that even a rep would want to call on those

4    physicians more often.

5         MS. REPORTER:  Can we take a two-minute

6    break?

7         MR. DI CHIARA:  Yeah, sure.

8                              (WHEREUPON, a recess was

9                              had.)

10   BY MR. DI CHIARA:

11        Q.    Now, you mentioned that the reps can add

12   or delete physicians from the call list; is that

13   correct?

14        A.    Uh-huh, yeah.

15        Q.    Okay.  Now, can reps delete a physician

16   from a call list for reasons other than the ones I'm

17   about to list, either the physician died, retired,

18   moved out of the territory, or is incarcerated?

19        A.    Yes, they can.

20        Q.    And what -- under what other

21   circumstances?

22        A.    Representative's judgment which would

23   probably include access like they're inaccessible, or

24   they're on the verge of retirement.  I mean there are

1     just somebody who's a low writer who the

2     representative deems is still important because of

3     their reputation, you know, in the community.

4                      That covers a pretty wide spectrum.

5     I mean I'm not sure there would be any other reason

6     why a rep would ever want to add another doc.

7          Q.     Sure.   And is there a limit as to how

8     many doctors a rep can add?

9          A.     Well, again, you acknowledged, and I

10    verified, that there usually is a parameter of, you

11    know, max adds, max drops that we set, and that add/

12    drop sort of tool that is sent to reps to manage.

13         Q.     So Abbott sets the parameters under

14    which -- sets the parameters for the number of

15    doctors that a rep can add or delete; is that

16    correct?

17         A.     Yeah.   Keep in mind that each franchise

18    operates a different call plan process.

19                      Again, some use them, a lot of them

20    use them, some don't; but every selling period the

21    business rules that we call them for the add/drop

22    process change based on what -- what's going on in

23    the marketplace.

24         Q.     But, again, does Abbott still --

1    non-prescribe?

2         A.    Yeah, I mean that -- I would seriously

3    call into question their judgment.  I would want to

4    learn more.  I would use my coaching skills to learn

5    more.  Tell me more, Mike, about this call plan.

6    This is very unique to see all these low prescribers.

7    Tell me more about why you made those decisions.

8         Q.    And what if the rep were to respond,

9    Well, I think they're all up-and-comers?

10        A.    I've never had that experience happen,

11   and I don't think there's any legitimate case that in

12   any territory in the country that would have that

13   case where everybody would be -- should be added

14   that's not on the default list.

15        Q.    Okay.

16        A.    It's just I've never seen that in my

17   career.  Let's just put it that way.

18        Q.    Okay.  So if I'm a rep, and you're a

19   district manager, and I have all low or

20   non-prescribers on my cal plan, and the district

21   manager asks me, you know, Why do you have all these

22   people on it?  This doesn't make sense.  And I say,

23   Well, I think they're all up-and-comers.  And you ask

24   for an explanation.  And I say, It's just a gut

1   feeling.  Can a DM say, No, you need to change your

2   call plan?

3        A.   Absolutely.  And they should.

4             In that case it's -- what your

5   describing sounds like poor judgment that the

6   representative is using.

7             Unless there's some absolutely out

8   of -- off the wall, one in a million territory that

9   this representative has that would call for that

10  exception.

11       Q.   Okay.

12       A.   What you described would be highly

13  unusual.  I have to tell.

14       Q.   Okay.  Now, you mentioned that reps, that

15  their job is to sell the Abbott product; is that

16  correct?

17       A.   Yes.

18       Q.   How do they do that?

19       A.   By visiting physician offices daily via

20  either drop-in or appointment and getting one-on-one

21  face time with that customer to engage in a

22  discussion with them about their product use, their

23  needs, you know, for patient treatment and how our

24  product may fit those needs and ultimately asking for

1    their commitment to use our product.

2         Q.    Now, we discussed this earlier, but the

3    commitment to use -- if a doctor gives a commitment

4    to use an Abbott product, it's a non-binding

5    commitment; correct?

6         A.    Absolutely.

7         Q.    Now, what tools do reps use to sell their

8    product?

9         A.    They use sales materials, like what are

10   commonly called sales aids and reprints.

11              Sales aids are the color brochures

12   about the product, and the reprints are often, you

13   know, the studies, clinical studies.

