# EXHIBIT D

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DISTRICT

3

4

   JAMES JIRAK AND ROBERT PEDERSEN,  )
5                        )
           Plaintiffs,    )
6                        )
       vs.                 )Case No. 07 C 3626
7                        )
                        )Judge Castillo
8                        )
                        )Magistrate Judge Keys
9   ABBOTT LABORATORIES, INC.,     )
                        )
10                       )
          Defendant.     )
11  _____

12

13

14            V I D E O  D E P O S I T I O N
15

16

17       Video Deposition of JAMES JIRAK, taken on behalf

18  of the defendant, pursuant to the Federal Rules of Civil

19  Procedure, before Jim D. Harper, C.S.R., at the Hilton

20  Wichita Airport, Director's Room, 1098 Airport Road,

21  Wichita, Kansas on the 21st day of December, 2007,

22  commencing at 9:30 a.m.

23

24

25

1

2

3

4                    A P P E A R A N C E S

5

6

7

8          The Plaintiffs appeared by and through Michael

9    DiChiara of Joseph & Herzfeld, LLP, 757 Third Avenue,

10   25th Floor, New York, Nework 10017;

11

12

13

14

15          The Defendant appeared by and through Michael

16   J. Gray of Jones-Day, 77 West Wacker, Chicago, Illinois

17   60601-1692.

18

19

20

21

22

23

24

25

1      There's no natural breaking point.  Whatever you

2      think.

3                          (Off the record discussion.)

4                          (Short break.)

5      BY MR. GRAY:

6      Q.  Before we took the break we were talking,

7      Mr. Jirak, about your role at Biovail.  So describe

8      when you were a sales rep at Biovail how did you sell

9      the products you just described to the physicians?

10     A.  Okay.  I promoted products to the physicians

11     using company-derived sales pieces, studies, PI's,

12     the tools that they gave me.

13     Q.  What are PI's?

14     A.  Product inserts.

15     Q.  How was your role as a salesperson?  By the way,

16     what were you called?  What was your job title when

17     you were at Biovail?

18     A.  Pharmaceutical rep.

19     Q.  Not sales rep but pharmaceutical rep?

20     A.  No, I don't believe so.

21     Q.  When you were a pharmaceutical rep how was your

22     role different than when you were selling insurance?

23     A.  Well, of course, in insurance you have contracts.

24     You have invoices.  You service them.  You're

25     actually selling something when you're in insurance.

```
 1    We get commission on what we sell.  In pharmaceutical

 2    you promoted the product, promoted an idea.  You

 3    can't ask for a commitment.  You have to ask:  "Will

 4    you consider this the next time?"  We were not paid

 5    commissions.  We were paid bonuses on each sale.

 6    Like I said, no contracts, no invoices that you were

 7    givein to the doctors.

 8    Q.  When you say you were paid commissions, not

 9    bonuses, commissions -- I'm not sure I follow.  Was

10    that you were paid commissions where?  I'm sorry.  At

11    Biovail or --

12    A.  No, no, no.  You asked when I was selling

13    insurance.

14    Q.  You were paid commissions when you were selling

15    insurance but bonuses when you were a pharmaceutical

16    representative for Biovail?

17    A.  Right.

18    Q.  Was it a base salary plus bonuses?

19    A.  That's correct.

20    Q.  Any other aspects of your compensation?

21    A.  Other than company car and laptop, no.

22    Q.  And what was roughly your gross comp when you

23    were at Biovail?

24    A.  The base was 40 and bonuses varied.  I would say

25    in a given year probably my highest was 8,000 in
```

```
 1    to the other factors you were describing?

 2    A.   Well, I had a unique situation when I was at

 3    Biovail.  I moved from the Joplin territory to a

 4    Wichita territory.  And I'm sure that you have seen

 5    from my resume that I was ranked second, or my

 6    territory ranked second in total sales.  My territory

 7    did very well.  But the funny thing about that is

 8    when I left the territory it did better than when I

 9    was there without a rep.

10    Q.   Really.

11    A.   (Witness nods head affirmatively.)

12    Q.   How do you know that?

13    A.   Because that territory was still in my district

14    at the time.  They did not replace me for some time.

15    Q.   Was that the Joplin or the Wichita?

16    A.   Joplin.

17    Q.   Did you see an increase when you were in Wichita?

18    A.   Yes, I did.

19    Q.   What do you attribute that to, if anything?

20    A.   In Wichita there was more reps out promoting the

21    products, but also there were some formulary wins in

22    Kansas.  I can't say that I can directly correlate

23    that to my efforts.

24    Q.   Formulary wins.  What do you mean by that?

25    A.   Well, having a drug on formulary, a doctor can
```

```
 1     write that as a reduced cost to the patient.  So if

 2     it's not on the formulary the co-pay to the patient

 3     might be higher.  So, of course, the doctors will

 4     stick formulary very tightly.  When you do get it on

 5     formulary that means that your market share is going

 6     to naturally come up because the doctor's going to

 7     try to do the right thing as far as financially for

 8     the patient.

 9     Q.  When you called on doctors were you usually --

10     were you hoping they were prescribe all of the

11     pharmaceuticals that you were promoting, or would you

12     call on certain doctors and you were really pushing

13     one particular pharmaceutical as opposed to another?

14     A.  Well, we would be given targets lists of what

15     doctors we could go and see.  And we had an agenda

16     when we showed up there.  Each drug had more weight

17     than another one.  So if we went and saw a pediatric

18     doctor, we would go and promote our antibiotic first

19     and, of course, our cardiovascular medicine really

20     wouldn't have much to do with their type of practice.

21     Q.  And, therefore, would your sort of behavior or

22     conduct change based on what you were trying to sell?

23     A.  Yes, to the extent of what my company told me to

24     do and what to talk about.  Because all of those

25     target lists were derived from the company and told
```

