# EXHIBIT E

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JAMES JIRAK and ROBERT PEDERSEN, )
        Plaintiffs, )
vs. ) No. 07 C 3626
ABBOTT LABORATORIES, et al., )
        Defendants. )

The videotaped deposition of ROBERT ALLEN PEDERSEN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JULIANA F. ZAJICEK, CSR No. 84-2604, a Notary Public within and for the County of Kane, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3500, 77 West Wacker Drive, Chicago, Illinois, on the 4th day of December, A.D. 2007, at 9:24 a.m.

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 3 of 18 PageID #:1631
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

2

1  PRESENT:

2

3      GILLESPIE, ROZEN, WATSKY & JONES, P.C.,

4      (3402 Oak Grove Avenue, Suite 200,

5      Dallas, Texas 75204,

6      214-720-2009), by:

7      MR. JAMES A. JONES,

8      jaj@grwlawfirm.com,

9          -and-

10     SAUNDERS & DOYLE,

11     (20 South Clark Street, Suite 1720,

12     Chicago, Illinois 60603,

13     312-551-0051), by:

14     MR. THOMAS A. DOYLE,

15     tadoyle@saundersdoyle.com,

16         appeared on behalf of the Plaintiffs;

17

18

19

20

21

22

23

24

3

1  PRESENT: (Continued)

2

3      JONES DAY,

4      (77 West Wacker Drive,

5      Chicago, Illinois 60601-1692,

6      312-782-3939), by:

7      MR. MICHAEL J. GRAY,

8      mjgray@jonesday.com,

9      MR. BRENT D. KNIGHT,

10     bdknight@jonesday.com,

11          appeared on behalf of Defendant

12          Abbott Laboratories.

13

14

15

16  ALSO PRESENT:

17      MR. JOSEPH ELSEY, Videographer,

18          Esquire Deposition Services.

19

20

21

22  REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.

23              CERTIFICATE NO. 84-2604.

24

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 5 of 18 PageID #:1633
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

38

1  A. She was accusing me of that.

2  Q. Oh, I understood that. But when you

3 said false, did some type of court or

4 administrative proceeding deem them not to have

5 merit at some point?

6  A. That is correct. Usually they were

7 thrown out or I was found not guilty.

8  Q. But unfortunately had to spend some time

9 in jail in the interim?

10  A. That's standard, yeah, unfortunately.

11  Q. And at some point you filed for

12 bankruptcy, isn't that correct?

13  A. That is.

14  Q. When was that?

15  A. 2000 -- 2005.

16  Q. And what led to the bankruptcy?

17  A. Just an enormous amount of financial

18 responsibility as far as keeping up with the

19 payment on the mortgage, keeping up with paying

20 multiple attorneys, keeping up with basic

21 maintenance of the house, child support, and then

22 just a load of debt.

23  Q. Do you have an understanding,

24 Mr. Pedersen, as to result of the Chapter 7

73

1   Q.   I thought we could at least agree upon
2   that.
3   A.   I'm sorry.  Yes.
4   Q.   Now the next question I'm sure you'll
5   disagree with me.
6        So is it your position that although you
7   had sales in your title, you didn't sell anything?
8   A.   That's correct.
9   Q.   Do you have an opinion as to why you
10  were always referred to as a salesperson?
11  A.   No.  That was just the terminology used
12  for the position.
13  Q.   Now, how long were you at Abbott for?
14  A.   From 1999 to 2006.
15  Q.   Seven years?
16  A.   Yes.
17  Q.   At any point in those seven years did
18  you ever say to anybody either verbally or in
19  writing that you sold pharmaceuticals?
20  A.   Yes, yeah, that was the terminology that
21  was frequently used.
22  Q.   So you agree that you would use the
23  terminology that you sold pharmaceuticals, that's
24  correct?

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 7 of 18 PageID #:1635
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

81

A. We had discretion as far as which product we could actually detail first, but then towards the latter part of my employment, I don't know what the terminology is, but they had something that would actually specifically tell you what you should detail, in which position, how many times and also the number of samples that you should leave.

Q. So are you saying that in the first part of your tenure at Abbott your only discretion was which product you detailed first? So your big decision of the day was do you go with one first or the other one first?

A. Well, you could -- you had the flexibility of who you wanted to call on as far as for that particular day, did you want to call on Dr. Joe in the morning or, you know, Dr. Phil in the evening.

Q. Anything else before things changed? So you got to decide which drug to detail first and which doctor you would visit, is that correct?

A. Yes, and you could also determine, for example, the programs that we would have. There was the ability to select from one or two locations

89

1    A.    That's proper protocol.

2    Q.    Did you ever go with any other Abbott
3 sales reps?

4    A.    Yes.

5    Q.    So did you see them sell?

6    A.    Yes.

7    Q.    Did you ever see anyone do it better
8 than you did it?

9    A.    I wouldn't say so.

10    Q.    So were you the best at it?

11    A.    Probably not, but I would like to think
12 I was good at it.

13    Q.    Did any of the other sales reps that you
14 knew at Abbott get more awards than you did?

15    A.    Yes.

16    Q.    Why do you think that is?

17    A.    Based upon just the factors that I
18 stated earlier and then there are other outside
19 influences that come into play, such as managed
20 care. Sometimes managed care can effect somebody
21 so predominantly as far as a drug being placed on
22 formulary that it could make them, you know, shoot
23 through the roof as far as the numbers.

