# EXHIBIT G



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

---

JAMES JIRAK AND ROBERT PEDERSEN,

     PLAINTIFFS,

  V.

ABBOTT LABORATORIES, INC.

     DEFENDANT.

INDEX NO. 07 C 3626

---

AUGUST 21, 2009



  VIDEO-TAPED DEPOSITION of RENA RICCARDI HURLEY,
taken pursuant to Notice of Examination at the Crowne
Plaza Hotel, 44 Lodge Street, Albany, New York,
beginning at 8:28 a.m., on the above date, before
Christine Greenaway, Registered Professional Reporter
and Notary Public for the State of New York.

---



(RENA RICCARDI HURLEY)

1

2       Q.   Okay.  So those reps would speak with the

3  pharmacies and try to get the drug stocked, is that

4  --

5       A.   Yeah, there was buyers.  Like there was

6  different -- like Abbott, you know, would -- didn't

7  necessarily sell, you know, provide their products

8  directly to, you know, the pharmacies.  They went to

9  I think Cardinal was one of the big, I guess

10  wholesale groups or something, and then Cardinal

11  would be the one that would contract with the various

12  pharmacies.

13       Q.   Okay.

14       A.   So there was a buying group in the middle,

15  and there was somebody responsible for that.

16       Q.   Okay.

17       A.   I mean even when I worked on getting

18  products on formulary, I never -- it wasn't, umm, you

19  know, there was always a middle person.  I never

20  could negotiate price, I couldn't -- you know, there

21  were so many things that were not part of what I did.

22            I just would promote the attributes of the

23  product and try to get people in the hospital to say

24  yes, that they wanted that product there.  But there

1          (RENA RICCARDI HURLEY)

2    was a limit as to what you could do.

3          Q.   Okay.   When you did achieve formulary

4    status, did you receive credit for that

5    accomplishment?

6          A.   I'm sure everybody was, you know, happy,

7    you know.

8          Q.   Okay.   What is the furthest town you've had

9    to travel to visit a doctor when you were in the

10   cardio med rep position?

11         A.   Cardiology endocrinology.   The furthest I

12   had to travel, oh, gosh, I'll say at least an hour.

13   I was living in -- yeah, and in New Jersey the

14   traffic is, you know, crazy too, so that could add a

15   lot of...

16         Q.   Yeah, I understand, the traffic is pretty

17   bad, too.

18              Did you ever have to drive longer than an

19   hour?   Do you remember having to do that?

20         A.   With traffic and things, yeah, it certainly

21   was possible.

22         Q.   Did you visit doctors primarily in urban

23   areas or was it more rural?

24         A.   There was many positions.   I would say for

(RENA RICCARDI HURLEY)

1

2   to send it off to Scott?

3       A.  Uh-huh or whoever the manager was, right.

4       Q.  And Scott was your district manager at the

5   time?

6       A.  My last manager, yeah.

7       Q.  What was his last name?

8       A.  Gordon.

9       Q.  And what would he want you to use the

10  information for?

11      A.  He just wanted it, I guess if anybody asked

12  him what was going on, I mean he was supposed to be

13  -- you know, he was in charge of making any decisions

14  that weren't, you know, if it wasn't strictly laid

15  out and there was any gray area, I mean he was the

16  person to take anything gray to.

17         So, you know, he would send that

18  information up through to his boss, I guess.  I guess

19  the marketing teams or whatever.

20      Q.  Okay.  What's an example of like a gray

21  area that you would have to approach your manager

22  for?

23      A.  I don't know.  Gray area to approach them

24  for.  I suppose if, you know, got a call -- sometimes

1                    (RENA RICCARDI HURLEY)

2     you would get a call from, you know, a new office or

3     doctor that wasn't part of your call plan.  I mean

4     you could be penalized for calling on that doctor.

5     That's a gray area.  Do I visit this person or not

6     because it wasn't part of your call plan.

7              It wasn't delineated by, you know, the

8     powers that be and so if, you know, because they

9     would look at what percentage of calls, you know, was

10    to whatever targets and all those things were

11    analyzed and you were penalized if you didn't.

12             So that was an area that you definitely

13    want verifications to make sure that you weren't

14    going to be penalized for responding to a request for

15    samples from somebody that wasn't on your call plan.

16        Q.    Okay.  So if there was a new doctor in the

17    area that wasn't on your call plan, could you get

18    them on your call plan?

