# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

**COPY**

| | | |
|---|---|---|
| JAMES JIRAK AND ROBERT PEDERSEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | NO. 07 cv 3626 |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

\* \* \* \* \* \*

VIDEOTAPED DEPOSITION OF MATTHEW KEYSER

TAKEN ON BEHALF OF THE DEFENDANT

AT OKLAHOMA CITY, OKLAHOMA

SEPTEMBER 12, 2009

\* \* \* \* \* \*

REPORTED BY: ANNETTE L. BEAN, CSR, CLR



Case: 1:07-cv-03626 Document #: 146-13 Filed: 12/14/09 Page 3 of 16 PageID #:1729

1  A. Well, that's really hard to -- a typical sales call, you know, they vary. It's hard to say there's a typical sales call. Some lasted 15 seconds. Some lasted three hours. So it would be hard for me to say what a typical sales call.

6  Q. Maybe on average?

7  A. On average, 45 seconds, a minute.

8  Q. So I guess what I'm curious about is that Abbott gives you a core message that's "Dispense as written." What do you discuss the other 30 seconds?

11  A. Well, I have four products, so I'll try to segue into the next one and the next one and the next one, try to deliver those messages.

14  Q. So on every call, you would try to deliver all four messages on your four products?

16  A. If that's what I was -- that particular doctor I was directed to do. Some doctors, for instance, if they were not a target for a particular product, I would focus on the two that he was a target for.

20  Q. Okay. When I say the word "franchise," do you understand what that means?

22  A. I think so.

23  Q. What franchise did you work in as a sales rep at Abbott?

25  A. Metabolic, diabetic.

1  A. That's what -- I mean, that's kind of my
2  recollection of, you know, that time. I'll put it this
3  way. You were strongly encouraged to go as high as you
4  could go. I mean, essentially you weren't doing your
5  job if you weren't meeting your targets in the right --
6  the right times at the right frequency with the right
7  product message.
8  Q. Did the call plan tell you which order to see
9  the doctor -- doctors in?
10  A. It told us what order in which -- in the town,
11  I mean, as far as -- not on a daily basis. Order
12  with -- with areas, I mean, yeah. Not specific order.
13  In other words, if I had eight doctors on my list, I
14  didn't have to start the one at the top of the list.
15  Obviously if I went to his office and he wasn't there, I
16  would go to the second doctor and come back. So, no.
17  Q. So once you received the call plan -- I think
18  we alluded to this earlier -- you and your team mates
19  had a meeting; is that right?
20  A. Uh-huh.
21  Q. And at that meeting -- when I say the word
22  "routing," does that mean anything to you?
23  A. Yeah. That's basically how -- how the targets
24  are laid out.
25  Q. And were you and your team mates the ones that

1  mean, how many I had in my bag was what I thought I
2  needed that day.
3      Q.   So you had at any given time between one and
4  four sales aids per product, correct?
5      A.   Sure.
6      Q.   And you sold four products, correct?
7      A.   Correct.
8      Q.   And you had between one and ten studies per
9  product at any given time?
10     A.   Correct.
11     Q.   And you had potentially hundreds of
12 leave-behinds in your possession at any given time?
13     A.   Sure.
14     Q.   How did you pick which -- well, let me -- let
15 me start.  Did you use a sales aid, a study, and a
16 leave-behind on every call?
17     A.   If I was -- if it was directed to do that.
18 Again, we went through the sales aids that we were
19 mandated to go through based on our training, based on
20 the meeting that we -- our most recent sales meeting.
21 If they said in this particular meeting, We're going to
22 send some leave-behinds that you're going to leave to
23 your top 50 cardiologists, then that's what we would do.
24     Q.   In a sales aid that was ten pages long, for
25 example --

1  A. Sure.

2  Q. -- how would you choose which portion of the
3  sales aid to use?

4  A. Well, the sales aid was usually -- different
5  pages had different sort of places to go to for the
6  call. So again, you'd use your data in our training,
7  and we would say, you know, this particular call, you
8  know, his objection is, is that he likes the way
9  Augmentin -- he likes the way his patients are handling
10 on Augmentin. Well, in that 20-page -- in that 10-page
11 sales aid, there may be a chart in there about
12 Augmentin's side effects, causes a lot of diarrhea.
13 We'd go to that page and say, How are you seeing this
14 with -- again, an open-ended question -- we were taught
15 to do that -- Are you seeing these results with
16 Augmentin? And that's -- you know, that's the part of
17 that sales aid that you would go to.

