# EXHIBIT P

1     IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ILLINOIS

3        EASTERN DIVISION

4

5 JAMES JIRAK and ROBERT    )
  PEDERSEN,          )

6              )
      Plaintiffs,   ) No. 07 C 3626

7              )
      v.       ) Judge Castillo

8              )
  ABBOTT LABORATORIES INC,  ) Magistrate Judge

9              ) Keys
              )

10      Defendant.   )
              )

11

12

13

14

15    VIDEO DEPOSITION OF MS. AMBER MUNSON

16    Taken on behalf of the Defendant

17      August 28, 2009

18

19

20

21

22

23

24

25

           1

BARKLEY
Court Reporters

1    promised -- we were the first time Abbott had ever

2    laid off a group of people.

3          We were always told that Abbott didn't do

4    that type of stuff, and that it was very family

5    oriented, and that they would always find room and

6    find places for people.  But it just didn't happen.

7          And so to finish answering your question,

8    when I left Abbott, I decided to take some time off.

9    I had worked since I got out of college and decided

10   to do some traveling.

11         And really didn't have a desire to get back

12   into pharmaceuticals based on the fact that I just

13   knew it wasn't as rewarding as what I had done when

14   I was in telecom.

15         And the only problem is, is being in

16   Joplin, Missouri.  There's not a whole lot of great

17   jobs here in Joplin, Missouri.

18         And then PDI presented itself, and it was a

19   position that I decided that I would take to tide me

20   over until I find something else.

21         Q.    When you say that you didn't think

22   pharmaceutical sales was as rewarding as telecom --

23         A.    Mm-hmm.

24         Q.    -- can you explain that a little bit

25   more?

33

Ms. Amber Munson

BARKLEY
Court Reporters

1       A.   I believe that, you know, at the end of

2  the day -- when I was with Sprint and with McLeod, I

3  went home at the end of the day and knew that I had

4  accomplished something.

5       I was able to see the numbers.  It was

6  tangible.  And you don't get that in

7  pharmaceuticals.

8       Q.   You mean numbers in terms of your --

9       A.   Your sales.

10      Q.   -- your sales?

11      A.   Mm-hmm.

12      Q.   Doesn't Abbott generate reports showing

13  your sales performance?

14      A.   In the pharmaceutical industry, numbers

15  don't come out for months later after the fact.

16      Q.   I see.

17      A.   And it makes it very difficult as a

18  true professional to be able to adjust your

19  behaviors in order to be where you need to be when

20  they come back and give you numbers from three or

21  four months ago and say, "Well, here's your numbers.

22  You know, they need to be better for next month."

23       You know, I mean you can't do anything now.

24  That's four months ago.

25      Q.   Right.

34

Ms. Amber Munson

BARKLEY
Court Reporters

1          A.    So it's retroactive.

2          Q.    But is that an industry-wide problem in

3     your opinion or is it just Abbott?

4          A.    Oh, no, it's industry-wide.

5          Q.    So with telecom, were you able to see

6     your performance on a daily basis?

7          A.    Oh, absolutely.

8          Q.    Okay.

9          A.    You knew -- I mean at the end of the

10    day, you knew which accounts you'd closed.

11         You know, you can track what stage you were

12    in.  And when they said that they were going to sell

13    your phones, you knew they were going to sell your

14    phones.

15         Whereas with physicians, physicians will

16    look at you and say, "Yeah, sure I'm writing it."

17    You know, and then there's the secret life of the

18    reports that we get that, you know, we're not

19    supposed to discuss with physicians that show us

20    what they're writing.

21         And you know, even if they are writing it,

22    especially in this neck of the woods, it makes it a

23    lot harder because there's a lot of companies that

24    don't report their sales.

25         So I can have doctors writing my drugs.

35

BARKLEY
Court Reporters

1  But you know, being in Joplin, we've got all these

2  Wal-Marts in the area, and I don't get paid for any

3  of those scripts that are written.

4         Q.    So Wal-Mart is one of those pharmacies

5  that doesn't report?

6         A.    That's correct.

7         Q.    So do you get any other reports besides

8  the numbers that you would see every couple of

9  months?  I mean are there weekly prescription data

10  reports?

11         A.    There are.  And I believe that it

12  depends on who your manager is when those are shared

13  and when they're not, which also makes the industry

14  very hard.

