# EXHIBIT T

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - - -x

JAMES JIRAK AND ROBERT PEDERSON, :
Individually and on Behalf of All:
Others Similarly Situated,          :
as Class Representatives,           :
                                    :
            Plaintiffs,             : Case No.
                                    : 07cv3626
v.                                  :
                                    :
ABBOTT LABORATORIES, INC.           :
                                    :
        Defendant.                  :
- - - - - - - - - - - - - - - -x

                        Wilmington, Delaware

                  Wednesday, August 26, 2009


Deposition of:

            MICHAEL BOYER,

called for oral examination by counsel for

Defendant, pursuant to notice at the Sheraton

Suites Wilmington, 422 Delaware Avenue,

Wilmington, Delaware 19801, before Okeemah S.

Henderson of Global Deposition Services, a

Notary Public in and for the State of Delaware,

beginning at 9:57 a.m., when were present on

behalf of the respective parties:

**Page 78**

1  and get your certification and then you were
2  eligible to take the quiz. Or you reviewed the
3  sales aid during the regional training meeting
4  and then you would take the quiz at the end of
5  the training with your district manager and/or
6  regional manager.
7      Q.   Okay. I understand.
8      A.   Can I throw something else in there?
9  Sometimes your sales aid training was also done
10  in the field with your district managers during
11  the ride along.
12      Q.   In your personal opinion, do you
13  think you performed well as a pharmaceutical
14  representative at Abbott?
15      MR. PALMER: Objection. Vague as to
16  time period.
17  BY MS. LEITENBERGER:
18      Q.   From the period of 2004 to the
19  present, do you believe that you performed well
20  in your role at Abbott?
21      A.   I believe that three of mine I got
22  high expectations. I think one out of those
23  years of 4, 5, 6, 7 or 8 I think I got exceeds
24  expectations but the other times I got high
25  expectations.

**Page 79**

1      Q.   Just to be clear, do you understand
2  what the word franchise is when you use that in
3  reference to Abbott?
4      A.   No.
5      Q.   Are there different divisions within
6  Abbott in terms of who sells or who promotes
7  which products?
8      A.   Yes. Then I do know what you mean
9  by that term.
10      Q.   And what, to your knowledge, are the
11  different divisions?
12      A.   They have trained -- I mean, Abbott
13  has three different product groups. One is
14  devices, one is nutritional supplements and the
15  other one is pharmaceuticals. I work within
16  the pharmaceuticals one and within Abbott's
17  pharmaceuticals, there are numerous divisions
18  within that.
19      One is for Humira. One is a drug called
20  Depacot, I think. Please don't quote me on the
21  Depacot and there's other smaller products like
22  AIDS medications is another one, they have
23  their own division (inaudible) franchise --
24  within primary care, I believe there's two
25  franchises, but like I said, I'm not

**Page 80**

1  100 percent sure. One is specialty and one is
2  primary care.
3      Q.   So you work within the primary care
4  franchise --
5      A.   I think it's called PPD.
6      Q.   During your employment with Abbott,
7  have you worked in the same area
8  geographically?
9      A.   The quad state area. I have worked
10  in Maryland, Delaware, Pennsylvania and New
11  Jersey but all within about an hour drive of
12  where we're sitting right now in Wilmington,
13  Delaware. So usually about 50 miles.
14      Q.   From 2004 to present you lived in
15  Wilmington, correct?
16      A.   Correct.
17      Q.   What was the farthest city that you
18  ever had job responsibilities for to visit?
19      A.   Maybe Swedesboro, New Jersey or
20  Dover, Delaware.
21      Q.   Do you recall approximately how far
22  away Swedesboro is?
23      A.   About 50 miles, give or take.
24      Q.   And approximately how far Dover is?
25      A.   About 50 miles.

