# EXHIBIT U

# No. 09-0437

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

IN RE NOVARTIS
WAGE AND HOUR LITIGATION

On Appeal from the United States District Court
for the Southern District of New York

BRIEF FOR THE SECRETARY OF LABOR AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

CAROL A. DE DEO
Deputy Solicitor
 for National Operations

WILLIAM C. LESSER
Deputy Associate Solicitor

PAUL L. FRIEDEN
Counsel for Appellate
 Litigation

JENNIFER R. MARION
Attorney

U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave., N.W.
Suite N-2716
Washington, D.C. 20210
(202) 693-5555

TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF THE SECRETARY OF LABOR............... 1

STATEMENT OF THE ISSUES....................................... 2

STATEMENT OF FACTS............................................ 3

SUMMARY OF ARGUMENT........................................... 5

ARGUMENT...................................................... 6

    I.  The District Court Erred By Concluding That The Reps
    Are Exempt Outside Salespersons Despite The Fact That They
    Do Not "Make Sales" As Required By The Department's
    "Outside Sales" Regulations............................... 6

    II.  The District Court Erred By Concluding That The Reps
    Are Exempt Administrative Employees In Accordance With The
    Department's "Administrative Exemption" Regulations, Which
    Limit The Exemption To Employees Who Exercise Discretion
    And Independent Judgment With Respect To Matters Of
    Significance.............................................. 17

CONCLUSION................................................... 28

CERTIFICATE OF COMPLIANCE WITH RULE 32(a).................... 29

CERTIFICATE OF DIGITAL SUBMISSION............................ 30

CERTIFICATE OF SERVICE....................................... 31

ADDENDUM

<u>TABLE OF AUTHORITIES</u>

Page

<u>Cases</u>

*Amendola v. Bristol-Myers Squibb Co.,*
    558 F. Supp.2d 459 (S.D. N.Y. 2008).............. 13, 23, 24

*Arnold v. Ben Kanowsky, Inc.,*
    361 U.S. 388 (1960)........................................ 7

*Auer v. Robbins,*
    519 U.S. 452 (1997)........................................ 7

*Bilyou v. Dutchess Beer Distribs., Inc.,*
    300 F.3d 217 (2d Cir. 2002)............................... 7

*Chevron U.S.A. Inc. v. Natural Res. Def. Council Inc.,*
    467 U.S. 837 (1984)........................................ 7

*Clark v. J.M. Benson Co. Inc.,*
    789 F.2d 282 (4th Cir. 1986)............................. 20

*Clements v. Serco,*
    530 F.3d 1224 (10th Cir. 2008)........................... 15

*Cote v. Burroughs Wellcome Co.,*
    558 F.Supp. 883 (E.D.Pa. 1982)........................... 24

*D'Este v. Bayer Corp.,*
    565 F.3d 1119 (9th Cir. 2009)........................... 12

*Dalheim v. KDFW-TV,*
    706 F. Supp. 493 (N.D. Tex. 1998), *aff'd,*
    918 F.2d 1220 (5th Cir. 1990)........................... 20

*Delgado v. Ortho-McNeil Primary Care, Inc.,*
    Ninth Cir. No. 09-55229,
    (No. 07-263, C.D. Cal. Feb. 6, 2009).................... 12

*Delgado v. Ortho-McNeil Primary Care, Inc.,*
    2009 WL 2781525 (C.D. Cal. Feb. 6, 2009................... 8

Cases -- continued

Page

*Federal Express Corp. v. Holowecki,*
    128 S. Ct. 1147 (2008)..................................... 7

*Gregory v. First Title of Am., Inc.,*
    555 F.3d 1300 (2009)...................................... 15

*Havey v. Homebound Mortgage, Inc.,*
    547 F.3d 158 (2d Cir. 2008)......................... 13, 14

*IMS Health Inc. v. Ayotte,*
    550 F.3d 42 (1st Cir. 2008), *cert. denied,*
    129 S.Ct. 2864 (2009).................................... 16

*In Re Novartis Wage & Hour Litig.,*
    593 F. Supp.2d 637 (S.D. N.Y. 2009)................. *passim*

*Kennedy v. Commonwealth Edison Co.,*
    410 F.3d 365 (2005)...................................... 27

*Kuzinski, et al. v. Schering Corp.,*
    604 F.Supp.2d 385 (D.Conn. 2009)........ 10, 13, 14, 15, 27

*Lombard v. Whitman,*
    485 F.3d 73 (2d Cir. 2007).............................. 24

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007)...................................... 7

*Medtronic, Inc. v. Gibbons,*
    527 F. Supp. 1085 (D. Minn. 1981), *aff'd,*
    684 F.2d 565 (8th Cir. 1982)............................ 16

*National Cable & Telecomms. Ass'n v.*
    *Brand X Internet Servs.,*
    545 U.S. 967 (2005)...................................... 7

*Reich v. American Int'l Adjustment Co.,*
    902 F. Supp. 321 (D. Conn. 1994)....................... 25

Cases -- continued

Page

*Reich v. John Alden Life Ins. Co.,*
    126 F.3d 1 (1st Cir. 1997)................................. 26

*Robinson-Smith v. Gov't Employees Ins. Co.,*
    323 F.Supp.2d 12 (D. D.C. 2004).......................... 24

*Ruggeri v. Boehringer Ingelheim Pharm., Inc.,*
    585 F. Supp.2d 254 (D.Conn. 2008)........ 13, 14, 23, 24, 25

*Schaefer-LaRose v. Eli Lilly & Co.,*
    No. 07-1133 (S.D. Ind. Sept. 29, 2009)................... 8

*Smith v. Johnson & Johnson,*
    3rd Cir. No. 09-1223,
    (No. 06-4787, D. N.J. Dec. 30, 2008)..................... 12

*Smith v. Johnson & Johnson,*
    2008 WL 5427802 (D. N.J. Dec. 30, 2008)................. 12

*United States v. Mead Corp.,*
    533 U.S. 218 (2001)...................................... 7

*Wirtz v. Charleston Coca-Cola Bottling Co., Inc.,*
    237 F.Supp. 857 (E.D.S.C. 1965)......................... 11

*Yacoubian v. Ortho-McNeil Pharm. Corp.,*
    Ninth Cir. No. 07-00127,
    (No. 07-127, C.D. Cal. Feb. 6, 2009).................... 12

Statutes

Fair Labor Standards Act of 1938,
    as amended; 29 U.S.C. 201 *et seq.*

    29 U.S.C. 203(k)........................................ 8
    29 U.S.C. 204(a)........................................ 1
    29 U.S.C. 204(b)........................................ 1
    29 U.S.C. 207(i)....................................... 11
    29 U.S.C. 211(a)........................................ 1
    29 U.S.C. 213(a)(1)................................... 1, 6
    29 U.S.C. 216(c)........................................ 1
    29 U.S.C. 217........................................... 1

## Code of Federal Regulations

Page

29 C.F.R. Part 541................................... 21, 24
29 C.F.R. 541.2..................................... 10
29 C.F.R. 541.200(a)(1)............................. 17
29 C.F.R. 541.200(a)(2)............................. 17
29 C.F.R. 541.200(a)(3)........................... 2, 17
29 C.F.R. 541.202(a)................................ 17
29 C.F.R. 541.202(b)..................... 18, 20, 21, 27
29 C.F.R. 541.202(e)................................ 19
29 C.F.R. 541.202(f)............................. 19, 25
29 C.F.R. 541.203(g)-(i)............................ 19
29 C.F.R. 541.500.................................... 2
29 C.F.R. 541.500(a)(1)(i)........................ 8, 10
29 C.F.R. 541.500(a)(1)(ii)......................... 8
29 C.F.R. 541.500(a)(2)............................. 8
29 C.F.R. 541.501................................... 8
29 C.F.R. 541.501(b)................................ 9
29 C.F.R. 541.501(d)................................ 9
29 C.F.R. 541.503(a)................................ 9
29 C.F.R. 541.503(b)............................. 9, 10
29 C.F.R. 541.700................................... 8

## Miscellaneous

Federal Register
    69 Fed. Reg. 22,122 (April 23, 2004).......... 7, 18, 22, 24

Federal Rule of Appellate Procedure,
    Rule 29............................................ 1

Department of Labor, Wage-Hour
    Field Operations Handbook, ¶22e04 (1965)............... 12

Department of Labor, Wage-Hour Opinion Letter
    May 19, 1945....................................... 23

Department of Labor, Wage-Hour Opinion Letter
    August 19, 1994, 1994 WL 1004855....................... 11

Department of Labor, Wage-Hour Opinion Letter
    FLSA-2005-06, 2005 WL 330605 (January 7, 2005).......... 11

Department of Labor, Wage-Hour Opinion Letter
    FLSA-2006-16, 2006 WL 1698305 (May 22, 2006)............ 11

Miscellaneous - continued

Page

Department of Labor, Wage-Hour Opinion Letter
FLSA-2006-27, 2006 WL 2792441 (July 24, 2006)........ 20, 21

Department of Labor, Wage-Hour Opinion Letter
FLSA-2006-34, 2006 WL 3227789 (September 21, 2006)....... 21

Department of Labor, Wage-Hour Opinion Letter
FLSA-2006-45, 2006 WL 3930478 (December 21, 2006)........ 19

Department of Labor, Wage-Hour Opinion Letter
FLSA-2006-46, 2006 WL 3930479 (December 21, 2006)........ 22

No. 09-0437

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

IN RE NOVARTIS
WAGE AND HOUR LITIGATION

On Appeal from the United States District Court
for the Southern District of New York

BRIEF FOR THE SECRETARY OF LABOR AS
*AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

Pursuant to Federal Rule of Appellate Procedure 29, the Secretary of Labor ("Secretary") submits this brief as *amicus curiae* in support of the Plaintiffs-Appellants. The district court committed legal error when it concluded that the Plaintiffs-Appellants, Pharmaceutical Sales Representatives ("Reps") employed by Novartis Pharmaceutical Corporation ("NPC"), are exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA" or "Act") under the "outside sales" exemption or, alternatively, the "administrative" exemption. *See* 29 U.S.C. 213(a)(1).

## STATEMENT OF INTEREST OF THE SECRETARY OF LABOR

The Secretary administers and enforces the FLSA, *see* 29 U.S.C. 204(a) and (b), 211(a), 216(c), 217, and has a compelling interest in ensuring that it is interpreted correctly. By

concluding that the Reps are exempt as outside salespersons despite the fact that they do not engage in any sales, the district court failed to follow the Department of Labor's ("Department's") regulatory provisions limiting the exemption to employees who make sales or obtain orders or contracts for services for which a consideration will be paid by the client or customer. *See* 29 C.F.R. 541.500. Moreover, the court's conclusion that the Reps, who are given lists of physicians to visit and are not allowed to go beyond the messages crafted by NPC (as set out in scripts and related materials with which they are provided), are exempt administrative employees is inconsistent with the regulatory requirement that employees must exercise discretion and independent judgment with respect to matters of significance in order to qualify for the administrative exemption. *See* 29 C.F.R. 541.200(a)(3).

### STATEMENT OF THE ISSUES

(1) Whether the district court erred by concluding that the Reps are exempt outside salespersons despite the fact that they do not "make sales" as required by the Department's "outside sales" regulations.

(2) Whether the district court erred by concluding that the Reps are exempt administrative employees in accordance with the Department's "administrative exemption" regulations, which limit

2

the exemption to employees who exercise discretion and
independent judgment with respect to matters of significance.

STATEMENT OF FACTS

The plaintiffs in this case are a class of over 2,500 Reps
who worked for NPC in New York, California, and other states.
The Food and Drug Administration ("FDA") prohibits Reps from
selling drugs to physicians, see In Re Novartis, 593 F. Supp. 2d
637, 642 (S.D. N.Y. 2009); their primary duty is to call on
physicians and provide them with information about NPC's drugs.
Id. at 641. The goal of providing the physicians with this
information is to convince them to prescribe NPC's drugs to
their patients. Id.[1]

NPC trains the Reps in sales techniques as well as giving
them basic training in pharmacology and other relevant subjects.
Id. NPC expects the Reps to deliver a "core message" about the
drugs to each physician, and provides them with scripts and
other materials to help them do so. Id. They may not elaborate
on the messages crafted by NPC, such as making claims about a
drug's effectiveness, absent NPC authorization. Id. NPC also
provides the Reps with materials to use in their presentations,

---

[1] The patient does not purchase the prescribed drugs from a
physician, but rather from a pharmacy. NPC sells its drugs
directly to distributors, who in turn sell them to pharmacies,
who then sell them to patients with prescriptions (Oral Argument
Transcript, Nov. 18, 2008 at 5:9-10).

such as pamphlets, clinical studies, and visuals aids, together with instructions on how these materials should be utilized; Reps may not use other materials unless NPC has cleared them. *Id.*[2] Within these stringent parameters, the Reps "tailor" their presentations to each physician based on such considerations as the amount of time the physician is willing to meet with the Rep, the physician's patient base and prescribing habits, and the physician's personality. *Id.* at 642. NPC also provides the Reps with a budget for organizing informational events for their target physicians, following NPC guidelines for speakers and invitees. *Id.*

Each Rep is assigned a target list of physicians to call on; Reps may not remove or add physicians to their list without NPC's consent, and are reprimanded for failing to adhere to their target lists (Plaintiffs-Appellants' Statement of Facts ("SOF") at ¶¶ 37-40). NPC also assigns the Reps specific drugs to promote. *In Re Novartis*, 593 F. Supp. 2d at 641. Although NPC does not directly supervise the Reps, it expects them to call on a certain number of physicians on their list between 8 a.m. and 5 p.m. each weekday, determines how often Reps should

---

[2] If a Rep does not have a scripted response from NPC to a physician's concerns, she must try to "sidestep" the question by restating the "core message" or refer the physician to medical experts and NPC (Plaintiffs-Appellants SOF at ¶¶ 77-78).

4

call on each physician, and ranks each physician and drug in order of importance for each Rep (Plaintiffs-Appellants SOF at ¶ 37). *Id.* at 642. NPC also expects the Reps to "close" each physician visit by requesting a non-binding commitment to prescribe NPC drugs to their patients when appropriate or, in other cases, giving a physician a clinical study to review or thanking the physician for his time. *Id.* The Reps earn an average annual "salary" of $91,500 that includes both base pay and "incentive payments" based on the number of prescriptions written by physicians. *Id.*

## SUMMARY OF ARGUMENT

Under the Department's regulations, the Reps do not meet the requirements for either the outside sales or administrative exemption. The Reps do not sell or take orders for NPC's drugs; rather, they provide information to target physicians about NPC's drugs with the goal of persuading the physicians to prescribe those drugs to their patients. The actual sale of drugs takes place between NPC and pharmacies. Although the Reps' duties bear some of the indicia of sales -- they use methods of persuasion similar to those of salespersons, they receive some of their compensation in the form of bonus or incentive payments, and their promotion work affects NPC's actual drug sales -- the fact that the Reps do not actually "make sales" conclusively demonstrates that the position is not

5

that of an outside salesperson consistent with the Department's legislative rules.