14        Q.    Now, do reps, do they develop these sales

15   aids?

16        A.    No.

17        Q.    Who creates the sales aids?

18        A.    The marketing team, under the supervision

19   of medical, regulatory and legal.

20        Q.    Can a rep mark up a sales aid?

21        A.    They -- can they, yes?  Should they, no.

22        Q.    Okay.  Let me rephrase that.

23              Why shouldn't a rep mark up a sales

24   aid?

```
1          A.    Because the sales aid was approved

2     because it met the approval of our medical regulatory

3     department that says, yes, this fits within the label

4     of the product.

5                      By allowing a physician to mark up

6     the sales aid, that -- that's really affecting the

7     integrity of the material in that sales aid, and we

8     wouldn't be able to control to what extent the rep

9     would make changes that could be innocuous or

10    actually equate material changes, so we have to have

11    a policy of not making the changes to stay within

12    label.

13         Q.    Can reps make their own sales aids?

14         A.    No.  Well, can they, yes.  Should they,

15    no.  It's against policy.

16         Q.    Whose policy?

17         A.    It's against company policy, and frankly

18    the FDA would forbid that as well.

19         Q.    Okay.  Now, so if a rep creates their own

20    sales aid and they think it's the greatest sale aid

21    in the history of sales aids, they still can't use it

22    on a sales pitch?

23         A.    Correct.  And I run across a lot of low

24    performers that think that they know better how to
```

1   market a product and think they can develop a better

2   one when really my experience tells me they can't.

3       Q.   Okay.  Fair enough.

4            So the people who are -- you know,

5   the professionals who are responsible for developing

6   the sales aids know what they're doing and --

7       A.   Absolutely.

8       Q.   Okay.  Now, reprints, reps can only use

9   approved reprints; correct, on sales calls?

10      A.   Correct.

11      Q.   Now, if a rep, say they're flipping

12  through the New England Journal of Medicine, and they

13  find this great study that supports the product

14  they're promoting, but it hasn't yet been approved by

15  Abbott, can they use that on the sales call?

16      A.   No.

17      Q.   Now, are reps allowed to -- can they

18  highlight or mark up the reprints?

19      A.   They can, but they should not.

20      Q.   Okay.  And for company policy reasons?

21      A.   For the same company policy reasons.

22  They -- if we allow that, who is to say they wouldn't

23  block out certain things that would affect the

24  integrity of that study.

98

1        Q.    Okay.  Now, are these -- well, who

2    decides which reprints reps should use?

3        A.    Our internal Medical and Regulatory

4    Departments.

5        Q.    Okay.  Now, I've also seen some documents

6    that reps get and say -- are you familiar with

7    these -- that say, For representative use only.  Not

8    for detailing?

9        A.    Yes.

10        Q.    Can a rep use those documents, show them

11    to a physician on a sales call?

12        A.    Once again, can they, yes.  Should they,

13    no, because of what you just described, they're

14    labeled, For representative education use only.

15        Q.    So even if a rep thinks that this

16    document they received that says, For representative

17    use only, will help them, you know, increase market

18    share, they shouldn't use it because it's against

19    company policy?

20        A.    Exactly.  And I'm not aware of any

21    material that truly could help a rep that you

22    described.  That's material that you describe in that

23    way.  That if they used it that it would help them

24    more than if they just used their approved materials.

1  They shouldn't use those unapproved materials, and it

2  wouldn't help them anyway, so I don't know why they'd

3  want to.

4      Q.   Okay.  Because Abbott has people who

5  develop those materials?

6      A.   Absolutely.

7      Q.   And now those rules concerning, you know,

8  sales materials, sales aids and reprints, do those

9  apply to all types of pharmaceutical reps at Abbott?

10     A.   Yes.  I mean each sales force is bound to

11 operate within that sales force's approved materials.

12 Of course, those materials differ by sales force, by

13 product.

14     Q.   Okay.  Now, when a rep calls on a

15 physician, can they say anything to a physician about

16 the product that's not included in a sales aid, a

17 reprint or some preapproved Abbott product?

18     A.   Well, yeah, they can.

19          I mean all the dynamics of

20 conversational language that go into a discussion

21 aren't necessarily -- aren't going to be in a sales

22 aid or a reprint.