1    me what order I had to promote the products in.

2    Q.  Did you make any decisions as to what you should

3    promote or what you should try to sell or what

4    doctors you should try to see?

5    A.  As far as the doctors I should see, no.  Because,

6    like I said, part of the bonuses, what frequency

7    you're seeing those doctors and how many times and

8    what order you're talking about drugs with them.

9    Really the only decisions would have been, like, with

10    habit, making sure I'm not in the same place as one

11    of my pod mates because you don't want to hit the

12    same doctor twice in the same day.  Also depending on

13    how much time the doctor had would tell me if I

14    needed to get a 30-second commercial or if I got a

15    couple of minutes to talk about a drug state with

16    them.

17    Q.  That was only based -- my questions right now are

18    just about Biovail, okay?

19    A.  Okay.

20    Q.  Are you saying that sort of the message that you

21    conveyed just depended upon what the company told you

22    and how much time you were provided?

23    A.  Absolutely.

24    Q.  Did you make any decisions while you were at

25    Biovail as to what doctors to see or was that

```
 1      Nothing that would have made me do my job

 2      particularly any better than any other rep.  Target

 3      reports, targeting to make sure that I was on track

 4      to see the specific doctors that they wanted me to

 5      see, the specific number of times they wanted me to

 6      see them in a quarter.

 7              MR. GRAY:  We are out of tape, so we're

 8      going to take a little bit of a break and let the

 9      videographer change the tape; then we'll get started.

10              VIDEOGRAPHER:  Going off the record at

11      11:02.

12                              (Recess.)

13      BY MR. GRAY:

14      Q.  Before we took break we were talking about

15      reports that were provided to you when you were at

16      Abbott.  If I understood your testimony correctly --

17      please clarify if I have it wrong -- there were

18      reports provided to you that helped you do your job,

19      but you didn't utilize them?

20              MR. DiCHIARA:  Objection,

21      mischaracterization.  Go ahead.

22

23      A.  Okay.  That told me to do my job.  As far as what

24      doctors to see and how many times I needed to see

25      them, yes.
```

1    to sort of take that message and convey it in the

2    manner you deemed most effective?

3    A.   There was a strict message that you needed to

4    stick with.  Their preference would be to have a

5    canned message, company-approved message, studies.

6    You can't make homemade bread and bring in your own

7    study, of course.  So, yes, you had to speak to the

8    sales piece that you were using.  You can't go off P

9    I, things like that.

10   Q.   Did the message tell you exactly what to say in

11   answer to every question?

12   A.   The questions -- we were prepared for pretty much

13   whatever question a doctor would ask about the

14   product, and we had a canned answer for every

15   question that might possibly come up.

16   Q.   Did you learn particular therapies that were

17   effective that pertained to a particular doctor?

18   A.   Therapies?  Clarify that.

19   Q.   Did you use the term "therapy" when you were at

20   Abbott?

21   A.   I don't believe so.

22   Q.   Did you learn about the reimbursement and

23   formularies in training when you were at Abbott?