24    Q.    Never as a result of effort or better

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 9 of 18 PageID #:1637
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

90

1 work or performance on behalf of the sales
2 representatives, really just sort of based on the
3 drugs?
4     A.    That was the general consensus among a
5 lot of the representatives is that, yes, you know,
6 there is a possibility of managed care directly
7 influencing the numbers and there were cases where
8 even, you know, a territory would be vacant and it
9 did well.
10     Q.    When you would go -- did you ever have
11 training when you were at Abbott Laboratories?
12     A.    Yes.
13     Q.    Did anyone ever provide you any written
14 materials or tell you orally that you had
15 discretion to make decisions as a sales
16 representative?
17     A.    You had the ability to answer it based
18 upon how the physician responded. So, for example,
19 if they objected to a statement, then according to
20 the sales model call that they would provide, they
21 would actually give you the objections as far as
22 how to specifically handle them.
23     Q.    So is it your testimony that in seven
24 years at Abbott Laboratories you were never told

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 10 of 18 PageID #:1638
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

135

1  Q. So tell me how in your interactors -- in
2  your interaction with the physicians that you were
3  able to leverage or use the information about the
4  marketplace or, you know, competitors' products?
5  A. It would be just responding to an
6  objection or a question as far as if a physician
7  asked why should I prescribe this over that, in
8  other words, let's say why should I prescribe
9  Biaxin XL over a Quinolone, then there was a
10 message that we were to convey as far as the
11 strengths of the product and that's the reason why
12 the physician should write that product.
13 Q. Now, you went back in your answer to
14 sort of the messages that you were given. Were
15 these training modules just verbatim responses to
16 questions or objections or were they more
17 broad-based training on particular products?
18 A. No. They actually included like what
19 you would say for a response if this particular
20 question came up from a physician or if they raised
21 a particular objection.
22 Q. Is that all they did?
23 A. Other than just educating you on the
24 products, that's -- yeah.

142

1 routing as far as which, you know, turn that you
2 took in a particular city and then, you know,
3 occasionally there would be phone calls about,
4 "Hey, are you in this area because I'm planning on
5 coming in."
6     Q.    So is it your testimony today,
7 Mr. Pedersen, that the -- your pod did not make any
8 decisions as to the day-to-day activities of the
9 sales reps?
10     A.    As far as in the meetings, they would
11 come up with the routing.
12     Q.    So we, right, you would come up with the
13 routing?
14     A.    Yeah, along with other representatives,
15 and that would have to include the parameters set
16 forth by the company as far as, you know, hitting
17 specific physicians with specific calls and...
18     Q.    But I believe you just said that the
19 company planned out all of your routes. And my
20 question is, did the company plan out all of your
21 routes or did you have flexibility within your pod
22 to decide who was handling what routes?
23     A.    The company actually provided the
24 individuals that you should call on. It provided

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 12 of 18 PageID #:1640
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

143

1  what you should first talk about, which would be
2  the primary, what you should do secondly, which was
3  the co-primary, and then they had a reminder for a
4  third product. But as far as the flexibility
5  within the pod, the pod then would sit down and
6  look at who it was that had to be called on and
7  then they just arranged a routing so that way you
8  weren't stepping all over each other's feet, which
9  actually occurred quite a bit.
10      Q.   Now, you said that the company
11 determined who you should call on. Did they demand
12 that you call on people? Did they provide
13 suggestions? What did you mean by who you should
14 call on?
15      A.   It's just a report that contained what
16 they called high decile physicians that the company
17 as well as whoever decides who is best to call on.
18 They would provide those in a list format with high
19 decile physicians being the -- I guess the most
20 important.
21      Q.   Did you ever take any exams as part of
22 your either Abbott Park or home study training?
23      A.   Yes.
24      Q.   How often and what type of exams?

1    on if this was an abrasive doctor, here is an
2    approach you could try, an amiable doctor, as you
3    said, a different approach, correct?
4        A.    Yeah, although we didn't really have
5    that amount of time to really be able to adjust it
6    for each physician like that.  It would have been
7    nice in theory, but --
8        Q.    Did you have training on what Abbott
9    called messaging skills?
10       A.    I don't recall that terminology.
11       Q.    Did you learn techniques for getting
12   Abbott's message out to the physicians on
13   particular drugs?
14       A.    Yes.
15       Q.    And what techniques were you taught to
16   do that?
17       A.    Just how to address an objection.  They
18   shared with us on how we should transition from the
19   primary product to the secondary product.  It --
20   so.
21       Q.    In these training courses, Mr. Pedersen,
22   were you taught to give verbatim responses?
23       A.    Yeah, you had to stick within what was
24   actually approved as far as the message.