19        A.    Umm, you could request to.  You could, you

20    know, you could certainly add them to a system and

21    try to get data on them, if there was data being

22    sold, but all that would -- you would have to discuss

23    that with your manager whether that was something you

24    were allowed to do or not.

(RENA RICCARDI HURLEY)

1

2      Q.   So you would just go in and discuss it with

3   your manager and then he would --

4      A.   Decide.

5      Q.   Decide whether or not you could call on

6   that person?

7      A.   Right.

8      Q.   Okay.  So in terms of the morning, you

9   stated that you pretty much prepared for the day the

10  night before, so in the morning would you just make

11  sure that everything was in order and then start your

12  calls?

13     A.   Yeah, yeah, pretty much.  You know,

14  whatever things that I had packed up the night before

15  and make sure my trunk was in good order and ready to

16  go.

17          You know, I would have things, you know,

18  somewhat laid out, but whatever final stages of

19  making sure my car was prepared and my detailed bag

20  was there and I had my computer because the night

21  before, you know, I was -- there's nothing worse than

22  driving halfway to where you need to be and realize

23  you didn't have your PDA with you.  I mean that's not

24  something you want to do.  So you make sure you have

(RENA RICCARDI HURLEY)

1

2    A.    The pre-call plan was really just

3    reiterating whatever that call plan document said,

4    because you had a call plan and that was really a

5    pre-call plan.

6         But, you know, I guess in a very formal

7    kind of way they wanted you to write that down into

8    your system to say that you were going to call, you

9    know, because -- you know, on whatever day.

10        It was just showing, it was, I guess, a --

11   I don't want to say a micromanagment technique, but I

12   guess it was.  It was a way of kind of micromanaging

13   the reps to make sure that they were really doing

14   what that call plan said and that they would write

15   down this activity here happened here on this day,

16   you know, with this doctor.

17        And then because it was all in the PDA, it

18   actually had time stamps and everything so that they

19   could I guess analysis that for whatever, you know,

20   effectiveness.  I'm 99.9 percent sure they aborted

21   the system, but...

22   Q.    You mentioned a core message.  What do you

23   mean by core message?

24   A.    It is what you are supposed to say no

1                    (RENA RICCARDI HURLEY)

2      matter how many minutes you have or how many seconds

3      you have.

4          Q.   So do you have to adjust that core message

5      depending on the time that you have?

6          A.   You know, if you're -- you know, depending

7      -- if -- it's a core message.  It's the minimum

8      amount of information that you should be expressing.

9          Q.   Do you remember what the core message was

10     for Omnicef, for example, when you were a cardio med

11     rep?

12         A.   Oh, gosh.  You know, like for pediatrics

13     I'm sure the core message had to do with, you know,

14     the coverage of pathogens for treating, you know,

15     aultites or different respiratory infections.

16         Q.   So you would have to convey that kind of

17     information to the doctor when you visited them?

18         A.   Yes.

19         Q.   Okay, and where did you get this core

20     message?

21         A.   From the Abbott marketing team and from the

22     sales aids and from the sales training.

23         Q.   And how often would you get a new core

24     message for a particular drug?

```
 1              (RENA RICCARDI HURLEY)

 2    trimester or, you know -- and they had switched that

 3    to how often they had it done, but it was such a big

 4    process, they wound up -- I think the last time we

 5    did the process it was for every six months, but

 6    initially they had it every trimester.

 7              So three times a year you were messing with

 8    this call plan and being told what you needed to do,

 9    and then that would determine -- but your routing

10    would also determine how often you could get there.

11              So it wasn't really like I'll call on him

12    twice in a month, it was, you know, usually the

13    maximum frequency was five that was required of you.

14    Q.    Five per month or five --

15    A.    Five per, you know, I guess, semester.

16    Five, maybe six times per semester was considered a

17    pretty high frequency, and that was because there

18    were other reps doing the same thing, so they were

19    getting it more than that.

20              And now I'm not sure -- I know it was

21    probably a double question, so I'm forgetting what

22    I'm supposed to answer.

23    Q.    My question is if you're visiting these

24    doctors five to six times per semester, and you have
```

(RENA RICCARDI HURLEY)

1

2  to deliver this core message each time that you visit

3  them, do you say the exact same thing to them five to

4  six times per semester?

5      A.  Yeah, a lot of times you do.  A lot of

6  times you do.