18      So within that sales aid, there were specific
19 areas of -- you were taught to go to, to handle
20 objections.

21 Q. So you would have to first identify the
22 physician's objection?

23 A. With -- with the data that was provided to us,
24 yeah. Now, I mean, the objection would come from the
25 open-ended question. Sales data would come from -- I

1   know that I would be doing a Biaxin call, again, based
2   on what I was supposed to be calling him on and what
3   Abbott believed was his primary product that I'm selling
4   him today. So that -- that's the way --
5          You know, the sales aid's nothing more than a
6   continuation of what we've been talking about. The data
7   comes from Abbott. The call frequency comes from
8   Abbott. The order with which we're detailing the doctor
9   comes from Abbott. And handling that particular
10  objection comes from the sales aid. And it can be a
11  20-page sales aid, or it can be a one-page. You kind of
12  have to know your sales aids and go to which page that's
13  appropriate for handling the objection.
14       Q.   Do you have to be able to identify where would
15  appropriately handle the objection?
16       A.   Well, I mean, we are trained in the possible
17  objections, you know. They're usually -- there's only
18  one place to go. There may be -- typically there's one
19  place to go when he says he likes Augmentin. That's our
20  chart on Augmentin's side effects. That's our -- we
21  were trained that's our -- the best defense against
22  Augmentin. For instance, that's a -- you know, that's a
23  for instance.
24       Q.   And what if you have a sales aid that had
25  information on Augmentin in it, and you had a study as

1  well that compared Augmentin and Biaxin? Could you
2  choose between those?
3       A.   Well, again, it would be based on how --
4            MR. LIANG: Let me object, that it assumes
5  facts not in evidence.
6            THE WITNESS: Again, it would be based on our
7  training of how far down along the line of -- on the
8  call we were on. If he -- you know, we're trained for
9  the whole call. So, I mean, we're trained for this is
10 his objection. I'm going to take him here. I'm going
11 to give him a study. I'm going to close him. So it
12 depends on how far he wants to take me that -- as far as
13 how far we go. I'd love to get him to the point where I
14 gave him that study because that's where you want to be.
15 But that's up to the -- that's up to the doctor. It's
16 up to the doctor to determine that. It's up to Abbott
17 for the next step on that. It's up to Abbott to decide
18 what came after the quick study. If he's got more time,
19 we go to the -- we go to the study instead of the quick
20 sales aid.
21           MS. LEITENBERGER: I'm handing the Court
22 Reporter what's been Bates labeled Abbott 7 to be marked
23 as Defendant's Exhibit 6.
24           (Defendant's Exhibit No. 6 was marked for
25           identification.)

1  he's very resourceful." So, I would say that my
2  creativity and original thinking beyond the expectations
3  would be the scenario that we talked about where, if
4  someone's going to come up to me that's not a target,
5  I'm still going to, you know, call on them the same way
6  I would even if it was a doctor.
7      Now, like I said, that's not something I would
8  do -- I would do because it's discouraged. But if
9  you're put in a situation where it comes down to
10  insulting a doctor by not talking to him or being
11  original and creative and pulling out a sales aid. And
12  like I said, maybe -- maybe later on they would be in
13  the call plan and I could call on him. So I do agree
14  with that.
15      But I think the key is it says, "When faced
16  with unexpected challenges." And that unexpected
17  challenge to me would be something, like I said, where
18  I'm not expecting that there's a fit doctor in this
19  practice because it's not on my list.
20      Q.   But you would call on that doctor anyway?
21      A.   Well, I would -- I would detail that doctor,
22  yeah. I mean, that's something that you kind of have to
23  do for future when he does show up on your list, if he
24  shows up on your list.
25      Q.   But you said that was discouraged; is that

1  correct?