15         Because there are some managers that will

16  share that information with their reps, and there's

17  others that won't.

18         But a lot of the times those numbers come

19  from the 30,000 up, you know, view so that they

20  don't really trickle down to your exact areas.

21         Which, you know, they're supposed to be

22  like pep-me-up talks like, "We're doing a great

23  job," or, "Things aren't working out."

24         But no, it's -- it's definitely something

25  that's pharmaceutical-wide.

36

BARKLEY
Court Reporters

1         Q.   So as far as your personal experience,

2   did your manager share reports with you on a more

3   frequent basis than once every couple of months?

4         A.   Oh, my manager?  He was very good at

5   giving us numbers.  He was very good at giving us

6   numbers.

7         Q.   How often would you receive numbers?

8         A.   Oh, I would say -- it's been many years

9   ago, but I would say on a very regular basis.

10        Q.   Like weekly or monthly or --

11        A.   Well, weekly.  Weekly, maybe biweekly.

12   We always had a pretty -- a pretty good grasp on

13   where things were going.

14        Q.   So did that help you feel like you had

15   a better understanding of what your numbers were if

16   you were receiving reports on a weekly or biweekly

17   basis?

18        A.   I wouldn't say that it really was able

19   to give you a grasp of how successful you were doing

20   your job.  It was just a matter of luck of the draw

21   of whether or not the prescriptions that were being

22   written were going to the right pharmacies.

23        Q.   So luck of the draw in the sense that

24   if the prescriptions went to a pharmacy that

25   reported, then your numbers would be better than if

37

BARKLEY
Court Reporters

1  the field to, you know, produce it and see how it

2  should be done.

3          Well, when I was with National Car Rental,

4  I had come from the corporate world, and I had gone

5  out into management.  And I was working at the

6  Minneapolis location, and I wanted it all to be

7  corrected, in my corporate mentality, to be fixed

8  right away.

9          So I went into National Car Rental.  And I

10  was pulled in and was told I got elected -- I mean I

11  don't know if it so much was disciplined as much as

12  I think it was constructive criticism that was much

13  appreciated, when I was told that Rome wasn't built

14  in a day.

15          That you can't just come in here and expect

16  to take all 75 of these people and do -- you know,

17  tell them that they need to change their ways.

18          I had that happen at National Car Rental.

19  And then at Sprint I never had anything that I can

20  think of.  McLeod, everything was good.

21          I know at Abbott there were a few times

22  that I was put on a PIP, a performance improvement

23  plan, because numbers weren't where they needed to

24  be.

25          Q.    Mm-hmm.

40

BARKLEY
Court Reporters

1    A. But that goes back to the reporting

2 issue. And as pharmaceutical sales representatives,

3 we know that it's just a matter of reporting.

4    You know, they control which doctors we

5 call on, you know. And when they tell me I can only

6 call on this doctor but yet I know this doctor over

7 here is writing my drugs, but I don't have the

8 ability to put that doctor on there to get credit

9 for those scripts -- you know, for talking to that

10 physician.

11    It's really nothing that's within your

12 control.

13    Q. Okay. So we'll get into more specific

14 Abbott stuff in a little bit. I just want to ask

15 you one question.

16    MS. OSE: This will be Exhibit 2.

17      (Exhibit 2, Employment

18      Application of Amber

19      Lofton to Abbott

20      Laboratories; Request

21      Number 96598;

22      ABBOTT0066495 -

23      ABBOTT0066498, was marked

24      for identification by the

25      court reporter.)

41

BARKLEY
Court Reporters

1    this goes back to the corporate management side of

2    things, is when you've got 10 different -- or 20

3    different reps, and you've got 10 of them on one

4    side and 10 on the other, you get to hear how 10 --

5    I mean 10 people might verb -- the verbiage they

6    might use.

7           Q.    Mm-hmm.

8           A.    So you might learn something as one of

9    those people go through.  You know, they might use a

10   different, you know, analogy or might use an example

11   or the way they open it or close it.

12          It was just so you could get practice.

13          Q.    I see.  And you could see different --

14          A.    Right.

15          Q.    -- styles and --

16          A.    Mm-hmm.

17          Q.    Did you learn -- did you have classes

18   or training on selling skills?