**Page 81**

1      Q.   About how often did you visit
2  Swedesboro, New Jersey?
3      A.   An average about once a week when I
4  had that. I only had that territory for Abbott
5  nine months.
6      Q.   And what nine months was that? A
7  year would be fine?
8      A.   That's going to be harder, too. I
9  apologize. Maybe 2007 and that's Dover,
10  Delaware.
11      Q.   Approximately how often did you
12  visit Dover, Delaware?
13      A.   Usually one or two times a week. I
14  probably had it in 2004 and probably like 2007,
15  8 and 9. It's that gray area that I was in New
16  Jersey that I'm not too sure.
17      Q.   And then you had mentioned earlier
18  that you promoted different drugs over the
19  years. Do you recall approximately how many
20  you've promoted?
21      MR. PALMER: Objection. Vague.
22  Answer if you understand.
23      A.   I do. Maybe 10.
24  BY MS. LEITENBERGER:
25      Q.   And to whom are you promoting them?

**Page 218**

```
 1   the last three to six months, but any call that
 2   I make prior to that, I would have probably as
 3   a general rule, I would have put that in the
 4   system.
 5       Q.   All right.  So I'm looking at 65547.
 6   I'm looking on January 23rd.  There appears to
 7   be multiple entries for Naranger Sing?
 8       A.   Yes.  I'm looking at that, too, and
 9   I have a feeling -- I can maybe shed some light
10   on that if you're looking for it?
11       Q.   Sure.
12       A.   That was one call and each line item
13   within the Max database, there may be three
14   different things that have to go into three
15   different databases or three different fields.
16   One of them is the first line, which is an it
17   says sample detail but really what that was is
18   a TriCor dislypedemic detail and that was
19   probably the primary or co-primary call for
20   that particular one and that would be
21   classified as it's probably a detail only,
22   which means that any time you have an
23   interaction with a doctor, you need to document
24   that interaction with that doctor.
25       The second line says TriCor tab under the
```

**Page 219**

```
 1   drug and then says quantity No. 1.  That is
 2   probably a sample entry and that means I left
 3   one sample of TriCor.  The third item, which is
 4   Nader Sing (phonetic) it's a detail for Omnicef
 5   capsules sinusitis, so that's probably a
 6   detail.
 7       All three of those things would have
 8   constituted a call and they all share some of
 9   the same fields like the date, the reference
10   number and that kind of stuff, but like I said,
11   I have never seen it in this format before.
12       Q.   I understand.  So your call to Dr.
13   Sing would have been one call on January 23rd,
14   2006, correct?
15       A.   Correct.
16       Q.   Then you would have had a call to
17   Nicholas Biasotto, B-I-A-S-O-T-T-O?
18       A.   Correct.
19       Q.   And that would have been your second
20   call for the day?
21       A.   It appears to be.
22       Q.   Then Dr. Kamen, K-A-M-E-N?
23       A.   Correct.
24       Q.   So that would be 3?
25       A.   Correct.
```

**Page 220**

```
 1       Q.   Doctor?
 2       A.   Osunkoya.
 3       Q.   O-S-U-N-K-O-Y-A, so that's four?
 4       A.   Correct.
 5       Q.   Dr. Mann?
 6       A.   That is correct.  M-A-N-N.
 7       Q.   And that would be your fifth?
 8       A.   Probably.  Yes.
 9       Q.   Then Dr. Austria
10       A.   Yes.
11       Q.   Would be your sixth?
12       A.   Dr. Donlick (phonetic) would be your
13   seventh.
14       Q.   So counting total on the 23rd, I
15   will ask you how many doctors did you visit on
16   the 23rd?
17       A.   12.  Does that sound about right?
18   There's a nurse practitioner in there.
19       Q.   And then after the 23rd, there's a
20   break?
21       A.   Correct.
22       Q.   Do you recall why there would be no
23   data entry from the 24th to the 29th of
24   January, 2006?
25       A.   No.  I can't recall exactly why that
```

**Page 221**

```
 1   would be.
 2       Q.   Could it have been vacation?
 3       A.   Could have been.  I can give you
 4   speculation.
 5       Q.   But you don't recall?
 6       A.   But what were you going to say.
 7       Q.   But you don't recall?
 8       A.   No, I do not recall.
 9       Q.   So that would be the 24th, the 25th,
10   26th, 27th, 28th and 29th that you did not
11   work?
12       A.   I'm assuming that two of those days
13   were Saturdays and Sundays?
14       Q.   Let's take those two days off.  That
15   would be four days total?
16       A.   Correct.
17       Q.   And during the week where you worked
18   one full day in the field.  So according to
19   Exhibit 3, you would have worked --
20       A.   If I had to guess just by looking at
21   where these doctors are, I went from Newark to
22   Wilmington to Dover, to Smirna, to Middletown
23   and then came home.  That's a long day.  I
24   probably spent more than eight hours in the
25   field that day.  But that being said, if I had
```