Furthermore, when promoting the drugs to the physicians, the Reps are not permitted to deviate from the "core message" found in the scripts, manuals, brochures, and other materials NPC provides them. If the Reps do not have a scripted response to a physician's question, they are required to either reiterate the "core message" or refer the physician to NPC's medical experts. These constraints on the Reps' primary duties demonstrate that, although the Reps have some discretion (such as deciding what time of day to see which physician, tailoring their message to a physician's personality or time constraints, and deciding whether to ask for a non-binding commitment at the end of a visit), they do not exercise discretion and independent judgment with respect to matters of significance. Thus, the Reps do not qualify for the administrative exemption.

<u>ARGUMENT</u>

I. THE DISTRICT COURT ERRED BY CONCLUDING THAT THE REPS ARE EXEMPT OUTSIDE SALESPERSONS DESPITE THE FACT THAT THEY DO NOT "MAKE SALES" AS REQUIRED BY THE DEPARTMENT'S "OUTSIDE SALES" REGULATIONS

Section 13(a)(1) of the FLSA provides a complete exemption from the overtime pay requirement for "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman[,] as such terms

6

are defined and delimited from time to time by regulations of the Secretary[.]" 29 U.S.C. 213(a)(1). The Act's "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those [cases] plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *see Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002).

Pursuant to Congress's express delegation of rulemaking authority, the Secretary issued revised regulations after notice and comment that "define and delimit" the FLSA's overtime exemptions. *See* 69 Fed. Reg. 22,122 (Apr. 23, 2004). As such, they are entitled to controlling deference. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984); *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165-68, 171-74 (2007); *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001).[3]

---

[3] To the extent that the plain language of the Department's outside sales or administrative regulations are ambiguous, courts must give controlling deference to the Department's interpretation of its own regulations unless such interpretation is plainly erroneous or inconsistent with those regulations. *See Federal Express Corp. v. Holowecki*, 128 S. Ct. 1147, 1155 (2008); *Auer v. Robbins*, 519 U.S. 452, 461 (1997). This principle holds true whether the Secretary's interpretation is found in a Preamble to a final rule published in the Federal Register, an opinion letter or other interpretive materials, or in a legal brief. *See, e.g., Coke*, 551 U.S. at 171 (controlling deference to Department's Advisory Memorandum issued during the

1.  As noted *supra*, section 13(a)(1) of the FLSA provides
an exemption from the statute's minimum wage and overtime
requirements for "any employee employed . . . in the capacity of
outside salesman."  The Department's regulations define that
phrase as including "any employee . . . whose primary duty is
. . . making sales within the meaning of section 3(k) of the
Act, or . . . obtaining orders or contracts for services or for
the use of facilities for which a consideration will be paid by
the client or customer."  29 C.F.R. 541.500(a)(1)(i)-(ii).[4]
"Primary duty" means "the principal, main, major, or most
important duty that the employee performs," 29 C.F.R. 541.700,
and section 3(k) of the FLSA defines "sale" as "any sale,
exchange, contract to sell, consignment for sale, shipment for
sale, or other disposition."  29 U.S.C. 203(k); *see* 29 C.F.R.
541.501.[5]  The Department's regulations further explain that

---

course of litigation); *Auer*, 519 U.S. at 462 (controlling
deference to legal brief).

[4] It is clear that the Reps are "customarily and regularly
engaged away from" NPC's place of business.  29 C.F.R.
541.500(a)(2).

[5] Contrary to the conclusions of two recent district court
decisions, the Reps' activities do not come within the "other
disposition" language found in section 3(k).  *See Schaefer-
LaRose v. Eli Lilly & Co.*, S.D. Ind. No. 07-1133 (Sept. 29,
2009); *Delgado v. Ortho-McNeil, Inc.*, 2009 WL 2781525 (C.D. Cal.
Feb. 6, 2009).  The term "other disposition" must be read in the
context of the language that precedes it, i.e., in the context
of making some kind of a sale.  The most the Reps can obtain is

"[s]ales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property," and that "services" "extends the outside sales exemption to employees who sell or take orders for a service, which may be performed for the customer by someone other than the person taking the order." 29 C.F.R. 541.501(b) and (d).

The regulations also explain the relationship between promotional work and the outside sales exemption, clarifying that

> [p]romotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed. Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.

29 C.F.R. 541.503(a). In other words, "[p]romotion activities directed toward consummation of the employee's own sales are exempt. Promotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work." 29 C.F.R. at 541.503(b).

Thus, under the plain language of the Department's

---

a non-binding commitment from a physician to prescribe NPC drugs as appropriate.

regulations, the Reps do not meet the primary duties test for the outside sales exemption.[6] Because the Reps do not sell any drugs or obtain any orders for drugs, and can at most obtain from the physicians a non-binding commitment to prescribe NPC's drugs to their patients when appropriate, the Reps do not meet the regulation's plain and unmistakable requirement that their primary duty must be "making sales." 29 C.F.R. 541.500(a)(1)(i). Contrary to the district court's assertion that "Reps make sales in the sense that sales are made" in the pharmaceutical industry, *In Re Novartis*, 593 F. Supp. 2d at 650, the actual sale of NPC's drugs occurs between the company and distributors (and then to the pharmacy).[7] Insofar as the Reps' work increases NPC's sales, it is non-exempt promotional work "designed to stimulate sales that will be made by someone else." 29 C.F.R. 541.503(b).

---

[6] "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations." 29 C.F.R. 541.2. Therefore, contrary to the district court's suggestion in *In Re Novartis*, 593 F. Supp. 2d at 654 n.7., the fact that NPC "hired, trained, paid, and incentivized [the Reps] as sales personnel" is not in any way dispositive.

[7] Even if it is true that absent a prescription no drugs would be sold to patients, *see In Re Novartis*, 593 F. Supp. 2d at 650, it nonetheless is "irrelevant to the dispositive inquiry of whether [Reps] make sales of those products as defined in the FLSA." *Kuzinski, et al. v. Schering Corp.*, 604 F. Supp. 2d 385, 398 (D. Conn. 2009) (internal quotation marks omitted).

2. To the extent, however, that there is any ambiguity on this point in the Department's regulations, the Department's Wage and Hour Division has consistently reiterated its position that a "sale" for the purposes of the outside sales exemption requires a consummated transaction directly involving the employee for whom the exemption is sought.[8] For example, Wage and Hour rejected the application of the outside sales exemption to individuals soliciting charitable contributions, noting that "[s]oliciting promises of future charitable donations or 'selling the concept' of donating to a charity does not constitute 'sales' for purposes of the outside sales exemption . . . . [These] solicitors do not obtain orders or contracts for services or for use of your client's facilities for which a consideration will be paid." WH Opinion Letter FLSA 2006-16, 2006 WL 1698305; *see* WH Opinion Letter August 19, 1994, 1994 WL 1004855 (concluding that soliciting organ and tissue donors by selling the concept of being a donor does not constitute "sales"

---

[8] In the context of addressing the "retail or service establishment" criteria of the FLSA's section 7(i) exemption, *see* 29 U.S.C. 207(i), Wage and Hour noted when discussing the definition of "sale" in section 3(k) of the FLSA that "[t]hough the term sale does not always have a fixed or invariable meaning, it is generally held to be a contract between parties to give and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought or sold." WH Opinion Letter FLSA 2005-06, 2005 WL 330605 (citing *Wirtz v. Charleston Coca-Cola Bottling Company, Inc.*, 237 F. Supp. 857 (E.D.S.C. 1965)) (internal quotation marks omitted).

under the regulations). Further, Wage and Hour's Field
Operations Handbook ("FOH") states that "[a]n employee whose
duty is to convince a dealer of the value of his employer's
service to the dealer's customers and who does not in fact
obtain firm orders or contracts from either the dealer or his
customers is not making sales within the meaning of FLSA Sec.
3(k)." FOH § 22e04 (1965).

    3. This Court has not addressed the question whether Reps
are exempt as outside salespersons.[9] Within the Second Circuit,
the district courts that have addressed the question have, with
the exception of the decision in the instant case, concluded
that the outside sales exemption does not apply to Reps because

---

[9] No circuit court has addressed this specific question. There
are, however, cases involving the application of the outside
sales and administrative exemptions pending in the Third and
Ninth Circuits. In *Smith v. Johnson & Johnson*, No. 09-1223, now
before the Third Circuit on appeal, the district court
determined that the outside sales exemption does not apply to
Reps because they do not "make sales," but that they are exempt
administrative employees who exercise discretion as to matters
of significance. *See Smith v. Johnson & Johnson*, 2008 WL
5427802, at *11-12 (D. N.J. Dec. 30, 2008). Currently before
the Ninth Circuit are two cases in which the Central District of
California concluded that Reps are exempt as outside
salespersons. *See Yacoubian v. Ortho-McNeil Pharmaceutical
Corp.*, Ninth Cir. No. 09-55225 (No. 07-127, C.D. Cal. Feb. 6,
2009); *Delgado v. Ortho-McNeil Primary Care, Inc.*, Ninth Cir.
No. 09-55229 (No. 07-263, C.D. Cal. Feb. 6, 2009); *cf. D'Este v.
Bayer Corp.*, 565 F.3d 1119 (9th Cir. 2009) (certifying to
California Supreme Court the question whether the Central
District of California correctly concluded that Reps are exempt
outside salespersons under California state law; the district
court's decisions relied in part on its interpretation of the
FLSA's requirements).

they do not make sales as required by the Department's regulations. *See Kuzinski*, 604 F. Supp. 2d. at 403 ("Because [the Reps] undisputedly do not sell or make any sales as those terms are defined in the FLSA and its implementing regulations, they fall outside the FLSA's outside sales exemption.") (internal quotation marks omitted); *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 585 F. Supp. 2d 254, 272 (D. Conn. 2008) ("Because [the pharmaceutical company] has not shown that [the Reps] make sales or obtain contracts or orders, the outside sales exemption is inapplicable."); *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 470 (S.D.N.Y. 2008) ("As a starting point, the interpretation of the [FLSA outside sales] exemption rests on the plain meaning of the statutory and regulatory texts that define it.").

The district court here relied upon this Court's statement in an FLSA "salary basis" case that "[g]iven the broad scope of the FLSA and its implementing regulations, [the Department's] regulations provide only general guidance to accommodate the varying needs of employers and employees in a diverse and varied national economy," *see Havey v. Homebound Mortgage, Inc.*, 547 F.3d 158, 163 (2d Cir. 2008), for its conclusion that it could "take[] into account the characteristics of the industry in question when determining the applicability of the outside sales exemption." *In Re Novartis*, 583 F. Supp. 2d at 649. As noted

13

by the district court in *Kuzinski*, however, "that observation
. . . does not mean that an exemption to an employer's
obligation to pay overtime under the FLSA can apply more broadly
than the regulations specify." 604 F. Supp. 2d at 397 (internal
quotation marks omitted).[10] "The conclusion that [Reps] fall
within the outside sales exemption from FLSA's overtime
provisions on the basis of the characteristics of the industry
in question . . . notwithstanding [the Reps'] lack of capacity
to sell, and physicians' lack of capacity to purchase" is an
attempt at "back-fitting . . . the FLSA to industry practices."
*Id.* at 399 (internal quotation marks omitted); *see Ruggeri*, 585
F. Supp. 2d at 267 ("The justification for the pharmaceutical
industry's use of [Reps] and direction of their efforts at
physicians based on the artifact of medical and drug regulation
. . . does not provide justification for applying the outside
sales exemption to [the Reps], especially given that FLSA
exemptions apply only to those employees who are plainly and
unmistakably within them.") (internal quotation marks omitted).

As noted by the Tenth Circuit, "[t]he touchstone for making
a sale, under the [Department's regulations], is obtaining a

---

[10] This Court, despite referring to the "general guidance"
provided by the regulations, did not ignore what the regulations
plainly and specifically prescribe. *See Havey*, 547 F.3d at 163-
64 ("[T]he regulations specify that a salaried employee must be
paid a fixed and predetermined amount . . . but do not prescribe
when or how frequently this fixed element of compensation may be
determined . . . .").

commitment." *Clements v. Serco*, 530 F.3d 1224, 1227 (2008) (concluding that civilian military recruiters are not within the outside salesperson exemption even though they "engaged in sales training and 'sold' the idea of joining the Army to potential recruits," because they did not engage in sales work as defined by the Department's regulations). In a similar situation to that presented here, the district court in *Kuzinski* concluded:

> [T]he closest that [Reps] come to consummating "sales" is increasing the overall demand for its products, such that [other company] employees negotiate and commit to contracts with wholesalers -- not the physicians to whom [the company's] products are promoted. An employee does not consummate a "sale" for purposes of the FLSA merely by "lay[ing] the groundwork" for another employee to obtain a customer's commitment. . . . To the extent [the Reps] lay foundation or groundwork, it is to increase or maintain their employer's market share for the products they promote. In this sense they pave the way for sales but in no more direct a manner as a pharmaceutical company's direct-to-consumer advertising, which raises demand for that company's products. Neither of these activities constitutes "sales" under the FLSA.

604 F. Supp. 2d at 399 (citing *Clements*, 530 F.3d at 1229).

4. The cases cited by the district court as support for its conclusion that the Reps "make sales" are inapposite. In *Gregory v. First Title of America, Inc.*, 555 F.3d 1300, 1308-10 (2009), the Eleventh Circuit concluded that a "Marketing Director" was an exempt outside salesperson because she obtained orders for title insurance services. In contrast to the instant case, there was no "evidence of any other intervening sales

effort between [the Marketing Director] and orders placed with [her employer]"; once she obtained the order for title insurance services, the sale was complete. *Id.* at 1309. The First Circuit case cited by the district court, *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 47 (2008), *cert. denied*, 129 S.Ct. 2864 (2009), involved the question whether Reps (which that court referred to as "detailers") were entitled to access to "patient-identifiable and prescriber-identifiable data" about prescriptions written in New Hampshire. Although the First Circuit referred to the Reps effect in increasing the pharmaceutical companies' market share, the question of pharmaceutical sales, in relation to the FLSA or any other law, was not before it. Similarly, although the district court in *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982), described the employees of cardiac pacemaker manufacturers' who promoted the pacemakers to physicians as "sales representatives" and their work in terms of "sales," the issue implicated in that case was a covenant not to compete, not the FLSA's outside sales exemption. *Id.* at 1094-95. The court was interpreting the term "customer" under applicable contract construction (i.e., the customers with whom Gibbons had contact in the year immediately preceding his employment with the employer), not the term "sale" under the FLSA or, more specifically, what is required before an employer

16

may avail itself of the outside sales exemption.