23          But all the factual information

24 about a product should come from an approved piece of

1    material, right, which is the sales aid or the

2    reprint or the package insert.

3         Q.   Yeah, and that's what I meant.   I'm

4    talking about like when a rep is talking to a

5    physician about an Abbott product and describing the

6    attributes of the product, they can -- they're

7    limited to what -- as to what they can say based on

8    what's in the product insert or a preapproved Abbott

9    document; is that correct?

10        A.   Yes, they're bound to reflect the

11   attributes of the product that are printed in the

12   package insert or our selling materials.

13        Q.   Now, obviously if a doctor wants to talk

14   about the Chicago Bears when a rep goes in, it makes

15   sense for the rep to talk about the Chicago Bears and

16   then try to segue into talking about the product?

17        A.   I hope that they would.

18        Q.   But, again, in a lot of instances when we

19   were talking about the conversational aspect of the

20   interaction between the rep and the physician, a lot

21   of that is based on what the physician wants to talk

22   about?

23        A.   In many cases, yeah.   I mean ideally the

24   representative is hopefully setting a call objective

1    materials to all the reps -- well, I guess it's all

2    relative, but I'm sure it costs a significant amount

3    of money or -- let me withdraw the question because

4    I -- for a pharmaceutical company I have no idea what

5    a significant amount of money would be.

6                    But in those sales -- in those

7    training materials that's provided to reps where they

8    provide probing questions, they're put there for a

9    reason in the hopes that a rep will use them;

10   correct?

11       A.    Absolutely.  To help train the

12   representative on what a best practice might look

13   like, right, from what other successful people have

14   done and how they have sold the product in the past,

15   we certainly want to create material, you know,

16   written material at times that helps demonstrate to

17   those representatives what good looks like.

18       Q.    And reps are evaluated on their -- at

19   least in part on their ability to ask probing

20   questions to the physicians; correct?

21       A.    Oh, jeez absolutely, yeah.

22       Q.    Okay.  Now, occasionally a doctor will

23   have a question or an objection; correct?

24       A.    Absolutely.

1       Q.   Okay.  And does Abbott provide reps with

2   appropriate responses to certain types of objections?

3       A.   We often do to make sure that -- you

4   know, to give an example of how to stay within the

5   label, right, so there are often common objections

6   that we expect, either at the launch of a product or

7   after the launch of a product, and we'll often tee

8   those up in the form of a document to demonstrate to

9   representatives again how to effectively use

10   convincing sales language to answer that and

11   hopefully address the physician's concerns, but most

12   importantly to make sure that that is -- they are not

13   speaking out of turn or making something up.

14       Q.   So Abbott basically provides the reps

15   with responses to particular types of objections?

16       A.   To some objections, yeah.

17            Certainly not -- we certainly can't

18   anticipate everything that comes up, so the ones that

19   we think are going to be the most common we certainly

20   try to educate the representative on what to expect

21   and, you know, offer them suggestions on how they can

22   address that.

23       Q.   Okay.  And reps are also evaluated on

24   their ability to handle objections; correct?

1    time.  Well, maybe OOS did better than that other

2    product.  Maybe that's what they're referring to

3    here.

4                    You know, what I mean?  So the

5    formulary change was sort of neutral because it

6    affected our product equally to the way it affected

7    the competitor, but yet our -- I'm reading into

8    this -- but our product actually did well after that

9    change.

10        Q.    Okay.

11        A.    But there's other information that I

12   don't know that happens all the time.  That doesn't

13   necessarily mean that the formulary decision itself

14   was the driving factor in the sales increasing.

15        Q.    Okay.  Now, in your experience in reading

16   these evaluations over the course of your years, it

17   seems that the district manager wrote in that it was

18   put back on formulary.