24   A.   Yes, we did.

25   Q.   Why was that important?

1    Q.  Would you agree that -- strike that.  You

2    understood that Abbott was and is in the business of

3    selling pharmaceuticals?

4    A.  Yeah, they produce and sell pharmaceutical,

5    right.

6    Q.  If you were a senior executive in sales at Abbott

7    Laboratories who would you suggest that the sales

8    representative should target in order to increase

9    sales revenue of its products?

10          MR. DiCHIARA:  Objection to the form.  Go

11   ahead.

12   A.  Who should they -- repeat the question.  I didn't

13   catch that all.

14                              (Question read.)

15   A.  Well, if it was a sales representative I guess it

16   would be the pharmacies.  If it was a pharmaceutical

17   promoter like I was, well, of course the doctors.

18   Several ways to sway the opinion of a prescribing

19   habit of the doctor.  Could be a medical journal,

20   could be a magazine or a TV ad.  It could be the

21   patient himself.  The more you get that message out

22   to the doctor and the more noise you make, well, of

23   course, the more that have doctor may think about

24   your drug the next time he sees that disease state.

25   Q.  Did Abbott seek to persuade individual physicians

1    did you mean by that?

2    A.  Well, as a salesman I refer to a close as signing

3    a contract.  The way that you do in the

4    pharmaceutical world:  "Hey, you might consider this

5    drug or keep us in mind."  There's no commitment.

6    Close is a commitment to me.

7    Q.  In the 18 months that you worked at Abbott

8    Laboratories did you make visits to the physicians in

9    which you did not leave samples?

10   A.  Yes.

11   Q.  How often would that occur?

12   A.  Probably half of the visits to doctors.  Probably

13   half were with samples stamps, half or more without,

14   I would imagine.  Maybe a little bit higher with

15   samples, maybe say 50/40.

16   Q.  What would the circumstances be that would lead

17   you to making a visit to a physician that wasn't one

18   to leave samples?

19   A.  If their simple bin was overflowing with samples

20   that were previously left by either myself or one of

21   the other pod members.

22   Q.  Any other reasons?

23   A.  Maybe if you're low on certain type of samples,

24   you hadn't gotten your shipment yet, then probably

25   might save some back.  Sure.

1    plan?

2    A.  Approximately three months, I believe.

3    Q.  In addition to the note that she was putting on

4    your pre-call plans were you also having

5    communications with Ms. Bloom about better ways to

6    improve your performance?

7    A.  She would do ride-alongs with me and critique me

8    at that time, yes.

9    Q.  Anything else?

10    A.  No.  That was pretty much it.  Just feedback on

11    call plans and any ride-alongs we had scheduled.

12    Q.  Earlier today you were quite clear in saying that

13    everything you did when you would make a call visit

14    was specifically prescribed by Abbott.  Do you recall

15    that?

16    A.  Yes, I do.

17    Q.  Yet if we go through these one-by-one in the two

18    call -- pre-call plan notes that we looked at you're

19    laying out a plan and your district manager is making

20    still different suggestions of different approaches

21    to make with the physicians; isn't that correct?

22    A.  I still had to be within bounds of Abbott sales

23    materials, what was off and what was on PI, and what

24    was on the target plans.  I still had to abide by

25    that.  I can't talk off label or off PI, no.

1    A.  Yes, I do.

2    Q.  She thinks that combined with some changes in

3    formularies will help you succeed; is that correct?

4    A.  That's correct.

5    Q.  So would you agree that a combination of changes

6    in formularies and some development outside your

7    control, combined with additional efforts and focus

8    from you, would lead to the growth of revenues for

9    Abbott in your territory?

10    A.  That's her subjective opinion.

11    Q.  I understand that, but my question is what about

12    you?  Do you agree with that?

13    A.  Not necessarily.

14    Q.  How do you disagree?

15    A.  I don't know what effect my efforts had overall

16    if the formulary is a huge deal, being on formulary ,

17    versus not, and all of the other media, be it

18    journals, print media, web advertisements, patient

19    requests.

20    Q.  Do you think this sort of lack of connection

21    between your effort and results was peculiar to Kansas

22    in this area or more of a national phenomenon at

23    Abbott?

24    A.  My disconnect between my efforts and how well the

25    territory did?