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 14 of 18 PageID #:1642
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

148

1   Q.   Right.  But I'm -- it is a very specific
2   question and I just want to make sure I understand.
3        Did the training teach you to give
4   straight verbatim, i.e., this is the only words I
5   want you to use responses or to be more creative
6   and give responses to the physicians based on your
7   training?
8   A.   It was just based upon reciting the
9   message.  You know, each individual representative
10  might have their own personality, so it would come
11  off differently, but essentially you had to stick
12  within what was provided to us.
13  Q.   Did you have training on role playing?
14  A.   Yes.
15  Q.   Describe that for me?
16  A.   That was where you would essentially
17  pair up with somebody and go back and forth as
18  doctor and representative.
19  Q.   And what -- what did you learn, if
20  anything, during those training sessions?
21  A.   Practice makes perfect.  It was just the
22  repetition of it and then you were able to learn
23  the exact message and have it transition smoothly.
24  Q.   Now, we talked a little bit about the

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 15 of 18 PageID #:1643
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

264

1 that I did, although, like I said earlier, I was
2 rather disappointed that we weren't able to really
3 sell sell, in other words, like deviate from beyond
4 the script that was given to us that we should use
5 to cover any objections or how we should, you know,
6 do an opener, things of that nature.  You know,
7 there was a desire to veer from that, but we
8 weren't allowed to and there was always a constant
9 fear of FDA-related issues.  And that's why even
10 the promotional pieces that we received from
11 marketing had to first go through, you know, the
12 legal department of Abbott Laboratories and all of
13 that to make sure that there wasn't anything in
14 there that could get Abbott Labs in trouble.
15     Q.  So let me ask you to look at the first
16 sentence that you just read.
17     A.  Okay.
18     Q.  It is late in the day and our poor court
19 reporter has been typing for hours, so I'm not
20 going to read each one.  But do you agree that
21 that's -- describes your role as a professional
22 pharmaceutical representative at Abbott?  I'm just
23 talking about the first sentence.
24     A.  The professionally, ethically, you know,

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 16 of 18 PageID #:1644
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

265

1  the -- they utilize the term sales, but I think
2  from that maybe they are inferring or referencing
3  that, you know, the prescriptions that are reported
4  from the pharmacies directly to Abbott
5  Laboratories, the territory assignment, you know,
6  continuing education and service to targeted
7  physicians and they were targeted.
8      Q.   I'm not sure I understood. So was one
9  of the things that you were designed to do to
10 create, maintain and expand sales in a designated
11 territory?
12     A.   According to what they state here, yes,
13 but is that what we actually did in reality,
14 absolutely not.
15     Q.   Right. That was my question. I wasn't
16 asking you whether or not they typed it on this
17 form. I was asking you whether or not you believed
18 that was what you did at Abbott?
19     A.   No. Unless -- you know, if you've been
20 in the industry long enough, you pretty much know
21 that that's what you are not doing unless if you
22 are blowing smoke to move up the chain, but as far
23 as actual sales, you know, there was no exchange of
24 cash, there was no contract signed. All it was was

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 17 of 18 PageID #:1645
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

266

1  asking a physician to keep your product in mind in
2  hopes that they would then prescribe it and that
3  the patient would then take it to the pharmacy and
4  that some of the pharmacies which reported would
5  then report that to your company and then so on.
6  But, I mean, I wish. That would be exciting.
7       Q.   Could you go to the bottom of your pile
8  back to Pedersen No. 4, your resume. I just had a
9  question. The last bullet under your work history
10 under Abbott, you emphasize seven years of
11 pharmaceutical sales experience demonstrates
12 consistent and high sales performance.
13      A.   Yeah.
14      Q.   Is that true?
15      A.   I did demonstrate consistent and high in
16 their standard of definition sales performance as
17 far as the number of scripts being reported back to
18 the company, but as far as actual sales
19 performance, it's hard to judge because there was
20 no physical anything that I was actually selling.
21      Q.   But you took credit in your resume for
22 sales performance, did you not?
23      A.   That is the terminology used within the
24 industry. So if I'm going to pursue employment

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

Case: 1:07-cv-03626 Document #: 146-6 Filed: 12/14/09 Page 18 of 18 PageID #:1646
ROBERT ALLEN PEDERSEN, DECEMBER 4, 2007

271

1  say that. I said professionally, yes, ethically,
2  yes, the territory that made sense, the targeted
3  physicians I remember saying yeah, they were
4  targeted, but I had issue with the terminology
5  "sales," but I didn't say it was totally wrong.
6      Q.   So if we took the word "sale" out of
7  that, that would accurately describe what you did
8  for Abbott?
9      A.   You essentially promoted the product
10 that you were assigned to the physician based upon
11 a call plan that was provided by the company which
12 you had very minor influence at adjusting. You
13 know, there was some, but not a lot, and then you
14 left them samples and you regurgitated essentially
15 the company message. And if there was an
16 objection, they would actually have something
17 printed out in regards to how to handle the
18 objection. And if you weren't sure how to address
19 it, then you were asked to have the physician sign
20 a medical request form which then the medical
21 department dealt specifically with the physician.
22 We did not after that point.
23              (WHEREUPON, a certain document was
24              marked Pedersen Deposition Exhibit