7          I mean if you only got so far getting

8  through the, you know, whole message or you could,

9  you know, give it -- you would say the last time I

10  was here, we talked about blah, you know, and you

11  would review what you talked about and, you know, you

12  said that you -- whatever, like this or did that and

13  then, you know, you would take it from there.

14          And, you know, depending on what your call

15  plan said -- because you may have to do five times

16  primary for say Omnicef, but you may only have three

17  co-primary calls for oral suspension, so then you may

18  have to quickly go into your co-primary in order to

19  make sure you get in one of the three that you need

20  for that time period.

21      Q.  Okay.  So in terms of the actual

22  conversation that you had with the doctors during

23  each of these calls, would they be different

24  depending on the time that you had with them?

(RENA RICCARDI HURLEY)

1

2   A.   I suppose it could be a little bit

3   different, but you're still trying to get in your

4   core message, you're still trying to make whatever

5   the key marketing points are.  You know, repetition

6   is, you know, sometimes helps it all, you know, stay

7   there.  So there was, you know, certainly a fair

8   amount of repetition.

9   Q.   Okay.

10  A.   Umm, yeah.

11  Q.   Would you use different or would you

12  provide different promotional materials to doctors

13  during various calls?

14  A.   Only what was approved.  Only what was

15  approved.

16  Q.   But would you be able to choose the types

17  of -- or within your group of promotional materials

18  that was approved, were you able to make the decision

19  in terms of what promotional material to give to your

20  doctor?

21  A.   If it supported something that you were

22  talking about, sure.  But it had to be approved.

23  Q.   Right.  And ultimately what was the end

24  result that you hoped to achieve after you visited

(RENA RICCARDI HURLEY)

1

2    Q.    Okay.

3    A.    It could be.

4    Q.    So you could ask a doctor for a commitment

5    or a refusal and an explanation for refusal at any

6    point during a sales call?

7    A.    Yeah, you could.

8    Q.    Okay.  If you look under Roman Numeral I.E,

9    it says, "Be completely familiar with the package

10   inserts of our products and those parts of our

11   competitors' package inserts that are relevant to our

12   selling efforts."

13         Did you receive your -- the competitors'

14   package inserts?

15   A.    They were in the offices, so, you know,

16   because they were, I guess considered medical stuff

17   that was readily available, yes, you're encouraged to

18   use them.

19         And you probably did get them in direct

20   sales training too, now that I think about it, as

21   part of a way of preparing you to understand the

22   differences between, you know, the different people

23   in the market.

24   Q.    Okay.  It also, if you look at Roman

(RENA RICCARDI HURLEY)

1

2  Numeral I.G, it asks you to establish a relationship

3  with the pharmacists in your area of your territory,

4  and then it states that it will enable you to educate

5  the pharmacist, obtain provider prescribing habits,

6  and maintain current prices for our products and our

7  competitors.

8       Would you gather information from

9  pharmacies and then report them to Abbott?

10      A.   No.  No.  You would, you know -- I mean

11  sometimes you would be very disappointed to find out

12  that physicians who, you know, the pharmacists may be

13  filling prescriptions, but they may not be being

14  reported, so it's not really affecting your market

15  share even though it's something that's taking place.

16      Or, you know, you would certainly want them

17  to know about your products.  You could try to find

18  out if, you know, it might be a way to find out that

19  you have somebody who's championing your product and

20  you may not know about it.  That's not a bad thing to

21  find out.

22      At one point, you know, getting price

23  information was considered a smart thing to do, but

24  that was a long time ago, and now you weren't allowed

(RENA RICCARDI HURLEY)

1  
2  to, you know, you were not allowed to go around with

3  a homemade detail piece with pricing information.

4  You can lose your job for doing it.

5      So even though that's stated there, it was

6  something that became a definite and clear no-no, and

7  you weren't allowed. If you were caught with a home-

8  made detail piece, even though it was information

9  from a pharmacy, it was grounds for termination.

10      Q.   Do you remember when Abbott changed the

11  policy with respect to that?

12      A.   It, it, it was a policy. It was just not

13  a firmly implemented policy. And then, you know, I

14  don't know what, you know, knocked the other foot,

15  but something happened and eventually it became like,

16  what are you doing? I don't know if a regional

17  manager -- I'm not sure. Something happened and that

18  was a definite no-no.

19      Q.   Okay. For Part II of this document, it

20  says, it says, "Adopt, embrace and implement Five Key

21  Coordination Strategies," and part (d) is "Physician

22  Ownership (10 per team member)."

23      What does that mean?

24      A.   This is what I was saying when you said