2  A. It is discouraged -- it was discouraged to
3  call on doctors that are not on your list. But again, I
4  mean, when faced with a situation where, you know, I
5  either sit there on my hands or I talk to him about
6  Biaxin, I'm going to talk to him about Biaxin. So --

7  Q. And that would be encouraged by Abbott,
8  correct?

9  A. It's neither. It's just -- I think it's more
10 of -- you know, it's more of a necessity in the
11 business. I mean, we never talked about, in sales
12 training, what happens when a doctor that you don't know
13 is on your call plan. We were sort of encouraged to
14 just steer away from those doctors.

15 In other words, if I'm in a clinic and there's
16 my three doctors on this side, and there's three on the
17 other side, I'm not going to even go to the other side,
18 so I'm going to stay on my side. But if a situation
19 comes into play where, you know, you're with your
20 manager or you're by yourself and the doctor wants to
21 come up to you and talk to you about Biaxin, I would do
22 that. I wouldn't say I was encouraged or discouraged.
23 I would say that that's just being professional, and --
24 and that's just how you do what you do when you're in
25 sales or what you do when you're representing a product.

1        (Defendant's Exhibit No. 11 was marked for
2        identification.)
3        Q.    (BY MS. LEITENBERGER)   Defendant's Exhibit 11
4   is before the witness.
5            You explained earlier that you usually got a
6   bonus between 25 and $40,000 per year?
7        A.    Well, for this particular year, I did.  Again,
8   I'd have to look at my W-2s.  I know there were some --
9   there's a lot of vagueness between years and the bonus
10  thing.  It seems as if, in pharmaceuticals, if you have
11  one good year, the next year you're not going to do as
12  good because they -- you're somewhere between where you
13  are this year versus next year.
14           So, you know, I mean, I'd have to look at my
15  W-2s to see what exactly I made.  I mean, this was
16  obviously maybe my high point at Abbott.  The other
17  years may have been lower.  So, I know my base was
18  around 50, and there may have been a year when I had a
19  $25,000 total bonus.  There may have been a year like
20  this one where it looks like I had about a 30,000 total
21  bonus, so --
22       Q.    Do you recall how bonuses -- what bonuses were
23  based upon at Abbott?
24       A.    Not particularly, no.  I mean, it was based
25  upon their -- what they wanted to base it on.

1  Q. Is it your understanding that the more
2  prescriptions physicians wrote in your territory for
3  Abbott product, the better you would do in terms of
4  bonus?
5  A. I think that's the theory. I don't know that
6  that's -- that's how it actually works in practice.
7  But, yeah, that's the theory.
8  Q. What do you mean when you say it doesn't work
9  like that in practice?
10 A. Well, I think there's a lot of ambiguity in --
11 in their data. Their data is normally old. Their data
12 is incomplete. Their data is shared among other reps.
13 that are also in that territory. Their data has a lot
14 of fluctuations due to supply to pharmacies.
15      So as far as the compensation reporting goes
16 with Abbott, I -- as I mentioned before with the
17 all-star report, I think it's subject to a lot of
18 ambiguity. I mean, I just think it's -- it's -- I'm
19 always -- I take these with a grain of salt because I
20 don't think the data is as measurable as they would like
21 us to think it is.
22 Q. So you take issue with the data that they're
23 using to calculate the bonus. Is that fair?
24      MR. LIANG: I object that it mischaracterizes
25 testimony.