19          A.    There were some.  There were some.

20          But I -- I mean they would -- it was not so

21   much selling, because in the true sale, I believe

22   you -- I don't think you can really teach somebody

23   to be a salesperson.  I mean they've either got to

24   have it in them or they don't.

25          But it wasn't something that we ever sat in

80

BARKLEY
Court Reporters

1  class and were told, "This is how you need to, you

2  know, have the -- have the contract signed." This

3  isn't, you know --

4       Q.   Mm-hmm.

5       A.   It wasn't something like, "This is

6  what's required in order for you to get paid." It

7  was just more the marketing message.

8       Q.   Did they ever teach you things about

9  like personality types of doctors and how to most

10 effectively communicate with certain types of

11 people?

12      A.   I think we took one class like that or

13 one afternoon might have been something similar to

14 that.

15      The one thing that sticks out the most in

16 my mind from training is when they once said, "You

17 know, you can't ever take anything personally with a

18 physician because you don't know what he just said

19 to that patient when he walked out of the room."

20      You know, if he just told somebody that he

21 died or they're dying and then he comes out in the

22 hallway and says something to you, you know, don't

23 take it personally.

24      Which I kind of already knew that coming

25 from telecom. I had lots of people that would say,

81

BARKLEY
Court Reporters

1    Q.   Oh, I'm sorry.  Go ahead.

2    A.   I just wanted to clarify that this did

3 not come from my original training --

4    Q.   Okay.

5    A.   -- from when I -- because I did not

6 have TriCor when I first started.

7    Q.   But it is --

8    A.   But this is very similar.  This is the

9 kind of marketing materials that we would be given

10 to learn what we were supposed to say to the

11 physicians.  Would you like a copy?

12    MR. LIANG:  (Indicating.)

13    MS. OSE:

14    Q.   So I've never seen one of these before,

15 so you might have to explain to me how you would use

16 this in your training to kind of learn about the

17 product.

18    A.   Well --

19    Q.   What are -- what are TriCor discovery

20 questions?

21    A.   This marketing material is something

22 that we received when we had TriCor.  Probably -- I

23 don't know if we got it in the mail or if it was

24 something we got at out of our POA meetings, when we

25 -- one of our national meetings.

94

BARKLEY
Court Reporters

1      But basically they tell you what questions

2  you should ask.  These are the questions you can

3  ask.  I mean they're like the awareness of the

4  knowledge.

5      You know, "Doctor, what criteria are most

6  important to you when evaluating lipid therapy?"

7  Or, "Doctor, how are you currently treating your

8  dyslipic patients with LDLs between 100 and 129?"

9      You know, and then you try to get them to

10  the next step.  Because they wanted you to obviously

11  gauge the doctor to see what stage they were -- they

12  were in the prescribing process.

13      And then these different questions would

14  come into play as to where they were.  And they

15  based -- and we -- and I don't think I saw numbers

16  in here anywhere.

17      But I remember once we had a chart that

18  they showed us that if a doctor was writing between

19  zero and five, he might have been at an awareness.

20      Or there's like zero -- yeah, like zero to

21  five scripts a month, he might have been at

22  awareness.  5 to 15, he might have been

23  limited trial.

24      They had a chart that showed us exactly

25  where they fell.  And based on where they fell,

95

BARKLEY
Court Reporters

1   these were the questions we were supposed to ask

2   them.

3           Q.    Okay.  I see.  So how did you know what

4   stage the doctor was at so that you could figure out

5   which of these questions to ask?

6           A.    The numbers that they would send to us,

7   the reporting that they had.

8           Q.    So like prescription data?

9           A.    Prescription data, right.

10          Q.    So you would receive the prescription

11  data, and then you would try to figure out what

12  stage the doctor was in.

13          And then with regard to these questions, I

14  mean what was the expectation?  Was the expectation

15  that you ask these questions verbatim during your

16  sales calls?

17          A.    Mm-hmm.  That's what the -- that's what

18  the grinders were for and what the role plays were

19  for.  You would -- I mean -- and I shouldn't say,

20  you know, word by word.

21          Q.    Mm-hmm.

22          A.    You didn't get counted off if you

23  didn't use the exact same words that are written

24  here.  But it would give you, "This is what you're

25  supposed to detail."