Case: 1:07-cv-03626 Document #: 146-21 Filed: 12/14/09 Page 5 of 5 PageID #:1823

## Page 242

1   A.   Yeah. That's what I mean. I don't
2   know if I would consider a mail person to be
3   that. But people above that or something like
4   that, administrative assistants you would
5   consider them professional. Yes.
6       Q.   And you will consider your job as a
7   professional pharmaceutical representative in
8   that same category of professional?
9       A.   Probably. I would consider that a
10  professional career, if more no other reason I
11  was raised blue collar and I'm working white
12  collar now. So when I was growing up it was
13  considered a professional career.
14      MS. LEITENBERGER:  No more questions.
15      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
16  BY MR. PALMER:
17      Q.   Has any doctor ever given you money
18  in exchange for an Abbott product?
19      A.   No.
20      Q.   Has any doctor ever signed a
21  contract that they would buy an Abbott product
22  from you?
23      A.   No.
24      Q.   Has any doctor ever signed a
25  contract that they would, with you that they

## Page 243

1   would prescribe an Abbott product?
2       A.   No.
3       Q.   Has any doctor ever been bound in
4   any way to fill an Abbott prescription after
5   you performed a call with him?
6       MS. LEITENBERGER:  Objection. Vague.
7       A.   As a general rule, Abbott's doctors
8   don't fulfill prescriptions. They write
9   prescriptions. But to answer that question, no
10  doctors have ever -- repeat your question
11  again.
12      BY MR. PALMER:
13      Q.   I think I misstated my -- after
14  performing a call, is a doctor ever bound in
15  any way to write an Abbott prescription?
16      MS. LEITENBERGER:  Same objection.
17      A.   No.
18      BY MR. PALMER:
19      Q.   Do the doctors that you visit, do
20  they have to do what they said they would do in
21  response to your request for a committee?
22      A.   No.
23      Q.   How many times in your career were
24  you a guest trainer?
25      A.   Once.

## Page 244

1       Q.   Just once?
2       A.   Correct.
3       Q.   Is it accurate that earlier you
4   stated doctors -- that you use doctors's trends
5   in precalls? Information?
6       A.   Yes.
7       Q.   Do you receive the information of
8   any doctors' trends?
9       A.   It normally comes down to a very
10  complicated Excel spreadsheet.
11      Q.   Sent to you by Abbott?
12      A.   Yes.
13      Q.   Has Abbott taught you how to use the
14  doctor's trend information?
15      A.   Yes, they have.
16      Q.   You testified earlier that in one
17  third of your calls you do not actually see a
18  doctor?
19      A.   No. I say I do not normally -- I
20  don't normally have much interaction with the
21  doctor at all. By law I have to witness the
22  signature.
23      Q.   And one third of -- let me strike
24  that. Two thirds of the time that you visit
25  doctors, you see them for 20 seconds or less?

## Page 245

1       MS. LEITENBERGER:  Objection
2   misstates witness's testimony.
3       BY MR. PALMER:
4       Q.   Is that accurate?
5       A.   Yes. Based upon my math. Yes.
6       Q.   And that one third of the time when
7   you do a call on a doctor, you actually speak
8   with him for more than 20 seconds?
9       A.   To the best of my knowledge. Yes.
10      Q.   Doze Abbott limit what you can say
11  to a doctor on a call?
12      A.   Yes, they do.
13      Q.   Does Abbott limit what you can show
14  the doctors in a call?
15      A.   Yes, they do. It has to be Abbott
16  approved.
17      Q.   Does Abbott limit which doctors you
18  visit?
19      A.   Over the course of their time they
20  have. I mean, I'm not allowed to call
21  cardiologists anymore, which makes up about
22  50 percent of my territory scripts, so yes.
23      Q.   Abbott has given you a budget?
24      A.   They give me word chest for me and
25  the team.