II. THE DISTRICT COURT ERRED BY CONCLUDING THAT THE REPS ARE EXEMPT ADMINISTRATIVE EMPLOYEES IN ACCORDANCE WITH THE DEPARTMENT'S "ADMINISTRATIVE EXEMPTION" REGULATIONS, WHICH LIMIT THE EXEMPTION TO EMPLOYEES WHO EXERCISE DISCRETION AND INDEPENDENT JUDGMENT WITH RESPECT TO MATTERS OF SIGNIFICANCE

1. The employer failed to show that the Reps exercise discretion and independent judgment with respect to matters of significance. Under the Department's administrative exemption regulations, an "employee employed in a bona fide administrative capacity" means "any employee . . . whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers . . . [and] . . . [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. 541.200(a)(2)-(3).[11] The requirement that the employee's primary duty include the exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses

_____

[11] In order to fall within the administrative exemption, the employee must also meet the salary requirement of $455 per week. *See* 29 C.F.R. 541.200(a)(1). The salary requirement is not at issue in this case. Further, because the Reps do not satisfy the "discretion and independent judgment with respect to matters of significance" prong of the administrative exemption, this brief does not address whether the Reps' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. 541.200(a)(2) and (3).

of conduct, and acting or making a decision after the various
possibilities have been considered.  The term 'matters of
significance' refers to the level of importance or consequence
of the work performed."  29 C.F.R. 541.202(a).  Furthermore, the
phrase "discretion and independent judgment" must be applied in
the light of all the facts involved in the particular employment
situation, with the following factors to be considered:

> whether the employee has authority to formulate,
> affect, interpret, or implement management policies or
> operating practices; whether the employee carries out
> major assignments in conducting the operations of the
> business; whether the employee performs work that
> affects business operations to a substantial degree,
> even if the employee's assignments are related to
> operation of a particular segment of the business;
> whether the employee has authority to commit the
> employer in matters that have significant financial
> impact; whether the employee has authority to waive or
> deviate from established policies and procedures
> without prior approval; whether the employee has
> authority to negotiate and bind the company on
> significant matters; whether the employee provides
> consultation or expert advice to management; whether
> the employee is involved in planning long or short-
> term business objectives; whether the employee
> investigates and resolves matters of significance on
> behalf of management; and whether the employee
> represents the company in handling complaints,
> arbitrating disputes or resolving grievances.

29 C.F.R. 541.202(b).[12]  Although this list is not exhaustive, it

------

[12] As the Preamble to the final rule, 69 Fed. Reg. 22,143 (Apr.
23, 2004), explained, federal courts generally find that
employees who meet at least two or three of the indicators
mentioned in 29 C.F.R. 541.202(b) are deemed to be exercising
discretion and independent judgment with respect to matters of
significance, although a case-by-case analysis is required.

indicates the kind of activities that constitute "matters of significance."

Moreover, the exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources. *See* 29 C.F.R. 541.202(e); *see also* 541.203(g)-(i) (clarifying through examples of exempt and non-exempt administrative employees that reliance on techniques and skills developed through specialized training and use of manuals is insufficient for application of the exemption). The regulations also clarify that "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." 29 C.F.R. 541.202(f).

2. Wage and Hour has consistently reiterated that both the nature and level of the employee's decisions as they relate to the employer's business operations determine whether the employee exercises discretion and independent judgment with respect to matters of significance. "In this regard, it is not sufficient that an employee makes decisions regarding when and where to do different tasks, as well as the manner in which to perform them." WH Opinion Letter FLSA 2006-45, 2006 WL 3930478 (copy editors do not exercise discretion as to matters of

significance even though they "organize work priorities to meet
production deadlines set by management . . . [and] make
decisions on workflow within their areas and communicate these
decisions to club copywriters") (citing *Clark v. J.M. Benson
Co.*, 789 F.2d 282, 287 (4th Cir. 1986)) (internal quotation
marks omitted). Another Wage and Hour opinion letter from 2006,
denying the application of the administrative exemption to legal
analysts, provides a helpful analogous example:

> Although you state that you work independently and use
> your own judgment as to how to prioritize your work
> assignments, including how the projects will be
> executed and how much time to spend on each
> assignment, it is not sufficient that an employee
> makes decisions regarding relatively insignificant
> matters . . . . Nor is it sufficient that an employee
> makes limited decisions, within clearly "prescribed
> parameters." *See Dalheim v. KDFW-TV*, 706 F. Supp.
> 493, 509 (N.D. Tex. 1998), *aff'd*, 918 F.2d 1220 (5th
> Cir. 1990). Rather, there must be the exercise of
> discretion and independent judgment on matters of
> significance or consequence related to the management
> or general business operations of the employer or the
> employer's customers. For instance . . . you do not
> formulate or implement management policies, utilize
> authority to waive or deviate from established
> policies, provide expert advice, or plan business
> objectives in accordance with the dictates of §
> 541.202(b).

WH Opinion Letter FLSA 2006-27, 2006 WL 2792441.[13]

_____

[13] Wage and Hours' opinion letter on legal analysts also
demonstrates that regulatory or legal limitations on an
employee's exercise of discretion are, in fact, limitations that
may preclude application of the administrative exemption: "In
addition, most jurisdictions have strict prohibitions against
the unauthorized practice of law by laypersons. . . . The
implication of such strictures is that paralegal employees would

Much like the legal analysts, Reps work independently (i.e., without direct supervision), determine what time of day to visit the physicians on their lists, and decide how best to execute their presentations within clearly prescribed parameters. This, however, similarly does not suffice to qualify for the administrative exemption; the Reps do not perform any primary duties that are largely comparable to those found in 29 C.F.R. 541.202(b), such as formulating or implementing management policies, utilizing authority to deviate from established policies, providing expert advice, or planning business objectives.[14]  *Compare* WH Opinion Letter FLSA 2006-34,

---

not have the amount of authority to exercise independent judgments with regard to legal matters necessary to bring them within the administrative exemption." WH Opinion Letter FLSA 2006-27. Similarly, there are legal constraints placed on the Reps. "Since the Reps are advocating products which are routinely and closely regulated by the Food and Drug Administration (FDA), NPC prepares scripts and related materials which the Reps are expected to use to deliver a 'core message' about NPC products to each physician they visit. Reps may not go beyond the boundaries of the messages crafted by NPC." *In Re Novartis* 593 F. Supp. 2d at 641.

[14] The cases set out in the Preamble to the 2004 Part 541 regulations to support the factors listed in 29 C.F.R. 541.202(b) clearly refer to the kind of work not engaged in by the Reps here -- making recommendations to management on policies and procedures; conducting independent investigation and resolution of issues without prior approval; having authority to waive or deviate from established policies and procedures without prior approval; developing guidebooks, manuals, and other policies and procedures for the employer or the employer's customers; negotiating on behalf of the employer with some degree of settlement authority; having authority to

2006 WL 3227789 (applying administrative exemption to community events supervisors because their authority to negotiate and bind their employers on significant matters such as negotiating contracts with vendors was sufficient to demonstrate discretion and independent judgment with respect to matters of significance); WH Opinion Letter FLSA 2006-46, 2006 WL 3930479 (location managers' primary duties, such as creating and enforcing regulations for the production crew, committing the employer in financial matters, and negotiating site rentals, included the exercise of discretion and independent judgment as to matters of significance).

3. No circuit court has addressed whether Reps are exempt administrative employees. Besides the instant case, one district court within the Second Circuit, relied upon by the district court in *In Re Novartis*, 593 F. Supp. 2d at 656-58, has concluded that the "discretion and independent judgment with respect to matters of significance" test for the administrative exemption "likely" applies to Reps because their daily decisions (which are similar to those in this case) "seek to influence prescription writing practices -- a matter of great consequence to [their employer's] business" -- and their "exercises of judgment [are] ways to drive the business [and] move market

commit employer in matters that have financial impact. *See* 69 Fed. Reg. 22,143-144 (April 23, 2004).

share," and because "if the doctor didn't like [the Rep], then the doctor was not going to prescribe the drug." *Amendola*, 558 F. Supp. 2d at 477. At issue in *Amendola*, however, was the plaintiff Rep's motion for discovery of the names and addresses of the pharmaceutical company's Reps, authorization for notice of the collective action to be sent to those potential plaintiffs, and equitable tolling of any claims they may file. *See* 558 F. Supp. 2d at 462. As such, the district court looked only at the "likelihood" that the pharmaceutical company would successfully argue the application of the administrative exemption to the Reps when deciding whether to grant the plaintiff's motion. *Id.* at 477.

Furthermore, the district court in *Amendola* relied in part on a 1945 Wage and Hour opinion letter which concluded that drug companies' "medical detailists" were administratively exempt. Those medical detailists, though, "were consulted with respect to individual nutritional problems encountered by hospitals and physicians, such as determining whether the use of subject's product was related to the occurrence of an epidemic," and "work[ed] virtually without supervision." *Ruggeri*, 585 F. Supp. 2d at 276 (internal quotation marks omitted). In addition, the court's analysis appears to have misunderstood the "matters of significance" requirement. In commenting on "driving the business" and "market share," it blurred the distinction between

an employee who exercises discretion and independent judgment related to matters of significance and one whose skillful job performance necessarily has some impact on her employer's bottom line (something undoubtedly important to the company).[15] *See, e.g., Robinson-Smith v. Government Employees Insurance Co.*, 323 F. Supp. 2d 12, 25 (D. D.C. 2004) (noting, in the course of concluding that auto damage adjusters, who assess, negotiate, and settle automobile damage claims, travel to and from

---

[15] In addition to the decision in *Amendola*, the district court in the instant case relied heavily on another district court case, *Cote v. Burroughs Wellcome Co.*, 558 F. Supp. 883 (E.D. Pa. 1982), as persuasive authority for concluding that the Reps are exempt administrative employees. In *Cote*, the court concluded that a Rep exercised sufficient discretion for the administrative exemption to apply because, even though she worked within a tightly-controlled marketing environment, the Rep could tailor her presentation to individual doctors in terms of her manner and the frequency of her visits and could "cultivat[e] a good working relationship with the nurses at a particular clinic and asking for their help in reminding physicians about the drug." 558 F. Supp. at 887. As a threshold matter, contrary to the district court's reasoning in *Ruggeri*, 585 F. Supp. 2d at 276, the fact that *Cote* was decided under the "old" Part 541 regulations does not vitiate its reasoning. *See* 69 Fed. Reg. 22,143 (April 23, 2004) (making the phrase "matters of significance" part of the regulatory test for the administrative exemption instead of having it as part of the Department's interpretive guidance). Nevertheless, the analysis in *Cote* fails for all the reasons set out *supra*. "Tailoring" one's strictly circumscribed presentations and establishing good personal working relationships do not equate to primarily performing duties requiring the exercise of discretion and independent judgment concerning matters of significance. Of course, as district court decisions, neither *Amendola* nor *Cote* is controlling vis-à-vis this Court. *See Lombard v. Whitman*, 485 F.3d 73, 83 (2d Cir. 2007) (distinguishing between own precedent and district court decisions).

inspection sites, inspect vehicles for damage, and write estimates for repairs were not exempt, that "'the use of skill is to be clearly distinguished from work requiring discretion and independent judgment'") (quoting *Reich v. American Int'l Adjustment Co.*, 902 F. Supp. 321, 324 (D. Conn. 1994)). As noted by the Department's regulations, an employee does not exercise discretion and independent judgment related to matters of significance merely because his success (or lack thereof) in performing his duties has a financial impact on his employer's business. *See* 29 C.F.R. 541.202(f); *see also Ruggeri*, 585 F. Supp. 2d at 276 n.13 (when denying summary judgment to pharmaceutical company on the question of whether its Reps were exempt administrative employees, the court rejected the argument that the exemption applied because of Reps' impact on company's financial success). Indeed, if the "matters of significance" standard were interpreted to include any actions that in some manner "move market share" or "drive the business," it would potentially broaden the exemption to include the host of employees whose successful performance of their duties contributes in some way to the success of the company; such an interpretation would effectively swallow the "rule" requiring the payment of the minimum wage and overtime compensation under the FLSA.[16]

---

[16] It is worth noting that the district court in *In Re Novartis*

4. In sum, as with the outside sales exemption, the district court's administrative exemption ruling in this case is unpersuasive in its attempt to "back-fit" the FLSA regulations into the pharmaceutical industry's practices. The facts are clear that, within the stringent restrictions on Reps' work activities, the Reps' discretion is limited to such matters as what time of day to visit a particular doctor, the manner in

---

did not rely upon the First Circuit's decision in *Reich v. John Alden Life Insurance Company*, 126 F.3d 1, 9 (1st Cir. 1997), to show that the Reps exercised discretion and independent judgment concerning matters of significance; rather, it used *Alden* to show that the Reps performed office or non-manual work directly related to management or general business operations. *See* 593 F. Supp. 2d at 655-58. In any event, the decision in *Alden* can be distinguished on its facts. In *Alden*, marketing representatives working for a company that designed, created, and sold insurance products (primarily for businesses that were purchasing group coverage for their employees) did not sell through direct contacts with the ultimate consumers but, rather, relied upon licensed independent insurance agents to make sales of the employer's financial products. The marketing representatives were responsible for maintaining contact with hundreds of these independent sales agents to keep them apprised of the employer's financial products, inform them of changes in prices, and discuss how the product might fit their customer's needs (they would also inform the employer of what they learned from these agents, e.g., regarding a competitor's products or pricing). The First Circuit concluded that these marketing representatives were administratively exempt. Significantly, however, the First Circuit, in concluding that the discretion and independent judgment prong was met, noted that the marketing representatives "do not use prepared scripts or read from a required verbatim statement, nor do they operate within the contours of a prescribed technique or 'sales pitch.'" *John Alden Life Ins. Co.*, 126 F.3d at 14. By contrast, the Reps in the instant case are provided with scripts, which they are required to use, to help them deliver the requisite "core message." *In Re Novartis*, 593 F. Supp. 2d at 641.

which to approach the doctor based on the doctor's personality, and how best to deliver (i.e., to "fit in") the NPC's "core message" for a particular drug given the time constraints of a visit. To the extent that the Department's administrative exemption regulations instruct that "[t]he phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises," *see* 29 C.F.R. 541.202(b), this guidance does not extend to ignoring the clear parameters and requirements of the regulations. *See, e.g., Kuzinski*, 604 F. Supp. 2d at 397-99. The Seventh Circuit's decision in *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (2005), although analyzing the pre-2004 regulations, provides a useful comparison of what constitutes the exercise of discretion related to matters of significance within a highly regulated industry. In *Kennedy*, the Seventh Circuit concluded that, despite the heavily regulated nature of the nuclear power industry, work planners whose "job is to come up with a set of instructions that will remedy reported problems around the plant" were exempt. Even though the planners "look to past work packages for guidance and use a computer to aid their recommendations . . . . [when] [f]aced with novel or not-so-novel problems, judges and Work Planners must use their independent judgment to determine how best to respond." *Id.*

27

The work planners, although heavily regulated, thus had the discretion to develop new ways to resolve issues. The NPC Reps, on the other hand, do not have such discretion; NPC provides them with specific instructions for each aspect of their job, including scripted responses for physician concerns, from which NPC does not permit them to deviate. They therefore should not be deemed to exercise discretion and independent judgment regarding matters of significance.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision.