19        A.    I tell you why they put that in there.

20        Q.    Okay.

21        A.    Because it's important -- when a product

22   does go on formulary, it's like now it's like

23   sellable.  Now it's like a product that customers can

24   write, so you have to make sure that your

```
 1    representatives are actively engaging in the right

 2    activity, calling on the right people, to make sure

 3    that because the customers can now write the product,

 4    that they actually do.

 5                    So the DM in this case is

 6    effectively recognizing that this was a selling

 7    opportunity that emerged during the year, right, and

 8    the representative did what they could to drive that

 9    chair as a result of that market occurrence.

10         Q.    And the opportunity emerged because it

11    was put back on formulary?

12         A.    At least the opportunity for physician's

13    to write the product seems to be the case.

14                    But to what extent they could write

15    that product and what their other choices were and

16    how those changes may have simultaneously also

17    occurred at that time, I don't know that from reading

18    this.

19         Q.    But you would agree that OOS being placed

20    back on formulary did create a selling opportunity?

21         A.    Yes.

22         Q.    Okay.

23         A.    Yep.   That without representative action

24    would be a latent influence.
```

122

1          A.    Vaguely remember that.  It's been a

2    little while since Omnicef has been around.

3          Q.    Sure.

4                Are reps also evaluated on their

5    ability to deliver those types of messages to

6    physicians?

7          A.    Sure, yeah.

8                There's been market research tested

9    with other physicians that has effective messages.

10         Q.    Now, going back to the exhibit that's in

11   front of you which I believe is Exhibit 2.

12               If you turn to Page 5 of the

13   document, and you look at the Competencies -- you can

14   take a minute just to look through these.

15               Are these the competencies that reps

16   have been evaluated on since 2005 to the present?

17   And you can look.  I know there's a lot there.

18         MR. KNIGHT:  Are you asking across all

19   franchises?

20         MR. DI CHIARA:  Yeah, I guess.

21   BY THE WITNESS:

22         A.    Well, then the answer is no because in

23   each franchise there are different -- there are

24   different performance evaluations.

125

1          Q.    Can you teach having a friendly

2     personality?

3          A.    No.    That would be a talent.

4          Q.    Okay.

5          A.    But the art of like how to initiate

6     conversations with like a nurse, with a receptionist,

7     with a physician and how to do that differently to

8     build a total office relationship, that's a skill

9     that could be taught.

10               So if that makes sense, there are

11    certain elements of this that are talents, but

12    certain elements that are definitely teachable

13    skills.

14         Q.    And Abbott gives the reps examples of

15    approaches that they can use with nurses and office

16    managers and doctors in training; correct?

17         A.    Certainly.

18               Yeah, because a lot of the folks we

19    train, they haven't ever done this before, so getting

20    a background on these customers -- these

21    professionals they're going to interface with, we

22    definitely give them some background.  We often bring

23    in physicians themselves into training to talk to the

24    rep about how they like to be interfaced with.

126

1          Q.    Going down to Business Judgment, what

2     does that mean?

3          A.    Well, it's being smart about where you

4     spend your time, where you spend your resources, the

5     decisions that you make because as a representative

6     you have an unbelievable amount of autonomy and

7     flexibility with how you spend your time and where

8     you go without a boss looking over your shoulder.

9     You're not in an office environment.

10               So it's important that we trust our

11    representatives to use their heads, to use good

12    decision making processes so that where they do spend

13    their time, where they do spend their money, is with

14    business judgment, they're using good judgment to

15    make good -- to affect the business positively.

16         Q.    So would it be good business judgment if

17    a rep calls on high prescribers more frequently than

18    low or non-prescribers?

19         A.    Generally speaking, yes, but for a

20    specific territory I would need to know more about

21    that territory to know that dynamic, right, to be

22    sure that in that case how you described it is the

23    best judgment.

24         Q.    Okay.  And would also business judgment

1 be effectively using the sales pieces or detail aids

2 that Abbott has provided for the reps?

3   A. I personally wouldn't consider that so

4 much a business judgment piece as probably like

5 selling effectively one of those.

6     I mean because, again, the

7 description here, it's understanding the business,

8 making good decision.

9     I see business judgment as more of

10 like how you carry yourself overall.  I don't see

11 that as like exactly what tactics you use in every

12 sales call.  I mean it's all part of like a bigger

13 picture.

14     But using the sales materials is

15 more commonly used in a sales -- I should say a

16 salesperson's performance evaluation.  That would be

17 more often reflecting in the selling effectively.

18   Q. Okay.  Then you said it's more how you

19 conduct yourself overall.

20     What does that mean?

21   A. Again, it's business judgment.  It's

22 making good decisions of where you spend your time.

23 Like are you spending your time with, you know -- are

24 you spending the whole morning on a low prescriber's

1    office, chitchatting with the nurse and not getting

2    any commitments. That's a poor business judgment.