1   THE WITNESS: It's fair to say that -- that
2 their data is not as accurate as it could be or should
3 be.
4   Q. (BY MS. LEITENBERGER) But you agree with the
5 idea that, if you increase the number of prescriptions
6 written by a physician in your territory, that it
7 should, if reflected accurately in the data, increase
8 your bonus?
9   A. It should, if reflected accurately in the
10 data, increase my bonus.
11   Q. So from a financial standpoint, would it
12 behoove you to get physicians to increase the number of
13 prescriptions written for Abbott product?
14   A. Maybe and maybe not. Again, depending if that
15 data is accurate and depending on Abbott's criteria for
16 compensa -- for a bonus. As I said, I think they
17 fluctuate. My personal opinion on the reports is
18 they're inaccurate, and they also tend to penalize
19 people that have had a good year last year because it's
20 based on -- as far as my understanding was, it's based
21 on growth for the following year. So if you're at a
22 certain level, it's going to be hard to, (a) get data
23 accurate, and (b), you know, grow it at the same rate
24 you did the year before. So I don't think there's a
25 cause and effect on bonuses.

1  Q. You said bonuses based on growth --

2  A. Well, I mean, I'm sure it has been based on
3  growth. I mean, they based -- throughout the years I
4  was with Abbott, it's based on any number of things.
5  It's not necessarily -- you know, again, that comes down
6  to what corporate directive they've done this quarter or
7  this half or this year how your bonuses are structured.
8  That changes. At their discretion, it changes.

9  THE VIDEOGRAPHER: Three minutes.

10  MS. LEITENBERGER: Let's take a break.

11  THE VIDEOGRAPHER: Going off the record. This
12  will be the end of tape No. 5. The time is 3:31.

13  (A brief recess was had from 3:29 p.m. to 3:36
14  p.m.)

15  THE VIDEOGRAPHER: We're back on the record.
16  This will be the beginning of tape six of the deposition
17  of Matthew Keyser. The time is 3:39 p.m.

18  Q. (BY MS. LEITENBERGER) Okay. You spoke
19  earlier about the hours you worked at Abbott, and you
20  estimated 50 to 60 hours per week; is that right?

21  A. Right.

22  THE VIDEOGRAPHER: Let's go off for a second
23  at 3:39.

24  (Discussion off the record.)

25  THE VIDEOGRAPHER: We're back on the record,

1   A.   I do.

2   Q.   The first reason you gave was that you had no
3   freedom to be a salesperson. Do you remember saying
4   that?

5   A.   I do.

6   Q.   Can you explain what you mean by that?

7   A.   What I meant by that was that we essentially
8   were scripted. We were not given the flexibility to
9   really manage our own territory. And I -- I have an
10  entrepreneurial spirit obviously in me, and that was --
11  that was not encouraged. And coupling that with the
12  fact that I felt as if a lot of my family time was being
13  infringed upon, whether that was early-morning
14  teleconference calls or late night paperwork that had to
15  be done the next day or working on Sunday nights or
16  working on my lunch hour or half hour, whatever the case
17  may be, I felt as if leaving Abbott was -- was the best
18  alternative for me. So --

19  Q.   You mentioned that you felt that your job was
20  scripted. How so?

21  A.   Basically they gave us the materials, and we
22  basically were trained in every possible facet of a sale
23  and given, you know, very little as far as our input.
24  Our input was -- was discouraged.

25       I remember a specific -- a specific training

1  session with my boss where I deviated from the script,
2  and I spent about the next half an hour in my car being
3  scolded for that and being told that, you know, that
4  wasn't the way we were going to do it. So even though I
5  had known that doctor for a few years and felt as if my
6  input was more valuable than the data collected, it was
7  discouraged.
8      And so, you know, from that point, before that
9  and after that, I -- I did what -- what I was told to
10 do, how I was told to do it.
11     Q.  You said that you were given materials. What
12 types of materials were you given?
13     A.  We were given sales materials and, you know,
14 basically -- basically told what to -- what to
15 incorporate in the call. No outside -- absolutely no
16 outside information was allowed to be brought into an
17 office, period.
18     Other -- other sales companies were using data
19 from whether it's home sources or had the ability to
20 gather information on their own. We did not. We were
21 given -- we were told what was -- what was to be brought
22 in that office, and that's it.
23     Q.  You mentioned that you were trained in every
24 facet of a sale. Can you list some of those facets?
25     A.  From -- you know, from opening, from an