96

Ms. Amber Munson

BARKLEY
Court Reporters

1          And then a lot of times -- and I don't know

2   -- well, here -- there might be some different

3   flashcards in here that might say, you know, "This

4   -- if the doctor says this, then this is where in

5   the sales piece you need to go to respond to that."

6          So if the doctor says, "I'm writing this

7   against this drug or this is the drug that I write

8   and this is why," then we would have training

9   materials that would say, "Well, then you need to go

10  to page 5 and show them this chart right here."

11         Q.   Okay.  So it was sort of a flow chart?

12         A.   An algorithm basically.

13         Q.   Algorithm?

14         A.   Depending on where they fall, this is

15  what you're supposed to do.

16         Q.   So what would happen if you asked the

17  doctor a question that wasn't on this training

18  material?

19         A.   Are you referring --

20         MR. LIANG:  I'm going to object.  That

21  assumes facts not in evidence.

22         MS. OSE:

23         Q.   Go ahead and answer.

24         A.   Are you referring to as in if I asked

25  a doctor this question when I was doing a grinder

BARKLEY
Court Reporters

1  expanding was probably just some verbiage that I had

2  used in something else or I probably saw, you know,

3  on another resumé somewhere.

4          But I mean you do create relationships.  I

5  mean it is getting in and going through that

6  gatekeeper and getting to know those physicians.

7          And I mean you do.  You call on the same

8  doctors for a while.  You maintain it, and you try

9  to expand the numbers and the sales and, you know,

10  doctors knowing about your products through

11  educating them.

12          That's what we did.  We educated them and

13  marketed to them versus closing them.  I mean

14  there's not a real close.

15          Q.   How is -- I mean we talked about a

16  close a little bit earlier this morning.  So I guess

17  I'm trying to understand why that's not a real

18  close.

19          A.   Well, because a real close in any real

20  sales job -- it goes back to that car analogy,

21  where when somebody buys a car, they sign on that

22  dotted line, and that guy knows he's getting paid

23  for that.

24          Whereas in pharmaceuticals, you don't ever

25  get that.  You don't ever get that.  In

139

BARKLEY
Court Reporters

1  pharmaceuticals you don't.

2       Now if you're in diagnostics or devices,

3  you do, because you actually see the products that

4  they're using, and you bill them for it.

5       But in pharmaceuticals it doesn't happen.

6  I mean we're -- we're basically like programmed

7  robots.  I mean we're trained to go out and give the

8  message that is presented to us.

9       I mean this is the verbiage we use.  And

10 you know, it's embedded in your head that this is

11 what is important to these doctors, and this is what

12 you need to sell to them.

13      But yet any doctor will tell you that he's

14 writing it, but then the numbers come back and

15 they're not.  But are they?

16      You know, a great example would be -- and I

17 know this isn't Abbott.  But recently at Pfizer they

18 sent out two different reports.  There was a 20

19 percent discrepancy in the number of scripts that

20 were written.  One report said they were writing 20

21 percent more than the other one did.

22      Nobody will ever give you any answers as to

23 what that is.  So I don't -- I mean that's not a

24 true sales job to me.

25      Q.   So explain to me then what it is that

140

Ms. Amber Munson

BARKLEY
Court Reporters

1    results."

2          So and then he counsels you to improve in

3    two categories:  territory analysis and business

4    planning, and execution and implementation.

5          Did you talk about this letter with

6    Mr. Gray at any point?

7          A.   Yeah, I did.  And if I remember

8    correctly, there is an email that I have in here

9    where he addressed this with Jeff Link.

10         Q.   And Jeff Link is?

11         A.   The regional manager.

12         Q.   Okay.

13         A.   I thought there was one in here.  He

14   addressed it with Jeff Link, because I had not been

15   in the territory that long and the territory had

16   been vacant --

17         Q.   Okay.

18         A.   -- when I came into it.  And he

19   addressed it with Jeff link that he did not feel

20   that it was fair that I received this letter based

21   off of it.  But let me see.

22         Q.   Do you remember how long you had been

23   in the territory?

24         A.   It had been vacant for like I want to

25   say four or five months.  There was a gentleman by

207

BARKLEY
Court Reporters

1    the name of Terry Kohl that they let him go too

2    because of -- I mean because of the numbers.