Respectfully submitted,

CAROL A. DE DEO
Deputy Solicitor
  for National Operations

WILLIAM C. LESSER
Deputy Associate Solicitor

PAUL L. FRIEDEN
Counsel for Appellate
  Litigation

/s/ Jennifer R. Marion
JENNIFER R. MARION
Attorney
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave., N.W.
Suite N-2716
Washington, D.C. 20210
(202) 693-5555

FORM 6. CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of
Fed. R. App. P.32(a)(7)(B) because:

  X  this brief contains 6,999 words, excluding the parts
of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

  ___  this brief uses a monospaced typeface and contains
[state the number of] lines of text, excluding the parts of the
brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of
Fed. R. App. P. 32(a)(5) and the type style requirements of Fed.
R. App. P. 32(a)(6) because:

  ___  this brief has been prepared in a proportionally spaced
typeface using [state name and version of word processing
program] in [state font size and name of type style], or

  X  this brief has been prepared in a monospaced typeface
using Microsoft Word XP in 12 point font in text and 12 point
font in footnotes and Courier New type style.

(s) /s/ Jennifer R. Marion

Attorney for the Secretary of Labor

Dated: October 13, 2009

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify this 13th day of October 2009 that:

1. The foregoing brief (and attached addendum) submitted in digital form is an exact copy of the written document filed with the Clerk; and

2. In accordance with Local Rule 32(a)(1) and Interim Local Rule 25.1, the digital submission of this brief and attached addendum has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee VirusScan Enterprise 8.0.0. updated on October 13, 2009. According to the virus scanning program, the digital submission is free of viruses.


*/s/ Jennifer R. Marion*
Jennifer R. Marion
Attorney
U.S. Department of Labor
Office of the Solicitor
Fair Labor Standards Division
Suite N-2716
200 Constitution Ave., N.W.
Washington, D.C. 20210
(202) 693-5555

## CERTIFICATE OF SERVICE

I certify that copies of the Secretary's amicus brief have been served on October 13, 2009 on the following:

Jonathan A. Wexler
Vedder, Price, Kaufman & Kammholz, P.C.
1633 Broadway, 47th Floor
New York, N.Y.  10019

Richard Schnadig
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle St.
Chicago, IL  60601

David W. Sanford
Katherine M. Kimpel
1666 Connecticut Ave., N.W.
Suite 310
Washington, D.C.  20009

Jeremy Heisler
Steven Wittels
Sanford Wittels & Heisler, LLP
950 Third Ave., 10th Floor
New York, N.Y.  10022

                                   /s/ *Jennifer R. Marion*
                                   Jennifer R. Marion
                                   Attorney
                                   (202) 693-5795

# ADDENDUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SUSAN SCHAEFER-LAROSE, on behalf )
of herself and others similarly situated, )
                         )
         Plaintiff, )
                         )
   vs.                  )      1:07-cv-1133-SEB-TAB
                         )
ELI LILLY AND COMPANY, )
                         )
         Defendant. )

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF SUSAN SCHAEFER-LAROSE

This cause is before the Court on the Motion for Summary Judgment as to

Plaintiff, Susan Schaefer-LaRose [Docket No. 68], filed by Defendant, Eli Lilly and

Company ("Lilly"), on December 17, 2007, pursuant to Federal Rule of Civil Procedure

56. Plaintiff, Susan Schaefer-LaRose, brings her claim against Lilly, her former

employer, alleging that Lilly failed to provide her with overtime compensation, in

violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New

York wage law. Lilly rejoins that Ms. Schaefer-LaRose was exempt from the overtime

pay provisions under both the FLSA and New York law.

On July 7, 2008, four days before the due date for her response to Lilly's summary

judgment motion, Ms. Schaefer-LaRose filed a Rule 56(f) motion [Docket No. 464],

requesting that the Court grant her a 30-day extension of the due date because Lilly had

allegedly failed to produce discovery essential to her response. However, on July 21,

2008, before the Court had ruled on her Rule 56(f) motion, Ms. Schaefer-LaRose filed her

response in opposition to Lilly's motion for summary judgment without mention of the

pending Rule 56(f) motion. On August 8, 2008, the Magistrate Judge denied as moot Ms.

Schaefer-LaRose's Rule 56(f) motion [Docket No. 554] on the ground that she had filed a

timely response to Lilly's summary judgment motion. On August 28, 2008, Ms.

Schaefer-LaRose filed objections to the Magistrate Judge's August 8, 2008, order

denying her Rule 56(f) motion [Docket No. 559], contending that her filing of her

substantive response to Lilly's motion for summary judgment did not moot the need for

Rule 56(f) relief. For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion

for Summary Judgment[1] and <u>DENY</u> Plaintiff's Rule 56(f) motion.[2]


**Factual Background**

Lilly is a global, research-based pharmaceutical company headquartered in

Indianapolis, Indiana, that develops and manufactures pharmaceutical products. As part

---

[1] Because, for the reasons detailed below, we find that Ms. Schaefer-LaRose was exempt from the FLSA's overtime requirements under both the outside sales and administrative exemptions, we need not address Lilly's arguments that parts of her claims are also barred under the highly compensated and motor carrier exemptions.

[2] On September 30, 2008, Ms. Schaefer-LaRose filed a Motion for Leave to File Notice of Supplemental Authority [Docket No. 567] and on January 27, 2009, filed a Motion for Leave to File a Response to Defendant's Supplemental Authority [Docket No. 620]. On November 18, 2008, Lilly filed a Motion for Leave to File Department of Labor Amicus Brief as Notice of Supplemental Authority [Docket No. 589] and on April 3, 2009, filed a Motion for Leave to File Notice of Supplemental Authorities [Docket No. 629]. We hereby <u>GRANT</u> these motions and said documents shall be deemed filed as of the date of this Order.

of its business, Lilly employs individuals as "sales representatives," who are responsible

for visiting physicians, informing them about Lilly pharmaceutical products and

encouraging them to prescribe Lilly's products to their patients, when and as appropriate.

In May 1998, Lilly hired Ms. Schaefer-LaRose as a Sales Representative, which was the

position she held until 2000, when she became a "Senior Sales Representative."

Deposition of Susan Schaefer-LaRose ("Schaefer-LaRose Dep.) at 39. Lilly contends

that this change constituted a promotion, but Ms. Schaefer-LaRose maintains that it was

simply a change in job title, not a formal promotion. Id. at 41. However, Ms. Schaefer-

LaRose testified in her deposition that her title changed in part because, by that point, she

was better at dealing with physicians than the more junior representatives, having gained

"accumulated knowledge from being with the company longer." Id. at 43. Ms. Schaefer-

LaRose remained a Senior Sales Representative until her tenure at Lilly ended in 2006.


**Plaintiff's Sales Training and Duties**

During her employment with Lilly, Ms. Schaefer-LaRose was responsible for

calling on physicians throughout various territories in the State of New York, including

areas around Syracuse, Binghamton, and Utica. Schaefer-LaRose Dep. at 47. Ms.

Schaefer-LaRose received her initial training at a facility located in Indianapolis, where

she was taught, among other skills, how to "detail" Lilly's products to physicians to

enable them to make educated decisions about which products would be best for their

patients. Id. at 122-24. Lilly also trained Ms. Schaefer-LaRose in the "sales productivity

processes," which included four components (tiering, frequency, message, and program) that, according to Ms. Schaefer-LaRose, were all controlled by Lilly's policies and procedures. Id. at 143-45. As part of that training, Ms. Schaefer-LaRose was instructed to "ask for business on every call" and to "ask the physician to commit to prescribe" Lilly products in their practices when medically appropriate; however, Lilly sales representatives never actually sold Lilly products to physicians or other buyers. Id. at 177. As a sales representative,[3] Ms. Schaefer-LaRose was required to become familiar with the pharmaceutical products of Lilly's competitors in order to understand the competitive market. Id. at 251. Her knowledge of such products was acquired through training and materials provided by Lilly. Id. at 250.

Ms. Schaefer-LaRose's calls on physicians occurred in their offices and on each visit she would try to get a "chip," which she describes as a "piece of information about what the physician said in a positive way about [Lilly's] product" and use that information "to get a commitment" from the physician to prescribe Lilly's pharmaceuticals. Id. at 182-83. With input from her district manager, Ms. Schaefer-LaRose would adjust her promotional efforts based on the prescribing habits of each doctor she visited. According to Lilly, Ms. Schaefer-LaRose had significant discretion to determine independently how frequently to visit various doctors based, in part, on the volume of prescriptions each physician wrote and was free to target her presentations

---

[3] Because the duties of a sales representative and senior sales representative appear to be the same, we refer to Ms. Schaefer-LaRose as a "sales representative" throughout this entry.

4

based upon data she received on a weekly basis that showed which products each doctor was prescribing (including competitors' products). Ms. Schaefer-LaRose disputes Lilly's characterization of the level of discretion she was afforded and contends that Lilly produced "tiering" lists containing the names of specific physicians whom she was directed to visit. Id. at 66. Further, she asserts that she did not have the discretion to determine the frequency of visits to particular doctors or to target competitors' products. Instead, Ms. Schaefer-LaRose maintains that Lilly instructed her on the frequency of her calls on any given physician, that her district manager had to approve her routing schedules, and that she had no role in determining which physicians or which products to target since company policy dictated those decisions. Id. at 94-96.

Ms. Schaefer-LaRose reportedly worked approximately ninety hours per week at Lilly, id. at 54, (including weekends, holidays, and vacation days, id. at 262-63), which often meant "[t]he end of the business day was midnight." Id. at 150. Although she concedes that no one from Lilly ever told her how many hours she should work in any given week, Ms. Schaefer-LaRose asserts that "the demands that were made [by Lilly] required the hours that were spent [working]." Id. at 54. Throughout her tenure at Lilly, Ms. Schaefer-LaRose spent most workdays calling on physicians, attempting to perform in line with Lilly expectations that she contact nine doctors per day. Periodically, Ms. Schaefer-LaRose's district managers conducted "ride-alongs" to observe or participate in sales calls on the basis of which Ms. Schaefer-LaRose's performance would later be evaluated and she would be advised as to future improvements. The frequency of the

5

ride-alongs was dependant upon the individual managers, but they occurred generally from once every two weeks to once every quarter. Id. at 163. In addition to the ride-alongs, Ms. Schaefer-LaRose participated in conference calls with her district manager approximately once a week or once every two weeks, during which meetings topics such as "a change in strategy for the message" or "a change in labeling" were discussed. Id. at 60.

Lilly required its sales representatives, including Ms. Schaefer-LaRose, to be familiar with the prescription-writing habits of the physicians they contact. Thus, part of Ms. Schaefer-LaRose's duties included analysis of reports containing the number of prescriptions written by physicians in her sales territory for each Lilly product as well as the products manufactured by major competitors, and preparation of a summary of her findings for her district manager. Lilly used these summaries to determine whether its sales representatives were being effective in the field. According to Ms. Schaefer-LaRose, she "lived and died by" the information in the reports and, depending on what the reports revealed, she was doing either well or doing poorly, causing her either to "keep doing what [she was] doing" or "try to up [her] frequency" and "target specific competitors, depending on their success against [Lilly's] product." Id. at 152. Ms. Schaefer-LaRose contends that any changes in her approach required permission from her district manager and that at all times she was subject to Lilly's strict policies and procedures governing the targeting of and frequency of calls on physicians.

Lilly required that Ms. Schaefer-LaRose receive training on and become familiar

6

with various disease states, such as osteoporosis, depression, bipolar disorder, and attention deficit hyperactivity disorder, in order to more effectively promote Lilly's products which were designed to treat those problems. Schaefer-LaRose Dep. at 133. Lilly's training process involved online computer testing, learning modules, educational materials, information regarding Lilly's Good Promotional Practices, memorizing scripted messages, and "verbatims for answering questions with regard to side effects, and warnings, and contraindications." Id. at 137. Ms. Schaefer-LaRose stated that she viewed the role of sales representative as similar to a "scientist" because her job was to "convey scientific information to physicians about how and why . . . [Lilly's] product is beneficial to patients." Id. at 185. Thus, she felt she was engaged not in sales, but merely in "professional visitation" due to the fact that "[t]here is no selling interaction going on." Id.

Lilly expected its sales representatives to build relationships with the physicians as well as with other staff members in the offices. Ms. Schaefer-LaRose testified that the sales representatives were "the primary contact between those physicians and Lilly." Schaefer-LaRose Dep. at 248-49. Although she was encouraged to tailor her message to each physician, based on information she had gained by asking the doctors open-ended questions about their practices and the types of patients they serviced, Ms. Schaefer-LaRose contends that, when promoting its products, she was limited to using pre-

7

approved scripted messages written by Lilly. If she had time allowed during a call,[4] she would focus the message on particular factors, depending on the product she was promoting, the physician's availability and mood, and how much time she actually had to make her pitch. Id. at 131-132.


**Plaintiff's Clerical Duties**

Lilly contends that, beyond her responsibilities relating to visiting physicians, Ms. Schaefer-LaRose also was expected to perform various clerical duties for which she exercised significant discretion, including managing a budget for meal programs with physicians, allocating resources for office supplies, selecting speakers and physicians to attend peer-to-peer programs, determining the number of pharmaceutical samples to distribute between and among doctors, and identifying "thought leaders," or physicians who were well-respected among their peers. While conceding that she had some discretion in these areas, Ms. Schaefer-LaRose maintains that she was afforded much less discretion and independent judgment than Lilly represents.

She claims that Lilly encouraged her to use her budget for meal programs for those physicians who had been identified as the highest prescribing doctors; Lilly also discouraged her from using resources for office supplies. Id. at 64-65. Although Ms.

---

[4] Ms. Schaefer-LaRose testified that calls on physicians could last from thirty seconds to up to an hour (Schaefer-LaRose Dep. at 129), but, according to Lilly, "research shows that a sales representative will have approximately two minutes with a physician." Pl.'s Exh. 6 at 798.

Schaefer-LaRose did have some choice of speakers for various programs, she was restricted to selecting individuals from the Lilly lecture bureau because those were the only approved speakers. Declaration of Susan Schaefer-LaRose ("Schaefer-LaRose Decl.") ¶ 23. With regard to distribution of drug samples, Ms. Schaefer-LaRose claims that she had no discretion in determining how many samples to order because her district manager always instructed that she order the maximum quantity of samples allotted each month by Lilly. Id. ¶¶ 24-25. In addition, Ms. Schaefer-LaRose states that Lilly expected her to divide the samples in the same manner each month, with the doctors who prescribed the most products receiving the most samples. Finally, Ms. Schaefer-LaRose maintains that Lilly trained her on how to identify "thought leaders," the primary criteria for which was simply that the doctor be a significant prescriber of Lilly products, and her identification of these physicians required Lilly's final approval and, in any event, that she performed this function only twice between 2000 and 2006. Id. ¶ 15.

### Plaintiff's Performance Reviews and Salary

Ms. Schaefer-LaRose received periodic performance reviews from her supervisors, which included a report on the sales results from her territory. In 2001, for example, Ms. Schaefer-LaRose's sales territory ranked near the bottom, and her performance review noted that she had failed to meet expectations on a certain product. Schaefer-LaRose Dep. at 207-211; Exh. 9 (2001 Performance Review). Another section of the performance reviews included sales-related objectives and evaluations; in one review she

9

was reminded that she needed to be "top 15% overall to make executive sales rep" and advised to "consistently grow TRx [total prescriptions] on a quarterly basis to insure SOM [share of market] growth." Exh. 9 at 3; see also Schaefer-LaRose Dep. at 207, 216-217, 221-22, 224-25; Exh. 10 (2002 Performance Review). However, Ms. Schaefer-LaRose never directly sold any Lilly product to any physician or any other buyer, nor did she accept purchase contracts or orders for Lilly products.