3                    Are you walking into an office

4    disheveled and not being a professional in how you

5    carry yourself.  That's using poor business judgment.

6                    Spending money frivolously on a

7    dinner program, allowing like a too-expensive bottle

8    of wine being ordered, letting things get away from

9    your control.  That's a poor business judgement.

10                   It's how you carry yourself in these

11   business settings that's more of a overall sort of

12   approach that you take.  I look at that more in that

13   way than I do in like did this person use this

14   specific tactic or not.  I look -- I would look at

15   that as a separate competency.

16                   Does that answer your question?

17        Q.   I think so.  And I have a few follow-up

18   questions.

19        A.   I mean business judgement is one of those

20   things it's like you can describe it -- and hopefully

21   I have -- but it's also one of these things that I

22   think we can all agree on, it's one of those common

23   sense sort of things that you know it when you see

24   it, and you know it when you don't see it.

129

1       Q.    Okay.  So now I use the example you gave

2    like where your spend your time, if you're spending

3    your time with a low prescriber or non-prescriber,

4    that would be in your mind poor use -- you gave a

5    example of poor business judgment?

6       A.    In this hypothetical example this

7    territory was ripe with high prescribers that are

8    accessible and yet this representative is spending

9    their time with low prescribers just because they're

10   accessible, that's poor business judgment.

11      Q.    And Abbott would prefer that reps spend

12   time with the high prescribers that are accessible?

13      A.    I absolutely would prefer that they do.

14   I would coach them heavily to do so yes.

15      Q.    And then looking professional, as you

16   said, that's common sense.

17            Now, as far as spending money

18   frivolously, what do you mean by that?

19      A.    Well, again, the representative has

20   control of where they spend their money to do

21   lunches, where they order from, who they invite.

22            Like, in other words, if you got an

23   office of 50 people, well, that's a good office maybe

24   to do pizza at lunch.  Not, you know, $12-a-head, you

184

1    messages concerning compliance factors; correct?

2         A.   Uh-huh.

3         Q.   I'm sorry.  You have to say yes?

4         A.   Yes.

5         Q.   Now, if I can direct your attention to I

6    guess the document that has -- on the bottom

7    right-hand corner you see Bates numbers that's

8    1111059?

9         A.   Okay.

10        Q.   If you look on the left-hand column, it

11   might be hard to read, but the third row down it

12   says, Discovery?

13        A.   Uh-huh.

14        Q.   What's Discovery?

15        A.   A generic term for this would be Probe.

16        Q.   Okay.  Which is questions you ask the

17   customer.

18                  And here it looks like in this row

19   that Abbott is providing reps with probes to use on

20   their calls with physicians?

21        A.   These are samples or examples, yep.

22        Q.   And these are -- I'm assuming these are

23   good examples or otherwise Abbott wouldn't put them

24   in this training module; is that correct?

1                So there is a letter of the law, and

2       there's a spirit of the law, and believe me when I

3       tell you, when people say, I expect you to be in the

4       field the whole day, it means, you know what, if you

5       start late and end early some days because you've got

6       to get your other stuff done, so be it.  I just don't

7       expect that every day you're going to not be out

8       there until 10:00 or 11:00 or 12:00.

9                And I think that's the intention of

10      why people would write something like that,

11      expectations, because too many reps out there do work

12      very few hours.  They figured out how to game the

13      system.

14           Q.   Do reps -- do they supervise anyone?

15           A.   Do the reps supervise any one, no.

16           Q.   Are reps involved in developing any

17      company-wide policies?

18           A.   Not officially, no.  I mean sometimes

19      their ideas surface up to become part of policy.

20           Q.   Is that part of their job description?

21           A.   It's not part of their job description,

22      no.

23           Q.   Are reps involved in developing

24      company-wide marketing strategy?

1          A.    Well, yeah, not -- not as an official

2     part of their job description, but they are often

3     involved in what are called SMAC panels.  It's

4     another acronym we use, Sales Marketing Advisory

5     Council.

6          Q.    Right.

7          A.    Where salespeople and marking folks are

8     together in sort of a task force where marketing uses

9     the rep input for future sales material development.

10               So the reps are involved, not as an

11    official part of their job description, but they do

12    get involved.

13         Q.    Do they have any input into company-wide

14    sales strategy?