3           Q.    Mm-hmm.

4           A.    And when I walked into the bad

5    territory, I mean it was -- it was not a good

6    territory.  I mean it wasn't ranked very high.

7           It all depends on your managed care

8    coverage.  When you get ranked -- when it comes to

9    rankings, they rank you with everyone else in the

10   country.

11          And if your drug isn't on formulary like

12   Medicaid or Blue Cross/Blue Shield, if you're not

13   ranked -- if you're not on first or second tier here

14   but yet somebody in Las Vegas has coverage and

15   they're covered on all the plans, and if they can

16   get -- you know, Medicaid people can get your drug

17   for 50 cents or $2, well, obviously they're going to

18   sell a lot more scripts in Vegas than you are in

19   Missouri.

20          And so numbers -- it's a number game.  I

21   mean it really is.  I mean I think if you go back

22   and look at other sales performance and look at

23   reviews that, you know, from the ride-alongs that

24   say, "You know, you're doing an excellent job of

25   your organization and stuff," this here is just

Ms. Amber Munson

BARKLEY
Court Reporters

1    basically a generic letter.

2         Q.   Do the doctors always know what's on

3    formulary and what's not?

4         A.   No.   That's what -- that's what we're

5    there for.   That's what we're supposed to tell them.

6    That's why they give us materials and stickers and

7    stuff to put on drugs when we go out in the field.

8         Q.   So I guess my question is, if you

9    write a prescription for a drug that's not on

10   formulary, and the doctor doesn't know that it's not

11   on formulary, he's going to write the product

12   anyway?

13        A.   But then when they go to the

14   pharmacist --

15        Q.   Does the pharmacist switch it out?

16        A.   -- the pharmacist switches it out.

17        Q.   And that's why you would call the

18   pharmacies and tell them not to?

19        A.   Right.   You would ask them not to.   But

20   the majority of people -- I mean anyone that's, you

21   know, going to write a higher tier drug, unless the

22   doctor is really educated and willing to take the

23   time, which most of them aren't, it's going to get

24   switched at the pharmacy anyhow.

25        Q.   So let's just talk about this letter

209

BARKLEY
Court Reporters

1        MS. OSE:

2        Q.   All right.  And are you familiar with

3 this document?

4        A.   Yep.  Basically the same thing as the

5 other one, just a different format.

6        Q.   Okay.  So this is a performance review

7 from the year 2004.  Let's look at, "Selling the

8 customers, partially achieved expectations."

9        A.   You know what?  Can you repeat that

10 again.

11        Q.   Sure.  Selling to customers, for which

12 you received a score of partially achieved

13 expectations.

14        A.   Mm-hmm.

15        Q.   This third bullet point down, it says,

16 "Monthly Mobic total prescriptions declined subtly

17 January through August.  Average 86 per month down

18 from January baseline."

19        You might not remember, but was there some

20 sort of formulary position change during that time?

21        A.   No, I don't -- I don't know exactly

22 what the difference was.

23        Q.   Okay.  So you don't --

24        A.   I would have to -- I would have to see

25 a full analysis of the market.  I don't know if

Ms. Amber Munson

BARKLEY
Court Reporters

```
 1   my -- see, the thing is, is that they don't take
 2   into consideration a lot of times -- and I don't
 3   know if this is the case.
 4          But a lot of times you might have a
 5   physician that was a high writer that might have
 6   left your area.  You know, he might move to another
 7   state.
 8          And then you're no longer -- you don't have
 9   that target in your territory anymore, and you don't
10   have the freedom to go out and pick other targets to
11   replace him with that might be able to write those
12   scripts for you.  You just have to use what's on
13   your call plan to pull those numbers from.
14          Another thing that sometimes happens is the
15   realignment.  You know, if you get new targets that
16   -- you know, a new area.
17          Or -- I don't think -- I don't think Mobic
18   had gone generic then, but that is very possible
19   that it had gone generic.
20          But I think that was too far back.  I don't
21   think it went generic till like '07, '06.  No.  Was
22   this -- this was '06.  No, it was '05.
23          Q.   No, this was performance year '04.
24          A.   Okay.  Yeah, so it wasn't generic yet.
25   Which is amazing because the Mobic is what I -- I
```

252

BARKLEY
Court Reporters