In addition to her fixed salary, Ms. Schaefer-LaRose was entitled to receive incentive bonus compensation based, in part, on the sales of Lilly's products as reflected by physicians' prescriptions. The parties agree that Ms. Schaefer-LaRose's average weekly earnings throughout her final six years as a Lilly employee (2000 through 2006) exceeded $1,600.00.[5] In 2005, Ms. Schaefer-LaRose's total compensation from Lilly amounted to $103,392.14 and, for her work during the first five months of 2006, she received $44,768.14 in total compensation. Declaration of Alison Franke ("Franke Decl.") ¶ 4; attached Exhs. H, I.

## Legal Analysis

### I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no

---

[5] According to Ms. Schaefer-LaRose, her weekly earnings from 2000 to 2006 were as follows: 2000 – $1,695.00; 2001 – $1,865.55; 2002 – $1,771.14; 2002 – $1,771.14; 2003 – $1,721.50; 2004 – $1,733.15; 2005 – $1,907.90; 2006 – $2,238.41.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v.

11

Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

If the opposing party cannot set forth facts sufficient to survive a motion for summary judgment, Rule 56(f) of the Federal Rules of Civil Procedure[6] gives the

---

[6] Rule 56(f) provides that:

If a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
    (1)    deny the motion;
    (2)    order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

                    (continued...)

12

opposing party opportunity to submit an affidavit explaining the reason. The court may then: "(1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed. R. Civ. Pro. 56(f). However, the party invoking the protection of Rule 56(f) "must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits . . . and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of material fact." Daley v. Grajec, 2007 WL 2286132, at *5 (S.D. Ind. 2007) (Tinder, J.) (quoting Korf v. Ball State Univ., 726 F.2d 1222, 1230 (7th Cir. 1984)). Thus, if a plaintiff fails to show how the additional discovery he or she seeks will help demonstrate the existence of a genuine issue of material fact, denial of a Rule 56(f) motion is appropriate.

We first address Lilly's summary judgment motion, because, if Ms. Schaefer-LaRose is able to set forth sufficient facts to survive summary judgment despite being denied additional time to conduct what she contends was discovery essential to filing her response, then we need not address her Rule 56(f) motion. However, if Ms. Schaefer-LaRose is unable to demonstrate the existence of a genuine issue of material fact, and/or an error in Lilly's legal analysis that would foreclose a dismissal of her lawsuit, we shall

---

[6](...continued)
        (3)    issue any other just order.

Fed. R. Civ. Pro. 56(f).

address her objections to the Magistrate Judge's August 8, 2008, denial of her Rule 56(f) motion.

## II. FLSA Exemptions

The FLSA imposes various wage and hour requirements on certain employers, including the overtime pay requirement at issue here. See 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."). However, in Section 13(a)(1), the Act establishes a number of so-called "white collar" exemptions to the overtime requirement, including the outside sales, administrative, and highly compensated exemptions.[7]

Due to the remedial nature of the overtime pay requirements, "exemptions from

----

[7] According to the Department of Labor ("DOL"), the rational behind these exemptions is as follows:

> The legislative history [of the FLSA] indicates that the section 13(a)(1) exemptions were premised on the belief that the workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay. Further, the type of work they performed was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium.

69 Fed. Reg. 22122, 22123-24 (Apr. 23, 2004).

14

[the FLSA's] coverage are to be narrowly construed against employers." Klein v. Rush-Presbyterian-St. Luke's Med. Center, 990 F.2d 279, 282 (7th Cir. 1993) (citations omitted). Further, "it is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirements." Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 370 (7th Cir. 2005) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974)).

## A.    Outside Sales Exemption

Lilly first claims that Ms. Schaefer-LaRose's entire FLSA claim fails because she is exempt from the benefits extended under the statute as an outside sales person. The FLSA exempts from overtime an employee who is employed "in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). DOL regulations define "outside salesman" as an employee:

> (1) Whose primary duty is:
>
>> (i) making sales within the meaning of section 3(k) of the Act, or
>>
>> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such a primary duty.

29 C.F.R. § 541.500(a). The parties do not dispute that Ms. Schaefer-LaRose's position meets the second requirement of the outside sales exception, to wit, that she is

15

customarily and regularly away from her place of business while performing her job. Their dispute centers only on whether Ms. Schaefer-LaRose's "primary duty" as a sales representative at Lilly was "making sales."[8]

Lilly contends that, because physicians decide which pharmaceuticals will be purchased by consumers based on the prescriptions they write, and Ms. Schaefer-LaRose's job was to persuade doctors within her territory to choose Lilly medicines to prescribe when and as appropriate, for which she received credit when they did prescribe Lilly medicines, she qualifies as an outside salesperson under the FLSA. Ms. Schaefer-LaRose rejoins that the outside sales exemption covers only those employees who, themselves, actually consummate sales and does not cover those employees, like herself, who merely engage in work to promote sales made by a third party. Thus, according to Ms. Schaefer-LaRose, Lilly has not met its burden to demonstrate that she comes within the outside sales exemption because it has presented no evidence that she ever personally consummated any sales transaction(s) for Lilly products.

As Lilly notes, the pharmaceutical industry is in a unique position with regard to the FLSA's outside sales exemption, since the only individuals who can legally authorize a purchase of the medications and who thus drive demand for those drugs – the physicians – do not buy them directly from the manufacturer. Consequently, a pharmaceutical sales representative, such as Ms. Schaefer-LaRose, whose efforts are

---

[8] The parties dispute does not include whether Ms. Schaefer-LaRose obtained orders or contracts for services or facilities; thus, we do not address this part of the inquiry.

16

targeted at encouraging physicians to prescribe the drugs, but do not result in direct sales of the medications, is in a special category with regard to "making sales," as that term is defined under the exemption.

Clearly, the unique characteristics of the pharmaceutical industry make this issue a closer question of statutory interpretation than it might otherwise be. While our research indicates that no appellate court has yet determined whether pharmaceutical sales representatives "make sales" pursuant to the FLSA's outside salesperson exemption, several district courts in sister jurisdictions to ours have addressed the issue but have arrived at conflicting results.[9] Compare Smith v. Johnson and Johnson, 2008 WL 5427802 (D.N.J. Dec. 30, 2008) (observing that, although physicians "do indeed present a chokepoint in the sales of pharmaceuticals, . . . the nature of the prescription system insulates them from being amenable to 'sales' within the definition of the applicable

_____

[9] Lilly relies in part on two cases arising under California law in which the Central District of California held that pharmaceutical representatives, such as Ms. Schaefer-LaRose, are exempt as outside salespersons. See Barnick v. Wyeth, 522 F. Supp. 2d 1257 (C.D. Cal. 2007) (holding that pharmaceutical representative was exempt outside salesperson under California's analogous wage statute); D'Este v. Bayer Corp., No. 07-3206 (C.D. Cal. Oct. 9, 2007) (finding the plaintiff's exempt classification "consistent with the spirit and purpose of the [outside sales] exemption"). These cases are not particularly instructive to our analysis, however, because, as Ms. Schaefer-LaRose argues, they are limited to the issue of whether a pharmaceutical sales representative's job involves "making sales," as defined under California's analogous outside sales exemption, not under the FLSA regulations. See 522 F. Supp. 2d at 1264 (recognizing that, unlike the California outside sales exemption, requesting a commitment from a physician was likely necessary to be exempt under the FLSA sales exemption); see also Amendola v. Bristol-Meyers Squibb Co., 558 F. Supp. 2d 459 (S.D.N.Y. 2008) (declining to rely on the line of California cases because, in addition to relying on California labor law and not the FLSA, "they do not acknowledge that the FLSA's exemptions must be narrowly construed against employers, or address the governing principles of statutory construction in grappling with the plain meaning of the regulatory term 'sales'").

regulation"), and Ruggeri v. Boehringer Ingelheim Pharm., Inc., 585 F. Supp. 2d 254 (D. Conn. 2008) ["Ruggeri I"] (holding that plaintiffs, pharmaceutical sales representatives, did not fall within the outside sales exemption because they never consummated actual sales), with In re Novartis Wage and Hour Litigation, 593 F. Supp. 2d 637 (S.D.N.Y. 2009) (finding plaintiff pharmaceutical sales representatives exempt under the FLSA's outside sales exemption "produces results that reflect the exemption's terms and spirit"), and Delgado v. Ortho-McNeil, Inc., 2009 WL 2781525 (C.D. Cal. Feb. 6, 2009) (holding that pharmaceutical sales representative fall within the outside sales exemption because "physicians' prescriptions are precisely the 'other disposition' envisioned" in the FLSA's definition of "sale"). Based on our careful review of Ms. Schaefer-LaRose's duties as a Lilly sales representative in light of the FLSA regulations and the relevant caselaw, we hold that, as a pharmaceutical sales representative, Ms. Schaefer-LaRose comes within the FLSA's outside sales exemption.

We begin by noting that the regulations define "sales" as follows: "Sales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that 'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, *or other disposition*." 29 C.F.R. § 541.501(b) (emphasis added). Promotional activity in support of sales is also addressed in the outside sales exemption regulations, providing that "[p]romotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or

18

solicitations is exempt work," but "promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." § 541.503(a). The regulations make clear that, in determining whether an individual's promotional work is exempt, it is important whether the work involves obtaining a commitment from the customer to purchase the product. § 541.503(c) (providing an example of non-exempt promotional work in which the employee "does not consummate the sale nor direct[s] efforts toward the consummation of a sale").

Here, Ms. Schaefer-LaRose never sold any product directly to the physicians or otherwise took orders for Lilly medications from the doctors she visited; the parties are in full agreement on this fact. Further, any commitments to prescribe Lilly medications that Ms. Schaefer-LaRose received from the physicians on whom she made sales calls were not binding either on the physicians or the physicians' patients.[10] However, the sole purpose of Ms. Schaefer-LaRose's regular calls on individual physicians was to persuade them to prescribe Lilly's medications as opposed to some other companies' pharmaceuticals, when and as otherwise appropriate. She testified in her deposition that Lilly trained her to "ask for the business" from the physicians upon whom she called, which entailed at the end of her visits "asking the physician to try the product with a patient." As described above, on each visit, Ms. Schaefer-LaRose would attempt to

---

[10] It is undisputed that regulatory and ethical restrictions on the pharmaceutical industry prevent physicians from making binding commitments to pharmaceutical sales representatives to prescribe certain drugs.

19

obtain a "chip," which she describes as a "piece of information about what the physician said in a positive way about [Lilly's] product" in order to use that information "to get a commitment" from the physician to prescribe Lilly's pharmaceuticals. Schaefer-LaRose Dep. at 182-83. According to Ms. Schaefer-LaRose, this was her "standard practice." Id. at 177, 182-83. Additionally, as a sales representative, Ms. Schaefer-LaRose received credit when her work was successful, reflected by the fact that her total compensation depended, in part, on the number of prescriptions for Lilly drugs issued and filled within her sales territory.

In our view, this activity constitutes "making sales," as defined under the FLSA regulations. When Ms. Schaefer-LaRose sought and received commitments, albeit non-binding commitments, from physicians to prescribe Lilly drugs, she was acting as a sales agent for Lilly. While her efforts did not result in consummation of sales in the traditional sense, the statutory language does not appear to require such a final sale. See Delgado, 2009 WL 2781525 at *3 (holding that "physicians' prescriptions are precisely the 'other disposition' envisioned in the FLSA"). Courts have recognized that "[t]he touchstone for making a sale, under the Federal Regulations, is obtaining a commitment." Clements v. Serco, Inc., 530 F.3d 1224, 1227 (10th Cir. 2008). The operative facts of the case at bar demonstrate that Lilly's sales representatives, including Ms. Schaefer-LaRose, were trained specifically to obtain such commitments from the physicians they visited, with the understanding that that is as far as they could go legally in their efforts to sell Lilly's products.

20

Only the nature of the heavily regulated pharmaceutical industry prevented Ms. Schaefer-LaRose from going beyond receiving non-binding commitments from the physicians on whom she made calls in her sales territory to consummating final sales to them. In Novartis, in support of its holding that pharmaceutical sales representatives (with similar duties as Ms. Schaefer-LaRose) engaged in "making sales" under the FLSA, the Southern District of New York observed that courts have properly "taken into account the characteristics of the industry in question when determining the applicability of the outside sales exemption." 593 F. Supp. 2d at 649 (citing Nielsen v. DeVry, Inc., 302 F. Supp. 2d 747 (W.D. Mich. 2003); Gregory v. First Title of America, Inc., 2008 WL 150487 (M.D. Fla. Jan. 14, 2008)). Here, despite the idiosyncracies of the pharmaceutical industry, Ms. Schaefer-LaRose was clearly hired as a Lilly sales representative, not simply to educate and inform physicians about Lilly pharmaceuticals, but to generate sales of those products. That undisputed fact is key to our analysis.

Thus, to the extent that sales are made in the pharmaceutical industry, Ms. Schaefer-LaRose made sales whenever she received commitments from physicians to prescribe Lilly drugs. Without the physicians being persuaded that Lilly products are superior for their patients, Lilly's pharmaceutical products might not be prescribed and ultimately sold to patients. Consequently, when Lilly hires sales representatives who direct their sales efforts at doctors (as opposed to pharmacists or the patients themselves), they are attempting to increase sales at the only point where they can hope to do so in the sales continuum. When Lilly's sales representatives are deployed, Lilly expects to

21

receive higher sales in return for its financial investment in its sales force. And, clearly this approach bears good fruits for Lilly.

Though not addressing the outside sales exemption under the FLSA, the First Circuit, in IMS Health Inc. v. Ayotte, 550 F.3d 42 (1st Cir. 2008), engaged in a similar discussion of the nature and effect of the work performed by pharmaceutical sales representatives, observing that, when they visit physicians, "[t]he objective of these visits is to make sales." Id. at 71. That court also recognized that the work performed by pharmaceutical sales representatives results in increased sales revenue for pharmaceutical companies. Id. at 56 ("Detailing works: that it succeeds in inducing physicians to prescribe larger quantities of brand-name drugs seems clear."). As stated in that opinion, "the fact that the pharmaceutical industry spends over $4,000,000,000 annually on detailing bears loud witness to its efficiency." Id.

Unlike non-exempt promotional work, Ms. Schaefer-LaRose's efforts were neither incidental to sales made by others nor performed only for the purpose of increasing Lilly's sales in general. Indeed, the evidence establishes that a significant portion of her compensation was based on her ability to increase prescription levels *in her sales territory*. See Novartis, 593 F. Supp. 2d at 652. ("To the extent these physicians write prescriptions for [the defendant's] drugs, it is the Reps – and not other [of the defendant's] employees – who obtain these prescriptions and who receive credit for them by means of incentive payments."). Ms. Schaefer-LaRose did not merely "grease the skids" in preparing the way for a second wave of Lilly employees who later would visit

22

those same physicians and close the actual sales. Ms. Schaefer-LaRose's job was to promote Lilly products to physicians in an effort to receive their commitments to prescribe and, when her efforts succeeded later on in terms of the issuance of a prescription by a physician to a patient who purchases the medication, Ms. Schaefer La-Rose personally received salary benefits for those prescriptions as part of her compensation package.