15         A.    I'm sorry.  Was that a question you just

16    asked?

17         Q.    Yeah, do they have any involvement in the

18    development of company-wide sales strategy?

19         A.    Once again, it's like the marketing

20    materials, not officially, but their input is very

21    much taken into account in the context of these like

22    SMAC panel advisory panel discussions.

23         Q.    Well, how about -- how many reps sit on

24    these -- what are these advisory panels?

1        A.    It totally varies.  Any rep who wants to

2   be on them generally can be on them.  It's one of

3   these things where if reps want to get involved and

4   be part of, you know, the larger team, with marketing

5   and sales, then all they got to do usually is just

6   ask their manager, Hey, is there SMAC panel that, you

7   know -- an opening on one of these SMAC panels that I

8   could be a part of.

9              I mean as a rep I was part of these

10  all over -- all the time.  I mean my whole career

11  I've been on these different panels where sales reps

12  and managers and marketing are all together and

13  helping to develop the strategy jointly, so reps have

14  an ability to be part of those discussions if they so

15  choose.

16       Q.    But it's on an advisory panel?

17       A.    On an advisory panel basis, yeah.  They

18  have a full-time job to do which is to sell so that's

19  not their full-time job.

20       Q.    Whose full-time job is it to develop

21  company-wide marketing strategy.

22       A.    It's the marketing department's.

23       Q.    And whose full-time job is it to develop

24  company-wide sales strategy?

210

```
1    leading to written coaching, potentially leading to a

2    performance improvement plan, which could lead to

3    termination.

4                   But it all starts with results, how

5    is that person performing, and then you work down to

6    what's driving that performance.

7         Q.   And we'll get to that in a second.

8                   Another question I wanted to ask is

9    if a rep isn't calling on the doctors with the

10   frequency that Abbott wants them to call on, could

11   that also lead to disciplinary action or some sort of

12   coaching discussion?

13        A.   Absolutely.  In the context -- the

14   greater context of how is their overall performance?

15        Q.   Okay.

16        A.   It's a very narrow view for someone to

17   coach or discipline strictly on activity.  In a sales

18   world you coach to -- first to results.

19        Q.   Okay.

20        A.   And behind that, you know, you diagnose,

21   okay, the results are not going well.  What's driving

22   that?

23        Q.   Now -- I'm  assuming -- well, correct me

24   if I'm wrong, but Abbott provides all these coaching
```

1      Q.   It's not correct, or the reps don't

2   develop those messages?

3      A.   Well, the document you're looking at has

4   suggested messages that do come from the home office,

5   mainly marketing.

6          The representatives, though, it's

7   common knowledge in this industry that the reps still

8   rephrases the messaging to reflect the spirit of what

9   was written in that document, but they're

10   paraphrasing and rephrasing it to fit their own

11   style.

12      Q.   Understood.

13      A.   And so in a sense they are messaging on

14   their own, but the context of their messaging still

15   fits within the spirit of what's on those printed

16   documents.

17          They are guides.  They're templates.

18   They're not scripts.  I mean there really is a

19   distinction here.

20      Q.   Okay.  I didn't ask about scripts, but

21   do -- at least the themes that you mentioned before,

22   would you agree that reps don't develop those themes

23   for the products?

24      A.   That's true.

220

1      Q.    And visual aids, they don't develop the

2   visual aids; correct?

3      A.    Correct, yeah.

4      Q.    Okay.

5      A.    I mean this wouldn't be unlike any

6   product of service that any salesperson sells.

7      Q.    I understand.

8            Now, as far as the bonuses that goes

9   for reps, does a manager's subjective evaluation play

10  a part in their -- the amount of their bonus?

11     MR. KNIGHT:   Again 30(b)(6) testimony.

12           You can answer if you know.

13  BY THE WITNESS:

14     A.    A rep's bonus -- the bonuses are a little

15  different across the franchises, but in our primary

16  care sales force that I work in now, 100 percent of

17  the rep's bonus is based on the sales results.

18     MR. DI CHIARA:   Okay.  I think you can go.

19     MR. KNIGHT:   I just have one thing I want to

20  follow up on.

21     MR. DI CHIARA:   Sure.

22                      EXAMINATION

23  BY MR. KNIGHT:

24     Q.    You had said earlier in the course of