Clearly, "making sales" was Ms. Schaefer-LaRose's "primary duty" as a Lilly sales representative, which places her squarely within the outside sales exemption. Courts are directed to look to indicia-of-sales factors when determining whether sales work is an employee's "primary duty." Kuzinski v. Schering Corp., 604 F. Supp. 2d 385, 394-95 (D. Conn. 2009); Ruggeri I, 585 F. Supp. 2d at 267. Such indicia-of-sales will help determine whether an employee meets the regulation's requirement that she be "employed for the purpose of and . . . customarily engaged" in making sales. Here, Ms. Schaefer-LaRose's other duties included reviewing monthly reports detailing for each Lilly product the number of prescriptions written by physicians in her sales territory, as well as the products manufactured by major competitors; distributing drug samples to physicians; deciding how to best allocate the funds allowed by Lilly for meals with physicians; and finding speakers for various programs. All these responsibilities were incidental to and in support of her sales efforts. Moreover, Ms. Schaefer-LaRose received incentive compensation based upon the number of prescriptions issued by physicians in her sales territory and worked largely independently and without constant supervision.

23

Less significant, but nevertheless notable, is that she received sales training from Lilly and her position was described as "sales representative" or "senior sales representative."

These indicia-of-sales buttress our conclusion that under the FLSA Ms. Schaefer-LaRose's duties comport with the outside sales exemption's purpose. In reaching this conclusion, we narrowly construe the FLSA's exemptions, while at the same time, "recogniz[e] the realities of the pharmaceutical industry [which] is not incompatible with engaging in a narrow reading [of the statute]. To the contrary, it produces results that reflect the exemption's terms and spirit." Novartis, 593 F. Supp. 2d at 653. Nearly seventy years ago, in Jewel Tea Co. v. Williams, 118 F.2d 202 (10th Cir. 1941), the Tenth Circuit provided an illuminating explanation of the rationale for the outside sales exemption:

> The reasons for excluding an outside salesman are fairly apparent. Such [a] salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

Id. at 207-08. The characteristics of Ms. Schaefer-LaRose's position as a Lilly pharmaceutical sales representative align closely with the Tenth Circuit's description of the quintessential outside salesperson. The highly regulated nature of the pharmaceutical industry stood in the way of her ability to close final sales in the traditional sense, but,

when Ms. Schaefer-LaRose chose to put in long hours, her efforts were not directed towards garnering overtime, but rather in generating additional physician commitments to prescribe Lilly pharmaceuticals, and, when she was successful in her efforts, it showed up in increased compensation. Clearly, Ms. Schaefer-LaRose's work took her away from the office and, with the exception of periodic "ride-alongs" by her supervisors, she worked without direct hour-to-hour, day-by-day supervision. Given these facts, we conclude that Ms. Schaefer-LaRose's exemption as an outside salesperson is consistent with the underlying purposes of the FLSA.

For the foregoing reasons, we hold that Ms. Schaefer-LaRose qualifies as an exempt employee under the FLSA's outside sales exemption.

## B.    Administrative Exemption

In addition to our conclusion that Ms. Schaefer-LaRose comes within the outside sales exemption of the FLSA, we also hold that she is not entitled to overtime under the FLSA because she is exempt as an "employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1).

The FLSA regulations define an "employee employed in a bona fide administrative capacity" as any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the

25

employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

Ms. Schaefer-LaRose does not dispute that she meets the first requirement under the administrative exemption, to wit, that she is compensated on a salary basis and receives at least $455.00 per week. Therefore, we address only the second and third requirements of the administrative exemption.

**1.   Office or Non-Manual Work Directly Related to Management or General Business Operations**

The FLSA regulations provide that, in order to satisfy this requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Exempt administrative work includes duties such as, "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control. Much of this work, but not all, will relate directly to management policies." Final Rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,138 (Apr. 23, 2004). While administrative work includes "those who participate in the formulation of management policies or in the operation of the business

26

as a whole," the DOL has made clear that the administrative exemption also applies to "persons who either carry out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." Id.

The promotional, marketing, and sales work performed by Ms. Schaefer-LaRose is of substantial importance to Lilly's business and is, in our view, the type of responsibilities covered by the administrative exemption. Initially, under the "production/administration" dichotomy described in 29 C.F.R. § 541.201(a),[11] it is clear that Ms. Schaefer-LaRose has engaged in exempt administrative work as opposed to nonexempt production work. Lilly's "product" is the pharmaceutical drugs that it researches, manufactures, and develops, and it is undisputed that Ms. Schaefer-LaRose plays no role in producing the pharmaceutical drugs. Her work, the marketing and promotion of those drugs to physicians, is thus clearly separate from Lilly's production work. See Novartis, 593 F. Supp. 2d 637, 655 (holding that pharmaceutical sales representatives do not function as production employees because their promotional work is "ancillary to their employer's production work"); Smith v. Johnson and Johnson, 2008 WL 5427802, at *11 (D.N.J. Dec. 30, 2008) ("The business of a pharmaceutical company

---

[11] As noted above, section 541.201(a) provides that, in order to fall within the administrative exemption, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id.

is not to educate physicians about their products; it is to produce and distribute those products."); see also Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 477 (S.D.N.Y. 2008) (holding that pharmaceutical sales representatives are not properly classified as "production" employees).[12]

Ms. Schaefer-LaRose contends that the work she performed for Lilly, that is, promotional and sales efforts focused on a limited, select group of doctors, does not qualify as work "directly related to the management or general business operations" of Lilly, as required by the administrative exemption. According to Ms. Schaefer-LaRose, her position as a sales representative requires her merely to carry out Lilly's day-to-day operations as opposed to running or servicing the business or determining its overall sales, promotional, and marketing policies, as is required under the administrative exemption. See Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002) (noting that, to fall within the administrative exemption, an employee must be involved with "'running the business itself or determining its overall course or policies,' not just in the day-to-say carrying out of the business' affairs") (quoting 29 C.F.R. § 541.2); Bratt v. Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990) (declining to apply the administrative exemption to probation officers and treatment counselors because "[t]he services the employees provide the courts do not relate to court policy or overall operational

---

[12] Although the production-administrative dichotomy is not "a dispositive test for exemption," the DOL recognizes that it "is still a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption." 69 Fed. Reg. at 22141.

28

management but to the courts' day-to-day production process.").

We find Ms. Schaefer-LaRose's arguments unavailing. The success of Lilly's business depends in significant part on whether consumers purchase pharmaceuticals produced by Lilly. Consumers are able to purchase Lilly's medications only when physicians prescribe those drugs. According to Ms. Schaefer-LaRose's own description, the sales representatives are "the primary contact between those doctors and Lilly." Schaefer-LaRose Dep. at 248-49. As "the primary contact," it was her job to represent Lilly in meetings with medical providers and to educate those physicians regarding the company's pharmaceutical products in order to influence their decisions to prescribe Lilly medications, rather than other manufacturers' medications, when and as otherwise medically appropriate.[13] Therefore, the success of sales representatives, such as Ms. Schaefer-LaRose, in obtaining increased levels of prescriptions is a critical part of Lilly's business because it generates demand for Lilly's product. As the Smith Court recently observed in holding that the plaintiff, a pharmaceutical sales representative, came within

----

[13] Ms. Schaefer-LaRose also contends that courts differentiate between a corporation's general marketing efforts, such as designing an overall sales campaign, and targeted selling efforts, such as those performed by sales representatives, finding the former to be exempt work and the latter to be non-exempt. See Casas v. Conseco Finance Corp., 2002 WL 507059, at *9 (D. Minn. March 31, 2002) (holding that plaintiffs did not fall within the administrative exemption because they did not promote "sales 'generally' but are actually selling loans directed to individual customers"). However, we find Ms. Schaefer-LaRose's reliance on Casas to be misplaced because, unlike the plaintiffs in Casas, who made telephone sales calls directly to potential customers and assisted the customers throughout the loan process, Ms. Schaefer-LaRose had no contact whatsoever with individual purchasers of Lilly's pharmaceuticals. Instead, it was Ms. Schaefer-LaRose's job to promote Lilly's medications in general within her geographical sales territory in an effort to have physicians prescribe Lilly's pharmaceuticals with more regularity and frequency, to multiple end-users, thereby increasing Lilly's overall sales.

the administrative exception of the FLSA, a pharmaceutical sales representative's duty to promote and market his or her employers' medications "is an example of the kind of role that, while it does not dictate corporate marketing policy, actually drives the market demand, and therefore substantially affects operation of 'a particular segment of the business.'" Smith, 2008 WL 5427802, at *10 (citing 69 Fed. Reg. at 22,138).

In reaching a similar conclusion with respect to pharmaceutical sales representatives, the Novartis Court held that the "sizeable incentive payments" made to the plaintiff sales representatives for generating prescriptions, as well as the significant level of financial resources committed by the defendant pharmaceutical company to its sales efforts, clearly demonstrated the critical role the company's sales representatives played in its overall success. 593 F. Supp. 2d at 656. Likewise, Lilly's financial commitment to its sales efforts further supports the conclusion that the work performed by Lilly's sales representatives, such as Ms. Schaefer-LaRose, is of the type covered by the administrative exemption. Recall that a significant part of Ms. Schaefer-LaRose's compensation was comprised of bonuses that she received based upon the number of Lilly prescriptions she generated within her sales territory. Furthermore, during the calendar years of 2003, 2004, and 2005, Lilly expended a total of approximately $2.7, $3.2, and $3.5 billion, respectively, on sales costs. See Lilly's "Answers for Shareholders 2005" at 19. Such a substantial financial investment in its sales efforts has but one purpose: to recoup these expenditures through sales of Lilly products; thus, the activities of each individual sales representative have a substantial impact on Lilly's business operations

30

and bottom line.

For the foregoing reasons, we conclude that Ms. Schaefer-LaRose's primary duty was the performance of work directly related to the management or general business operations of the employer or the employer's customers and, as such, satisfies the second prong of the administrative exemption of the FLSA.

### 2. Discretion and Independent Judgment with Respect to Matters of Significance

Finally, in order to qualify under the administrative exemption, an employee's primary duty – here, marketing to physicians – must also include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Under the FLSA, "the exercise of discretion and independent judgment" is defined as "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). To satisfy this requirement, the employee must have "authority to make an independent choice, free from immediate direction or supervision," (id. § 541.202(c)), and must do more than merely "use . . . skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. § 541.202(e). However, exercising discretion and independent judgment "does not require that the decisions made by an employee have a finality that

31

goes with unlimited authority and a complete absence of review. . . . The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." Id. § 541.202(c).

Ms. Schaefer-LaRose contends that, as a Lilly sales representative, she rarely exercised discretion or independent judgment. She maintains that the factual record of this case demonstrates that she "had very little latitude in her job, that she was rigorously trained, closely monitored and supervised, and was subject to strict oversight and control in the performance of her duties." Pl.'s Resp. at 28-29. Additionally, she asserts that her "promotional presentations to physicians were strictly controlled by Lilly scripts and verbatims, from which any deviation subjected her to disciplinary action." Id. at 28. In contrast, Lilly claims that Ms. Schaefer-LaRose "exercised discretion far exceeding the threshold set by the administrative exemption." Def.'s Br. at 24.

Our review of the evidence establishes that Ms. Schaefer-LaRose did, in fact, exercise considerable discretion and independent judgment in a variety of areas. For example, Ms. Schaefer-LaRose testified that when she made sales calls, she would alter her presentation from physician to physician depending on a number of factors, including the number and types of products she was promoting, the time constraints she was working under, the mood of the particular physician with whom she was dealing, and whether she planned to meet with the physician again in the future. Schaefer-LaRose Dep. at 129-132. Also, according to Ms. Schaefer-LaRose, it was important to identify

32

the particular needs of each physician with whom she dealt because, "if you can figure out what people need from you, then you can give them what they need and everybody will be more successful because of it." Id. at 156.

Although it is true, as Ms. Schaefer-LaRose contends, that the promotional tactics and materials she used contained pre-approved and scripted messages, as the Seventh Circuit recently explained in a case closely on point, "[I]ndependent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines." Roe-Midgett v. CC Servs., Inc., 512 F.3d 865, 875 (7th Cir. 2008) (holding that claims adjusters exercised independent judgment and the manuals and estimating software that they used to guide their work were "most accurately characterized as tools that channel rather than eliminate [their] discretion") (citations omitted). Here, the record shows that Ms. Schaefer-LaRose exercised discretion when she chose which parts of the pre-approved information to present to which physicians regarding which pharmaceutical products; none of these decisions or strategies was predetermined by Lilly, and all impacted significantly the effectiveness of her presentation.

Ms. Schaefer-LaRose also testified that it was part of her job to analyze reports on a monthly basis containing the number of prescriptions written by physicians in her sales territory for each Lilly product, as well as the products manufactured by major competitors sales reports, in order to keep track of the impact of various promotional techniques, such as speaker programs, on prescription numbers. According to her, she "lived and died by" those reports and, as necessary, would adjust her approach based

upon what they revealed. Id. at 152. For example, she testified that, "[i]f you were doing well, you would keep doing what you are doing or even up . . . [t]hings like frequency with your manager's permission. If you were doing poorly, you would try to up your frequency. You would target specific competitors, depending on their success against your product." Id.

Nevertheless, Ms. Schaefer-LaRose contends that the fact that she would adjust her approach based upon her analysis of and conclusions from the reports in an effort to improve her performance does not indicate that she had any real discretion because, before making any such changes, she always had to request and be granted permission to make these changes from her supervisor before doing so. However, the applicable federal regulations quite clearly provide that "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c).

As previously discussed, even though an employee's decisions may be subject to review or occasionally may be revised or reversed, an employee's responsibilities can entail discretion and independent judgment. Id. ("[T]he term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."). True, Ms. Schaefer-LaRose's supervisors would from time to time conduct "ride-alongs" with her (ranging from every two weeks to every quarter) to accompany her on some of her sales calls in order to observe her promotional techniques, but the majority of the time she performed

34

her duties without direct supervision.

To boost the effectiveness of her marketing presentations, Ms. Schaefer-LaRose was provided drug samples for distribution to physicians for their use with patients as well as a budget for promotional purposes to finance such sales initiatives as meals for physicians. Lilly's sales representatives received guidelines for the allocation of such resources which directed that they be allocated based on physicians' prescribing habits (i.e., more samples and meals should be offered to those physicians who prescribe the most Lilly medications). However, within those guidelines, Ms. Schaefer-LaRose was entrusted with deciding the number of drug samples to leave with each physician and how best to allocate the meals budget, which Ms. Schafer-LaRose testified she based primarily on the personal relationships that she had developed with the doctors. Schaefer-LaRose Dep. at 65-66.

These facts clearly demonstrate that Ms. Schaefer-LaRose exercised considerable discretion and independent judgment as part of her daily work for Lilly.[14] In the areas in

---

[14] In three recent cases this issue has been addressed based on facts similar to those before us. All three courts determined that, notwithstanding the restrictions placed upon the plaintiffs (pharmaceutical sales representatives) by their employers, the sales representatives exercised considerable discretion on matters of significance. See Novartis, 593 F. Supp. 2d at 657-58 (noting that plaintiffs called on physicians and, after assessing how much time was available for the call, chose the best approach to influence the physician; tailored their presentations to best convey various scripted "core messages"; and determined how to use drug samples and other promotional materials); Smith, 2008 WL 5427802, at *11 (citing plaintiff's ability to request permission to visit new physicians or update her marketing plan; lack of supervision from her manager who only accompanied her monthly; and the fact that she sought to have an impact on growing the market share in her territory); and Amendola, 558 F. Supp. 2d at 477 (noting that plaintiffs tailored the content of their presentations to physicians based on
(continued...)

which she exercised discretion, her decision-making related to matters of substantial significance. As previously detailed, the success of Lilly's pharmaceutical sales representatives in generating prescriptions is key to the overall success of Lilly's business, given that physicians' prescriptions are the only way ultimate consumers can purchase Lilly medicines. Because sales representatives are Lilly's primary contact with physicians, the effectiveness of their marketing and promotional techniques attempting to influence medical providers' choices of drugs to prescribe determines in part whether those physicians ultimately prescribe Lilly's medications for their patients.

Thus, we hold that the ways in which Ms. Schaefer-LaRose exercised discretion and independent judgment (e.g., tailoring her marketing presentation to each medical provider based on a variety of factors, adjusting her approach in response to reports revealing the prescription levels in her sales territory in order to increase those numbers, choosing the method of allocating her drug samples and funds for meals for her physicians, etc.) were all aimed at increasing her effectiveness in generating increases in the numbers of prescriptions issued by physicians, a matter of considerable significance to Lilly to say the least. Accordingly, the third prong of the administrative exemption of the FLSA is satisfied.

Thus, we hold that Ms. Schaefer-LaRose fully qualifies as exempt under the

_____

[14](...continued)
various factors; decided when and how often to visit individual physicians; determined how to allocate drug samples and how to spend their promotional budgets).

36

FLSA's administrative exemption.

### C.    State Law Claims

Under New York law, as under the FLSA, employees are entitled to overtime compensation for hours worked in excess of forty each week. New York's analogous wage statute also contains outside sales and administrative exemptions defined and applied in the same manner as the FLSA. See <u>Novartis</u>, 593 F. Supp. 2d at 647-48 (citing 12 N.Y.C.R.R. § 142-2.14(5); <u>Galasso v. Eisman, Zucker, Klein & Ruttenberg</u>, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004)). Accordingly, for the reason detailed above, we find that Ms. Schaefer-LaRose is an exempt employee and thus not entitled to overtime pay requirements under both the outside sales and the administrative exemptions per New York law, as well as the FLSA.

### III.    Docket No. 559 – Plaintiff's Rule 56(f) Motion

Having found that Ms. Schaefer-LaRose has not demonstrated the existence of any genuine issue of material fact as to whether she was exempt under the FLSA regulations and New York law, we turn to address her objections to the Magistrate Judge's August 8, 2008, denial of her Rule 56(f) motion. On July 7, 2008, four days before her response brief was due, Ms. Schaefer-LaRose filed a Motion for Relief Under Rule 56(f) [Docket No. 463], seeking a one-month extension of the due date for filing a response to Lilly's motion for summary judgment in order to obtain additional discovery. Four days later,

before the Magistrate Judge had ruled on her Rule 56(f) motion, Ms. Schaefer-LaRose timely filed her response brief to the Motion for Summary Judgment. In her response, Ms. Schaefer-LaRose made no reference anywhere in the brief to her Rule 56(f) motion, nor did she cite any deficiency in her brief based on inadequate or incomplete discovery or mention any need for additional discovery or time to respond to the summary judgment motion. On August 8, 2008, the Magistrate Judge denied as moot Ms. Schaefer-LaRose's Rule 56(f) motion, citing the timely filing of her response brief to the summary judgment motion. On August 28, 2008, Ms. Schaefer-LaRose filed Objections to the Magistrate Judge's August 8, 2008, Order.[15]

In ruling on non-dispositive matters decided by a magistrate judge, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. Pro. 72(a). Here, however, we would deny Ms. Schaefer-LaRose's Rule 56(f) motion on other grounds than those relied upon by the Magistrate Judge. Thus, we will assume that Ms. Schaefer-LaRose's request for thirty additional days to respond to Lilly's summary judgment

_____

[15] Lilly did not respond to Ms. Schaefer-LaRose's objections, asserting in a footnote in a brief addressing a different motion that Ms. Schaefer-LaRose's objection was untimely. Pursuant to Federal Rule of Civil Procedure 72(a), "[a] party may serve and file objections to the order within 10 days after being served with a copy." The Magistrate Judge's Order was filed on August 8, 2008, but was not entered on the docket until August 11, 2008. Therefore, under Federal Rule of Civil Procedure 6, the deadline for filing an objection to the Order was August 28, 2008. Accordingly, Ms. Schaefer-LaRose's objection was timely filed. See Fed. R. Civ. Pro. 6(a), (d).

motion pursuant to Rule 56(f) was not waived by her filing of a timely response[16] and

proceed to address Ms. Schaefer-LaRose's Rule 56(f) motion on the merits.

When requesting additional discovery pursuant to Rule 56(f), "[p]laintiffs must do

more than request a 'fishing expedition' to hopefully find evidence that will allow them to

make a case." Daley v. Grajec, 2007 WL 2286132, at *5 (S.D. Ind. Aug. 7, 2007)

(Tinder, J.) (citing Davis v. G.N. Mortg. Corp., 396 F.3d 869, 885 (7th Cir. 2005);

Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002); Korf v. Ball State Univ., 726 F.2d

1222, 1230-31 (7th Cir. 1984)). In other words, if plaintiff is unable to show how the

discovery sought will help demonstrate the existence of a genuine issue of material fact,

denial of the Rule 56(f) motion is appropriate. Otto v. Variable Annuity Life Ins. Co.,

814 F.2d 1127, 1138 (7th Cir. 1986). After a careful and extensive review of Ms.

Schaefer-LaRose's brief and arguments in light of her Rule 56(f) request, we find that she

has not only failed to set forth any specific evidence which she might have obtained from

additional discovery that would create a genuine issue of material fact germane to our

decision but that our ruling on summary judgment could be and has been made on the

---

[16] It is not completely clear from the caselaw whether the filing of a response that does not reference a prior Rule 56(f) motion, or otherwise state areas in which more discovery would be needed to properly respond, renders the previously-filed Rule 56(f) motion moot. Compare Stewart v. Wilkinson, 2008 WL 2674843, at *4 (S.D. Ohio July 7, 2008) (noting that, after plaintiff filed response to summary judgment motion, earlier motion filed pursuant to Rule 56(f) "appears to be moot"), with Hammer v. Ashcroft, 512 F.3d 961, 971 (7th Cir. 2008), reh'g en banc granted, opinion vacated, 570 F.3d 798 (7th Cir. 2009) (stating in an opinion that was later vacated that "the fact that [the plaintiff] filed his response before waiting to see if the court would grant the continuance shows only that he made the best of what he had, not that he had a fair opportunity to avail himself of discovery.").

39

basis of the existing record without need of embellishment. We address each of Ms. Schaefer-LaRose's additional discovery requests in turn below.

## A.     Requests Nos. 3, 17, and 47 of Plaintiff's 30(b)(6) Notice

These requests address discovery related to the mechanics of medical sales, to wit, how drugs move through the distribution chain from manufacturer to patient, and how and when Lilly recognizes revenue from the sales of its products. Ms. Schaefer-LaRose contends that this information is necessary to refute Lilly's defense that its sales representatives "make sales," as that term is defined under the FLSA's outside sales exemption. Such information is not germane to our decision, however. Lilly does not argue, nor do we find, that Ms. Schaefer-LaRose completed sales transactions in the traditional sense by completing a transaction involving the transfer of title or property for consideration. Nor does Lilly dispute that sales also take place at other points in the distribution chain. Instead, we have based our determination that Ms. Schaefer-LaRose was an exempt outside salesperson primarily on her testimony that it was her "standard practice" to attempt "to get a commitment" from the physicians she called upon and on the fact that she then received incentive compensation based upon the prescription rates in her sales territory. Thus, information relating to the point at which Lilly recognizes revenue from its pharmaceutical sales or other information about the distribution chain is not relevant to our analysis, and thus, would not help Ms. Schaefer-LaRose's efforts to demonstrate a genuine issue of material fact.

40

**B.    Request No. 15 of Plaintiff's 30(b)(6) Notice**

Ms. Schaefer-LaRose asserts that she requires testimony about the ethical and legal

guidelines surrounding whether physicians can "pre-commit to prescribing Lilly's

products" to respond to Lilly's contention that its sales representatives obtain

"commitments" from doctors to prescribe Lilly's medications.  Docket No. 464 at 7.

However, Lilly concedes, and we accept as true, that pharmaceutical sales

representatives, such as Ms. Schaefer-LaRose, are prevented from soliciting legally

binding commitments from physicians.  Because our findings and conclusions on

summary judgment are premised on the fact that the commitments Ms. Schaefer-LaRose

testified that she obtained from doctors to prescribe Lilly products when medically

appropriate were *not* legally binding, the information she seeks in Request No. 15 in order

to establish a fact that we have already accepted as true would not enable her to defeat

summary judgment.[17]

**C.    Request No. 14 of Plaintiff's 30(b)(6) Notice**

Request No. 14 seeks testimony from "[t]he person most knowledgeable about the

differentiation of the market performance for any and/or all Lilly products between the

promotion efforts of the Pharmaceutical Reps, mass marketing or Direct to Consumer

---

[17] We address only the information requests at issue in Ms. Schaefer-LaRose's Rule 56(f) motion that relate to the exemptions ruled upon in this opinion.

41

advertising, and/or any other marketing efforts." Docket NO. 464 at 8. Ms. Schaefer-LaRose contends that such information, which she maintains could demonstrate that other forms of marketing utilized by Lilly are more successful than the work performed by its pharmaceutical sales representatives, is essential to determining "the level of importance or consequence" of her work for purposes of the administrative exemption.

Even assuming that the information Ms. Schaefer-LaRose seeks would demonstrate that other marketing efforts were as, or even more, effective than the work performed by its pharmaceutical sales representatives, such information would not affect our determination that Ms. Schaefer-LaRose's work is nevertheless of great importance and consequence to Lilly's business. Merely because Lilly may employ other, also effective means of marketing and promoting its drugs does not diminish the significance of the work performed by its sales representatives. The fact that Lilly employs a sales force of over 4,000 individuals to makes sales calls on physicians, whose prescriptions are the sole means by which patients can purchase Lilly's products, demonstrates that the work of its sales representatives is important, regardless of other methods it may employ. Accordingly, the information Ms. Schaefer-LaRose seeks pursuant to Request No. 14 would not create a genuine issue of material fact.

**D.    Request No. 42 of Plaintiff's 30(b)(6) Notice**

This request seeks information from Lilly's Regulatory Affairs department about "any policies, procedures, practices or programs . . . insofar as they concern the job

42

duties, tasks, and responsibilities of Pharmaceutical Reps." Docket No. 464 at 8-9.

According to Ms. Schaefer-LaRose, because the promotion of pharmaceutical products is

heavily regulated by government entities, such as the Food and Drug Administration

("FDA"), and Lilly's Regulatory Affairs department reviews the promotional materials

used by Lilly's sales representatives and interacts with the FDA to ensure that those

materials do not violate FDA regulations, the testimony she seeks is essential to

determining whether pharmaceutical sales representatives "exercise discretion and

independent judgment," as required by the administrative exemption. However, the

information Ms. Schaefer-LaRose seeks would not affect our finding that Ms. Schaefer-

LaRose exercised sufficient discretion in her position to satisfy the requirements of the

administrative exemption, no matter what the FDA regulations might be.

Lilly has never argued (nor is our opinion based on a determination) that Ms.

Schaefer-LaRose exercised discretion and independent judgment in part because she

participated in creating Lilly's promotional materials or determined whether those

materials comply with regulatory guidelines. Lilly does not allege that Ms. Schaefer-

LaRose had any such authority nor in our ruling do we assume that she did. Rather, we

base our finding that Ms. Schaefer-LaRose exercised discretion when promoting Lilly's

pharmaceuticals to physicians, *despite being restricted to using Lilly's pre-approved*

*promotional materials and messages*, due in large part to her own testimony that she

would alter her presentation from physician to physician based upon a variety of factors,

including the number and types of products she was promoting and the time constraints

she was facing.

Thus, our determination is not premised on a finding that Ms. Schaefer-LaRose was allowed to deviate from Lilly's pre-approved messages, but instead that she exercised discretion and used independent judgment when she tailored her message to each physician she visited by choosing which parts of the pre-approved materials, about which products, to present during each sales call. Accordingly, given the facts upon which our determination rests, we are unable to find that the testimony Ms. Schaefer-LaRose seeks from Lilly's Regulatory Affairs department would help her in any way to demonstrate a genuine issue of material fact as to whether she herself, as part of her duties, exercised discretion and independent judgment.

### E.    Request No. 46 of Plaintiff's 30(b)(6) Notice

Similar to the information sought from Lilly's Regulatory Affairs department, Ms. Schaefer-LaRose also seeks testimony regarding "the policies, practices, or procedures of any brand team or brand department at Lilly insofar as they concern sales calls or presentations made by Pharmaceutical Reps." Docket No. 464 at 9. However, there is no allegation here that Ms. Schaefer-LaRose had a part in designing or creating the branding materials that she used to promote Lilly's pharmaceutical products or that she could deviate from the branding messages that she was provided. Nevertheless, as discussed above, we found that Ms. Schaefer-LaRose exercised some discretion in crafting different presentations to appeal to different doctors within the boundaries established by Lilly's

44

pre-approved materials. Thus, the information Ms. Schaefer-LaRose seeks regarding

Lillly branding teams would not have any effect on our determination that she exercised

discretion and independent judgment in her position as a sales representative.

### F.     Request Nos. 4 and 48 of Plaintiff's 30(b)(6) Notice

Ms. Schaefer-LaRose requests testimony pertaining to the nature of Lilly's

business and the extent to which the marketing, promotion, and sale of its pharmaceutical

products constitutes part of its business. She asserts that this information is essential to

determining whether she engaged in exempt administrative work, as opposed to non-

exempt production work, for purposes of the administrative exemption. However, in our

view, there is no dispute that the products Lilly develops are its drugs and that

pharmaceutical sales representatives, such as Ms. Schaefer-LaRose, do not manufacture

those medications. The information Ms. Schaefer-LaRose has requested, including

corporate spending levels on sales and marketing and whether Lilly's advertising and

marketing plan includes print and television advertising, cannot alter the nature of Lilly's

underlying, core business or turn Ms. Schaefer-LaRose into a production employee.

Moreover, as noted in the discussion above, while relevant, the "production-

administration" dichotomy is not a dispositive test for exemption. See 69 Fed. Reg. at

22141. For these reasons, we find that the information sought here by Ms. Schaefer-

LaRose would not help her claim to survive summary judgment.

Because we hold that Ms. Schaefer-LaRose has failed to demonstrate that the

discovery she seeks would create a genuine issue of material fact, we overrule on other grounds Plaintiff's Objection to the Magistrate Judge's August 8, 2008, Order denying Plaintiff's Rule 56(f) motion. Accordingly, Ms. Schaefer-LaRose's Rule 56(f) motion is DENIED.

## IV.    Other Pending Motions

### A.    Docket No. 569 – Plaintiff's Objections to Magistrate Judge's September 11, 2008, Denial of Motion to File Surreply

On September 18, 2008, in a marginal entry, the Magistrate Judge denied Ms. Schaefer-LaRose's Motion for Leave to File Surreply to Defendant's Reply in Support of Motion for Summary Judgment [Docket No. 557], "for the reasons set forth in Defendant's opposition brief." Docket No. 564. Upon review of the parties' briefings on this motion, we do not find that the Magistrate Judge's denial of Ms. Schaefer-LaRose's motion for leave to file a surreply was in any sense clearly erroneous or contrary to law. See Fed. R. Civ. Pro. 72(a) ("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.").

The Magistrate Judge was well within his discretion to deny Ms. Schaefer-LaRose's request to file a surreply. There was no new evidence attached to Lilly's reply and the only "new" arguments raised in the reply were in response to the arguments raised in Ms. Schaefer-LaRose's response brief. Accordingly, we overrule Ms. Schaefer-

LaRose's Objection to the Magistrate Judge's September 11, 2008, Order.

**B.    Docket No. 565 – Plaintiff's Objection to the Magistrate Judge's September 11, 2008, Order Denying in Part Motion to Compel Rule 30(b)(6) Testimony**

On September 11, 2008, the Magistrate Judge held, with respect to Plaintiff's

Request Number 42 in their Rule 30(b)(6) Notice, that the testimony sought from Lilly's

Regulatory Affairs department would not be relevant to the dispositive issues and thus

denied in part her Motion to Compel. For the reasons described in our discussion of this

request in reference to Ms. Schaefer-LaRose's Rule 56(f) motion, we agree that such

information would be irrelevant to Plaintiff's case and to our ruling. The Magistrate

Judge's denial of the motion to compel was neither clearly erroneous nor contrary to law.

Thus, we overrule Plaintiffs' objections to the Magistrate Judge's September 11, 2008,

Order.

**C.    Docket No. 602 – Defendant's Objections to the Magistrate Judge's December 23, 2008, Order on Plaintiff's Motion for Protective Order**

On December 23, 2008, the Magistrate Judge granted Plaintiffs' request for a

protective order, holding that, in connection with discovery requests that Lilly had served

on approximately 400 of the opt-in Plaintiffs in this case, representative, rather than

individualized, discovery would be appropriate. On January 12, 2009, Lilly filed an

objection to the Magistrate Judge's Order, pursuant to Rule 72(a) and 28 U.S.C. §

636(b)(1)(A), contending that the Magistrate Judge failed "to 'balance the interest of the parties' by weighing 'the importance of [specific] disclosure[s]' to Lilly against any 'particular and specific demonstration' of burden or other good cause shown by Plaintiffs." Docket No. 602 at 1 (quoting Borom v. Town of Merrillville, 2008 WL 2003075, at *4 (N.D. Ind. May 8, 2008)).

Contrary to Lilly's assertion, however, the Magistrate Judge discussed both the concerns raised by Plaintiffs regarding the breadth of Lilly's requested discovery, which would have consisted of approximately 14,400 responses from 400 opt-in Plaintiffs,[18] as well as Lilly's need in a complex case such as this for broader discovery than might normally be granted. Finding that Lilly's requested discovery would be unduly costly and burdensome, the Magistrate Judge determined that representative discovery was appropriate, but provided that additional discussions between the parties were necessary in order to determine the proper scope of that discovery in light of the Court's conclusion that Plaintiffs' request for a protective order was justified. Docket No. 598 at 2-3.

Federal Rule of Civil Procedure 26(b)(2)(c) gives the court broad discretion to limit the frequency or extent of use of the discovery methods otherwise permitted by the Federal Rules of Civil Procedure. While the Magistrate Judge determined that

---

[18] Lilly served fifteen interrogatories and twenty-one request for production upon each of the 400 opt-in Plaintiffs. Docket No. 598 at 1. Lilly requests information such as any job search each opt-in has conducted since 2003 and descriptions of every full-time employment position held by each opt-in since college. Lilly also requested each of the opt-in Plaintiffs to produce every document in their possession that relates to their employment with Lilly. Docket No. 572-2 at 6-7.

48

representative discovery would be appropriate, he recognized that, given the complexity

of the issues presented, further discussion between the parties was necessary to determine

the exact scope of discovery that would permit Lilly to conduct sufficient discovery to

challenge the Court's conditional finding that Plaintiffs are similarly situated, but not be

unduly burdensome to Plaintiffs. Since that time, the parties have continued their

communications with the Magistrate Judge to more clearly define the appropriate

discovery boundaries to ensure fairness to both parties.

In conclusion, although the Magistrate Judge's findings may not have been as

specific as Lilly would have liked in determining that representative discovery was

appropriate under the facts and circumstances presented here, we are unable to find that

the Magistrate Judge's decision was either clearly erroneous or contrary to law. See

Adkins v. Mid-American Growers, Inc., 143 F.R.D. 171, 174 (N.D. Ill. 1992) ("[D]espite

the differences between Rule 23 class actions and representative suits under the FLSA,

individualized discovery is not appropriate under every circumstance."). Accordingly, we

overrule Lilly's objection to the Magistrate Judge's December 23, 2008, Order granting

Plaintiffs' request for a protective order.


## V.    Conclusion

For the reasons detailed above, we find that Ms. Schaefer-LaRose's employment

with Lilly as a sales representative comes within the outside sales and administrative

exemptions under both the FLSA and New York law. Therefore, we GRANT Lilly's

Motion for Summary Judgment on Ms. Schaefer-LaRose's overtime claim in its entirety.

Because Ms. Schaefer-LaRose was set forth as a representative plaintiff in this conditionally certified collective action and summary judgment has been entered against her on all claims, Plaintiffs are hereby ORDERED TO SHOW CAUSE within thirty (30) days why this collective action should not be decertified, based on the rulings of the Court.[19]

IT IS SO ORDERED.

Date:    09/29/2009

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[19] Currently on the docket are the parties' cross-motions for summary judgment as to a number of allegedly time-barred opt-in plaintiffs, as well as several motions related to the issues set forth in the parties' cross-motions. Judgment on those motions is reserved pending further proceedings in this matter consistent with this opinion.

Copies to:
Jonathan S. Abady
EMERY, CELLI, BRINCKERHOFF & ABADY LLP
jabady@ecbalaw.com

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com

Michael R. DiChiara
JOSEPH & HERZFELD LLP
md@jhllp.com

Gabriel Adam Hawkins
COHEN & MALAD LLP
ghawkins@cohenandmalad.com

Ryan Michael Hurley
BAKER & DANIELS LLP
ryan.hurley@bakerd.com

James A. Jones
GILLESPIE, ROZEN, WATSKY & JONES, P.C.
jaj@grwlawfirm.com

Charles Joseph
JOSEPH & HERZFELD LLP
charles@jhllp.com

Gregory N. Karasik
SPIRO MOSS BARNESS LLP
greg@spiromoss.com

Eric B. Kingsley
KINGSLEY & KINGLSEY APC
eric@kingsleykingsley.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

51

James A. O'Brien III
SEEGER WEISS LLP
jobrien@seegerweiss.com

Michael D. Palmer
JOSEPH & HERZFELD LLP
michael@jhllp.com

D. Lucetta Pope
BAKER & DANIELS-SOUTH BEND
lucetta.pope@bakerd.com

Elizabeth Saylor
EMERY CELLI BRINCKERHOFF & ABADY LLP
esaylor@ecbalaw.com

Christopher A. Seeger
SEEGER WEISS LLP
One William Street
New York, NY 10004-2502

Ira Spiro
SPIRO MOSS BARNESS LLP
ira@spiromoss.com

Christopher Van De Kieft
SEEGER WEISS LLP
cvandekieft@seegerweiss.com

David S. Wagner
BAKER & DANIELS, LLP
david.wagner@bakerd.com

Stephen A. Weiss
SEEGER WEISS LLP
sweiss@seegerweiss.com

Case: 1:07-cv-03626 Document #: 146-22 Filed: 12/14/09 Page 94 of 97 PageID #:1917

22e    OUTSIDE SALESMEN -- 541.5

22e00  Nonexempt work test.  The rule that nonexempt work may not exceed 20% of the hours worked in the workweek by nonexempt employees of the employer applies only to full-time employees.  The maximum amount of nonexempt work permitted for part-time employees is 20% of their own hours worked in the workweek.  (See Reg. 541.507.)

22e01  Outside sales from hand trucks, push carts or other vehicles. Employees who are engaged away from their employer's establishment, such as on the streets or in factories or office buildings, to make sales of food products or other items from hand trucks, push carts or other vehicles are making "outside sales" for purposes of Reg. 541.5.  On the other hand, an employee is not engaged in making "outside sales" if his duty is simply to drive a mobile unit to supply other employees of his employer with the merchandise to be sold by them.

22e02  Finance company employees obtaining or soliciting mortgages.  Employees of a finance company which is engaged primarily in servicing mortgages and takes mortgages in its own name may be exempt as outside salesmen, if they are customarily and regularly engaged away from their employer's place of business in obtaining mortgages from brokers and individuals.  Such soliciting is exempt work under Reg. 541.5(a)(2).  Work incidental to the employee's obtaining the mortgage, such as obtaining credit information from the mortgagor, before and after the sale would qualify as exempt work if done with respect to his own sales.  Telephone solicitation, obtaining credit and other information with respect to sales made by others, and other work not incidental to his own outside sales would not be exempt work.

22e03  Copywriting, layout, and display work by newspaper advertising salesmen.  Layout and display work or copywriting prior to, or during the making of a sale by an outside newspaper advertising salesman or space salesman, when such work is performed as a part of his sales effort, is work which is incidental to, and in conjunction with the making of the sale and so is exempt under Reg. 541.5(2)(b).

22e04  Soliciting business through a dealer.  An employee whose duty is to convince a dealer of the value of his employer's service to the dealer's customers and who does not in fact obtain firm orders or contracts from either the dealer or his customers is not making sales within the meaning of FLSA Sec. 3(k).  An example is merchant's contact men employed

22e04-22e06          FIELD OPERATIONS HANDBOOK - 7/28/65

by finance companies who call at the place of business of retail mer-
chants dealing in furniture or appliances and bring to the merchant's
attention the finance service that the finance company is prepared to
offer to any of the merchant's customers who are in need of money for
purchases, and who lay the groundwork for a continuing relationship
between the finance company and the merchant. The finance man deals
with the merchant and the merchant with his customers. The finance
man is not exempt under Reg. 541.5, since he does not obtain orders or
contracts from either the customers or the merchant.

22e05 _Industrial insurance agents._  Industrial insurance agents, some-
times called "debit men", call on persons to solicit insurance contracts
and, once the contracts have been secured, they call on the insured to
collect the premium and thus obtain a renewal of the policy. This re-
newal work is done on policies originally sold by the agents as well as
on policies sold by other agents. Industrial insurance agents engaged
in this activity are considered to meet all of the requirements of the
outside salesman definition contained in Reg. 541.5, and thus qualify
for the exemption.

22e06 _Real estate salesmen._  (a) The definition of an exempt "outside
salesman" in Reg. 541.5 requires that such an employee be employed for
the purpose of, and be customarily and regularly engaged in making "sales"
within the meaning of Sec. 3(k) of the Act or in obtaining certain orders
or contracts for the use of facilities. Real estate salesmen will
generally meet this test, since "sales" under Sec. 3(k) of the Act include
contracts to sell.

(b) An "outside salesman" must be customarily and regularly engaged "away
from his employer's place or places of business" in making such sales.
Real estate salesmen typically are required, as a customary and regular
part of their employment, to spend whatever time is necessary at the site
of property to be sold and in visiting prospects at the latter's homes and
offices as a part of their sales effort. Most of them must leave whatever
place of business of the employer they use as headquarters in order to
perform these tasks.

(c) Real estate salesmen stationed in a model home on a tract from which
parcels of real property are being sold with or without improvements, leaving
the model home for such purposes, customarily and regularly, would meet the
requirement of the definition, so far as making sales "away from" the em-
ployer's place of business is concerned. This is true even though all of
the property shown to prospects by the salesman is within the tract on which
the model home is located. Further, not every home called a "model home"
would be a place of business of the employer. One which is in the nature of
an "open house" to which a salesman is assigned to meet prospects who may
buy that house or another similar one on the tract may more properly be
viewed as analogous to the hotel sample room of a traveling salesman referred
to in Reg. 541.502(b) than to an actual place of business of the employer.

(WH66-89)

Special Delivery

Kenneth P. Montgomery, Regional Attorney
Chicago, Illinois

Donald M. Murtha
Chief, Wage-Hour Section

21 BR 301.85
21 BL 302.44

SOL:AJE:YS

May 19, 1945

Carnation Company
700 Milwaukee Light Building
Milwaukee, Wisconsin

This will reply to your memorandum of April 20, 1945, inquiring as to the status of certain employees of subject firm known as "medical detailists". Letters from subject firm enclosed with your memorandum indicate that the employees in question are engaged principally in work apparently aimed at increasing the use of subject's product in hospitals and through physicians' recommendations. Such work appears to require a high degree of technical knowledge in the nutritional field in which these men are said to be experts. They train personnel, make special surveys and reports, and in general maintain this company's relations with the medical and associated professions. They are consulted with respect to individual nutritional problems encountered by hospitals and physicians, such as determining whether the use of subject's product in a hospital was related to the occurrence of an epidemic. When necessary, they arrange for added deliveries of subject's product to take care of emergencies. They instruct the firm's salesmen in such technical matters as disease prevention, the chemical components of their product and nutritional research. They work virtually without supervision and are paid salaries in excess of $200 per month. You wish to know whether they are exempt under section 13(a)(1) as employees employed in an administrative capacity.

On the basis of the statements submitted by subject firm and assuming that the foregoing description is a complete description of the activities of the employees under consideration, it seems that the employees in question are engaged in a form of promotional or missionary work having for its object not the making of specific transactions but concerning itself with matters directly related to general business operations. They perform special assignments requiring the use of their discretion and independent judgment and, furthermore, frequently calling for the employment by them of skills or knowledge acquired through special training or experience. Accordingly, it is my opinion that these employees meet the requirements of the administrative employee definition contained in section 541.2 of the regulations. It should be emphasized, however, that this opinion is rendered wholly on the basis of the employer's statement of facts and without an independent investigation.

Pursuant to your request, the Company's letters are herewith returned to you.

Attachment

- 2 -