UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES JIRAK and ROBERT PEDERSEN, ) on behalf of themselves and all others similarly ) situated, ) ) Plaintiffs, ) ) v. ) ) ABBOTT LABORATORIES, INC., ) ) Defendant. ) | No. 07 C 3626 Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

James Jirak ("Jirak") and Robert Pedersen ("Pedersen") bring this putative class action, on behalf of themselves and all others similarly situated, (collectively "Plaintiffs") against Abbott Laboratories, Inc. ("Defendant") for alleged violations of the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). (R. 49, First Am. Compl.) Presently before the Court are Plaintiffs' (R. 143) and Defendant's (R. 147) cross-motions for summary judgment. For the reasons stated below, Plaintiffs' motion is granted and Defendant's motion is denied.

### RELEVANT FACTS[1]

Defendant is a global, broad-based health care company headquartered in Illinois. (R. 144, Pls.' Facts ¶ 1.) Plaintiffs are current and former employees of Defendant that worked as Pharmaceutical Representatives ("Representatives"). (*Id.* ¶ 2.) Representatives had the core duties of "generating market share and market share growth for assigned professional pharmaceutical products" and "mak[ing] selling presentations to physicians and other health care

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 Statements. (R. 144, Pls.' Facts; R. 149, Def.'s Facts; R. 160, Pls.' Resp. Facts; R. 162, Def.'s Resp. Facts.)

professionals." (R. 149, Def.'s Facts ¶ 8.) Representatives, however, did not promote

Defendant's products directly to patients or end-users. (R. 144, Pls.' Facts ¶ 53.)

Representatives received initial training from Defendant on science and selling skills. (R. 149, Def.'s Facts ¶ 10.) This included training on product and competitor product information as well as selling techniques and techniques to determine the physician's needs. (*Id.* ¶¶ 11, 13-14.) After the initial period of training, Representatives received training to continue to develop these skills and were also encouraged to participate in sales training outside of the company. (*Id.* ¶¶ 16, 19.)

Representatives were evaluated on their ability to utilize their training in the field. (*Id.* ¶ 10.) During "calls" or visits to health care providers, Defendant expected Representatives to adhere to company policies and federal and state laws that govern the pharmaceutical industry. (R. 144, Pls.' Facts ¶ 11.) Their evaluations were based on job responsibilities that included "selling to customers" and "coordinat[ing] sales efforts." (R. 149, Def.'s Facts ¶ 20.) Defendant provided each Representative with a "call list" specifying the physicians in their assigned territory that they were to present information about Defendant's products. (R. 144, Pls.' Facts ¶¶ 8, 10.) Defendant ranked the physicians on the "call list" and Representatives were expected to call on the higher-ranked physicians with more frequency than others.[2] (*Id.* ¶¶ 39-40.) Each Representative was also supplied with a laptop computer to enter "call notes" describing what they did on a particular sales call. (*Id.* ¶ 11.) District Managers ("DMs") had access to these "call notes" to ensure that Representatives were following appropriate procedure. (*Id.*) DMs could also conduct "ride alongs" to monitor Representatives during their calls. (*Id.*)

---

[2] There was some flexibility with regard to these lists as Representatives were able to add and drop physicians and could adjust their call frequencies. (R. 162, Def.'s Resp. Facts ¶¶ 8, 10, 39.) Moreover, there were some offices that did not use call lists. (*Id.*) However, the record does not indicate that a call list was not provided to any Plaintiff in this case. (*Id.*)

2

Representatives were expected to deliver "core messages" created by Defendant's marketing department about the products to health care providers. (*Id.* ¶¶ 4-5, 41.) Although Plaintiffs contend that Representatives "could not deviate" from these messages, the record illustrates that Representatives were not provided "transcripts of communications to be repeated verbatim." (R. 144, Pls.' Facts ¶ 4; R. 162, Def.'s Resp. Facts ¶ 4.) Rather, they were free to "weave" these "core messages" into "their overall product conversations with doctors." (*Id.*)

To assist with "core message" delivery, Defendant's marketing department provided "visual aids" and material that Representatives could use or distribute during their calls. (R. 144, Pls.' Facts ¶¶ 6, 9.) The messaging and material was created under the supervision of Defendant's medical, regulatory, and legal departments to ensure compliance with industry and company policy.[3] (R. 162, Def.'s Resp. Facts ¶ 6.) Although Representatives were "prohibited" from using aids that had not been approved by Defendant, they did have discretion to decide which, if any, materials to use during a particular call. (*Id.* ¶ 9.) Representatives were evaluated on their ability to "consistently giv[e] a logical, reasonable call-to-action/close on every sales call to drive product adoption and utilization." (R. 149, Def.'s Facts ¶ 26.) "Closing," however, did not create a contract or an enforceable commitment by the doctor to write a prescription for Defendant's products.[4] (R. 144, Pls.' Facts ¶ 19.)

---

[3] Defendant had "Sales Marketing Advisory Councils," which were implemented so that Representatives could also provide "input" with regard to marketing materials. (R. 162, Def.'s Resp. Facts ¶ 5.) The record, however, does not establish that any Plaintiff in this case was a member of any of these Councils. (*Id.*)

[4] Defendant did employ "specialty" Representatives for the Lupron and Ultane products, who could negotiate contracts and deliver the product directly to the doctors and institutions. (R. 162, Def.'s Resp. Facts ¶ 15; R. 163, Def.'s Ex. Appx., Ex. 28, Rancourt Dep. Tr. at 65:10-66:9 & Ex. 29, Serio Dep. Tr. 60:11-61:12.) However, there is no evidence that any of the Plaintiffs in this case were employed by Defendant as "specialty" Representatives. (*Id.*)

Even if the targeted doctor wrote a prescription for the product and it was filled by a pharmacy, Defendant did not recognize income. (*Id.* ¶ 15.) Rather, Defendant recognized revenue when their "trade group" provided pharmaceutical products to wholesale and retail customers. (*Id.*) Eighty to ninety percent of the revenue recognized by Defendant came from sales to wholesalers. (*Id.*) The remaining ten to twenty percent, was from sales to managed care entities, VA hospitals, long-term care facilities, independent hospital, independent pharmacies, and other small entities. (*Id.*; R. 162, Def.'s Resp. Facts ¶ 15.) However, in addition to their base wages, Representatives were paid "incentive compensation" that was calculated, in part, based on prescriptions written in the Representatives' assigned territory. (R. 149, Def.'s Facts ¶¶ 30-35.)

## PROCEDURAL HISTORY

Jirak and Pedersen originally filed this action on June 28, 2007, and amended their complaint on November 27, 2007. (R. 1, Compl.; R. 49 First Am. Compl.) On February 1, 2008, Jirak and Pedersen moved for conditional certification of a class and approval of proposed notice to potential class members pursuant to Section 16(b) of the FLSA. (R. 54, Pls.' Mot.) This Court granted the motion, in part, on July 22, 2008. (R. 64, Order.) In the July 22 Opinion, the Court rejected the notice proposed by Plaintiffs but authorized a revised notice plan on September 3, 2008. (*Id.*; R. 70, Min. Entry.)

On December 14, 2009, Plaintiffs and Defendant filed cross-motions for summary judgment focusing on whether Plaintiffs were exempt from the overtime requirements of the FLSA under either the outside sales or administrative exemptions. (R. 145, Pls.' Mem. in Support of Summ. J. Mot. ("Pls.' Mem."); R. 147, Def.'s Summ. J. Mot.) On January 7, 2010, the Court granted Defendant's motion to dismiss Opt-in Plaintiffs who did not work for

4

Defendant as Representatives during the limitations period. (R. 157, Min. Entry.) In addition, on March 2, 2010, the Court granted Defendant's motion to dismiss Opt-In Plaintiffs who refused to participate in discovery. (R. 179, Min. Entry.)

## LEGAL STANDARDS

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In ruling on a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all doubts in favor of that party. *Keri v. Bd. of Trsts. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). On cross-motions for summary judgment, inferences are drawn in favor of the party against whom the motion under consideration was made. *First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this burden, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The non-moving party must show that there is evidence upon which a jury reasonably could find for [it]." *Wheeler*, 539 F.3d at 634. The Court may consider any evidence that would be admissible at trial. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008).

5

## ANALYSIS

The FLSA was enacted to protect covered workers from substandard wages and oppressive working hours, "labor conditions [that are] detrimental to the maintenance of the minium standard of living necessary for health, efficiency, and general well-being of workers . . . ." 29 U.S.C. § 202(a). The FLSA provides: "[N]o employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *Id.* at § 207(a)(1). Exempt from this requirement, however, are employees that work "in a bona fide executive, administrative, or professional capacity" or employees that work "in the capacity of outside salesman." *Id.* at § 213(a)(1). The Secretary of Labor administers the FLSA and the terms of the exemptions are "defined and delimited from time to time" by the Department of Labor ("DOL"). *Id*; 29 U.S.C. § 204.

"The burden is on the employer to prove that an employee is exempt under FLSA, and such exemptions are to be narrowly construed against the employer seeking the exemption." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010) (citations omitted). As such, the exemptions are "applied only where it 'plainly and unmistakably comes within the statute's terms and spirit' to deny the employee overtime." *Jackson v. Go-Tane Servs.*, 56 Fed. Appx. 267, 270 (7th Cir. 2003) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)). In this case, Plaintiffs and Defendant present cross-motions on the issues of whether Representatives are exempt from the overtime requirements of the FLSA under the outside sales and administrative exemptions. (R. 147, Def.'s Summ. J. Mot.; R. 145, Pls.' Mem.)

6

## I. Outside Salesmen Exemption

The DOL regulations define an "outside salesman" as an employee:

> (1) Whose primary duty is:
>
>> (i) making sales within the meaning of section 3(k) of the [FLSA], or
>>
>> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a). "Primary duty" means "the principal, main, major or most important duty that the employee performs." *Id.* at § 541.700(a). "Sale" or "sell" under the FLSA "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Id.* at § 541.501(b); 29 U.S.C. § 203(k). The regulations indicate that "promotion work" is "one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed." 29 C.F.R. § 541.503(a). "Promotion activities directed toward consummation of the employee's own sales are exempt." *Id.* § 541.503(b). However, "[p]romotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work." *Id.*

Plaintiffs argue that the outside sales exemption does not apply in this case because Representatives "do[] not sell anything" and health care providers "do[] not purchase anything." (R. 145, Pls.' Mem. at 2.) In support of their argument, Plaintiffs cite an *amicus curiae* brief submitted by the DOL in an appeal pending before the Second Circuit Court of Appeals, *In Re Novartis Wage and Hour Litigation*. (*Id.* at 3.) In its brief, the DOL argues that the district court in that case committed legal error when it concluded that the pharmaceutical sales representatives

7

employed by Novartis Pharmaceutical Corporation ("NPC") were exempt from the overtime requirements of the FLSA under the outsides sales and administrative exemptions. (R. 146-21, Ex. U - DOL Brief.)

In the context of the outside sales exemption, the DOL emphasizes the fact that pharmaceutical sales representatives do not sell or take orders for NPC's drugs; rather, "they provide information to target physicians about NPC's drugs with the goal of persuading the physicians to prescribe those drugs to their patients." (*Id.* at 5.) The DOL contends that "[b]ecause the reps do not sell any drugs or obtain any orders for drugs, and can at most obtain a non-binding commitment to prescribe NPC's drugs to their patients when appropriate," they "do not meet the regulation's plain and unmistakable requirement that their primary duty must be 'making sales.'" (*Id.* at 10.) The DOL acknowledges that the sales reps duties "bear some of the indicia of sales." (*Id.* at 5.) However, the DOL contends that insofar as the reps' work increases NPC's sales, "it is non-exempt promotional work 'designed to stimulate sales that will be made by someone else'" and that "a 'sale' for the purpose of the outside sales exemption requires a consummated transaction directly involving the employee for whom the exemption is sought." (*Id.* at 10 (citing 29 C.F.R. § 541.503(b)), 11-12.)

Plaintiffs argue that pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997), the DOL's amicus brief is "entitled to substantial deference by this Court." (R. 145, Pls.' Mem. at 4.) *Auer* involved a disputed interpretation of whether a class of law enforcement officers met the "salary-basis" test for overtime pay exemption under the FLSA. 519 U.S. at 454-55. The Secretary of Labor filed an amicus brief explaining why, in his view, the regulations gave exempt status to the officers. *Id.* at 461. The Supreme Court deferred to the Secretary's interpretation explaining that the test was "a creature of the Secretary's own regulations" and therefore his interpretation was

8

"controlling unless 'plainly erroneous or inconsistent with the regulations.'"[5] *Id.* at 461 (citations omitted); *see also Whetsel v. Network Prop. Servs., Inc.*, 246 F.3d 897, 901 (7th Cir. 2001) (quoting *Pauley v. BethEnergy Mines, Inc.* 501 U.S. 680, 702 (1991)) ("[i]f the regulation is ambiguous, then we defer to any reasonable construction by the Secretary").

Defendant argues that the Court should grant "no deference" to the DOL's amicus brief. (R. 161, Def.'s Opp'n Mem. at 8.) Defendant claims that the DOL's interpretation of what it means to "sell" under the outside sales exemption is not based on "language of the DOL's own creation;" but rather, "statutory language created by Congress." (*Id.* at 9.) Therefore, Defendant argues that pursuant to *Gonzales v. Oregon*, 546 U.S. 243 (2006), the DOL's interpretation is not entitled to controlling deference. (*Id.*) In *Gonzales*, the Supreme Court held that it would not accord deference to an Attorney General rule interpreting a "parroting regulation" that "just repeats two statutory phrases and attempts to summarize the others." 546 U.S. at 257. The Court reasoned that: "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Id.*

The Court, however, is not persuaded by Defendant's argument because the regulations at issue in this case do not merely "parrot" the FLSA. The Court acknowledges that both the regulations and the FLSA define "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *See* 29 C.F.R. § 541.501(b); 29 U.S.C. § 203(k). The regulations, however, go further and provide guidance directly applicable to the issue in this case: when the outside sales exemption applies. The regulations explain that

---

[5] Further, the Court explained that the interpretation is entitled to deference even though it comes in the form of a brief, explaining that "[t]here is simply no reason to suspect that the interpretation does not reflect the [DOL]'s fair and considered judgment on the matter in question." *Id.* at 462.

"sales" under the exemption include the transfer of both tangible and intangible property, and that "outside sales work" includes both the sale of commodities and obtaining orders or contracts for services or the use of facilities. *See* 29 C.F.R. § 541.501. Further, the regulations provide guidance as to when "promotion work" falls under the outside sales exemption.[6] *Id.* at § 541.500(b). As such, the regulations do more than merely repeat or summarize the FLSA. *See Harrell v. United States Postal Serv.*, 445 F.3d 913, 925-26 (7th Cir. 2006) (determining that although the DOL's interpretation "follows closely the language of the statute," it is entitled to deference because "the regulation goes beyond the mere recitation of the statutory language and speaks to the issue presented in this case"). Accordingly, the *Gonzales* exception to awarding deference to the DOL's interpretation does not apply here. Moreover, even if the Court did find that the DOL's brief was not entitled to deference, its interpretation is still "entitled to respect" to the extent that "it has the 'power to persuade.'" *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

After careful review, this Court finds that the DOL's interpretation is both persuasive and consistent with our analysis of the regulations. The regulations dictate that if an employee does not make any sales and does not obtain any orders or contracts, then the outside sales exemption does not apply. *See* 29 C.F.R. § 541.500(a). Further, the regulations state that "promotional

---

[6] The regulations provide examples of employees who perform various types of promotional activities. *Id.* at § 541.500. In the first example, a "manufacturer's representative," has duties such as "putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise." *Id.* at § 541.500(b). Pursuant to the regulations, this employee "can be considered an exempt outside sales employee if the employee's primary duty is making sales or contracts." *Id.* The second example involves a "company representative" who "visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases." *Id.* at § 541.500(c). The regulations explain that such activity is not exempt outside sales work because the representative "does not consummate [a] sale nor direct efforts toward the consummation of a sale." *Id.*

10

work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work" and that "promotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work." *Id.* at § 541.503(a)-(b). The latter regulation describes promotional activities generally, and does not distinguish between activities that are "incidental" versus "essential" to sales. *See id.* at § 541.503(b). In this case, the Court acknowledges that Representatives' promotional activities were not "incidental" to Defendant's sales; rather, such activity was an essential component of Defendant's business strategy. (*See* R. 149, Def.'s Facts ¶ 8.) However, the activities did not generate Representatives' "sales," but instead stimulated "sales" Defendant's "trade group." (*See* R. 144, Pls.' Facts ¶¶ 15, 19.) Therefore, Representatives' promotional activities are not exempt under the regulation.

Further, the Court finds that this conclusion is consistent with the DOL's prior position that a "sale" for the purpose of the outside exemption requires a consummated transition involving the employee for whom the exemption is sought. For example, the DOL found that the outside sales exemption did not apply to "enrollment advisors" or college recruiters whose duties included "selling" the school and "inducing" student applicants, which resulted in the advisors personally obtaining a signed enrollment application and a nonrefundable $50.00 application fee. DOL Opinion Letter, 1998 DOLWH LEXIS 17, at *3,7 (Feb. 19, 1998). The DOL explained that the activities of the position were more "analogous to sales promotion work" because "like a promotion person who solicits customers for a business," the college recruiter identifies customers and induces their application but does not "make a contractual offer of its educational services to the applicant." *Id.* at *7. *See also* DOL Opinion Letter, FLSA2006-16, 2006 WL 1698305, at *2 (May 22, 2006) (finding that "'selling the concept' of donating to a charity does not constitute 'sales' for purposes of the outside sales exemption" because the solicitors do not

11

obtain orders or contracts and the "exchange of a token gift for the promise of a charitable donation" is not a "sale").

In arguing that Representatives "made sales" within the meaning of the FLSA, Defendant relies on the *Novartis* district court decision as well as the opinion of the only court in this Circuit to address the issue, *Schaefer-LaRose v. Eli Lily & Co.*, 663 F. Supp. 2d 674 (S.D. Ind. 2009).[7] (R. 148, Def.'s Mem. at 6-12.) The district court in *Novartis* found that "the realities of the pharmaceutical industry" was "incompatible" with engaging in a "narrow reading" of the outside sales exemption and that a determination that sales representatives are exempt "produces results that reflect the exemptions terms and spirit." 593 F. Supp. 2d at 653. Similarly, the *Schaefer* court noted that the pharmaceutical industry was "unique" because "the only individuals who can legally authorize a purchase of the medication and who thus drive demand for those drugs" are physicians.[8] 663 F. Supp. 2d at 684. As such, the *Schaefer* court found that although the pharmaceutical sales representatives in that case did not provide "direct sales of the medications," they represented a "special category with regard to 'making sales'" and thus fell within the FLSA's outside sales exemption.[9] *Id.* at 684-85.

---

[7] The Seventh Circuit has yet to consider the applicability of the outside sales exemption to a pharmaceutical sales position.

[8] The Court notes that the district court in *Schaefer* issued its opinion without the benefit of the DOL's interpretation of the outside sales exemption in the context of pharmaceutical sales representatives.

[9] Further, the court in *Schaefer* noted that "[u]nlike non-exempt promotional work" the plaintiff engaged in work that was "neither incidental to sales made by others nor performed for the purpose of increasing [the Defendant's] sales in general." 663 F. Supp. 2d at 687. However, as previously discussed, if the promotional activities stimulated sales that were made by someone else (even if such activity was not "incidental"), it is not exempt outside sales work. *See* 29 C.F.R. § 541.503(b).

12

This Court, however, declines to follow these decisions and carve out this "special category." Instead, pursuant to the Seventh Circuit's mandate that FLSA exemptions must be "narrowly construed against the employer seeking the exemption," *Schmidt*, 599 F.3d at 631, the Court finds that Representatives do not "plainly and unmistakably" come within the outside sales exemption. *See Jackson*, 56 Fed. Appx. at 270. It is clear that Representatives bear some indicia of salesmen (as evidenced by hiring considerations, training, their evaluation criteria and incentive pay). However, pursuant to both the plain text of the outside sales exemption and the DOL's interpretation of it, Representatives fail to satisfy the primary duty test of the exemption because they do not "make sales" under the statute. (*See* R. 146-21, Ex. U - DOL Brief at 11 ("a 'sale' for the purpose of the outside sales exemption requires a consummated transaction directly involving the employee for whom the exemption is sought").) *See also Kuzinski v. Schering Corp.*, 604 F. Supp. 2d 385, 402-03 (D. Conn. 2009) ("Because [pharmaceutical sales reps] undisputedly do not 'sell' or make any 'sales' as those terms are defined in the FLSA and its implementing regulations, they fall outside the FLSA's outside sales exemption."); *Ruggeri v. Boehringer Ingelheim Pharms., Inc.*, 585 F. Supp. 2d 254, 272 (D. Conn. 2008) ("Because Defendant has not shown that [pharmaceutical sales reps] make sales or obtain contracts or orders, the outside sales exemption is inapplicable.").

Thus, Representatives are not exempt from the overtime requirements of the FLSA under the outside sales exemption.[10] Accordingly, summary judgment is granted to Plaintiffs on this issue.

## II. Administrative Exemption

Next, the parties present cross-motions on the issue of whether Representatives are exempt from the overtime requirements of the FLSA under the administrative exemption. (R. 145, Pls.' Mem at 11-19; R. 148, Def.'s Mem. at 12-20.) The DOL Regulations define an "administrative employee" as someone:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200. There is no dispute that Representatives in this case meet the first prong of the administrative employee exemption. (*See* R. 145, Pls.' Mem at 11-19; R. 148, Def.'s Mem. at 12-20.) The parties, however, disagree as to whether Representatives performed work "directly related" to Defendant's management or business operations and whether

---

[10] The Court is not persuaded by Defendant's argument that summary judgment should be precluded because there is "at least a material question of fact" as to whether Plaintiffs qualify for the outside sales exemption. (*See* R. 161, Def.'s Opp'n Mem. at 6-8.) While the factual record in this case is quite contentious (*see* R. 160, Pls.' Resp. Facts; R. 162, Def.'s Resp. Facts), the record is clear that Plaintiffs did not promote Defendant's products directly to patients or end-users and did not receive an enforceable commitment by doctors to write prescriptions for the products. (R. 144, Pls.' Facts ¶¶ 19, 53; R. 162, Def.'s Resp. Facts ¶¶ 19, 53.)

Representatives exercised "discretion and judgment with respect to matters of significance." (*Id.*)

Turning first to prong three of the exemption, the regulations explain that, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* The exercise of discretion and independent judgment requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* at § 541.202(e). The employee must have "authority to make an independent choice, free from immediate direction or supervision." *Id.* at § 541.202(c). Further, an employee does not meet the requirement "merely because the employer will experience financial losses if the employee fails to perform the job properly." *Id.* at § 541.202(f).

"The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the questions arises." *Id.* at § 541.202(b). The regulations, however, provide factors to consider when determining whether an employee's duties meet this threshold. *Id.* These factors include, but are not limited to, whether the employee "carries out major assignments in conducting the operations of the business"; "has authority to commit the employer in matters that have significant financial impact"; "has authority to waive or deviate from established policies and procedures without prior approval"; and "has authority to negotiate and bind the company on significant matters." *Id.*

Defendant argues that Representatives "regularly exercised discretion and independent judgment with matters of significance." (R. 148, Def.'s Mem. at 13-19.) Specifically, Defendant

15

asserts that Representatives built relationships, created "pre-call plans" and customized their calls to develop a specific strategy to increase their effectiveness with targeted physicians, which resulted in an increase in Defendant's market share. (*Id.*) Defendant cites the recently decided case *Smith v. Johnson & Johnson*, 593 F.3d 280 (3d Cir. 2010), in support of their argument. (R. 169, Def.'s Reply at 6-10; R. 173, Def.'s Mot. to File Supp. Authority.) The facts before the Third Circuit (the only circuit to address the administrative exemption status of pharmaceutical sales representatives), however, do not persuade this Court to reach the same conclusion in this case. The Third Circuit noted that the plaintiff, Smith, "executed nearly all of her duties without direct oversight" and during her deposition "described herself as the manager of her own business who could run her territory as she saw fit." *Smith*, 593 F.3d at 285. Although Smith argued that she lacked discretion with respect to matters of significance and that her previous statements were "overinflated" and "mere puffery," the Third Circuit was "unwilling to ignore Smith's testimony" and accepted her statements "as an accurate description of her position."[11] *Id.*

The facts before this Court are distinguishable from *Smith* and indicate that Representatives did not exercise discretion and independent judgment, but instead used their sales skill to apply Defendant's well established techniques and procedures. For example, the record illustrates that Representatives did not independently solicit doctors, but worked from a "call list" provided by Defendant that specified the physicians in their assigned territory that they were to target. (R. 144, Pls.' Facts ¶¶ 8, 10.) The "call list" also dictated the frequency that Defendant expected Representatives to visit the targeted physicians. (*Id.* ¶ 39.) Further, although Representatives had flexibility to determine how to best craft the appropriate message for a

---

[11] The Third Circuit noted that "when Smith testified she surely understood the significance of her testimony in the context of the case." *Id.*

16

particular doctor (R. 162, Def.'s Resp. Facts ¶ 4), they did not engage in sales "calls" "independent[ly]," and were not "free from immediate direction." *See* 29 C.F.R. § 541.200. Representatives were expected to adhere to company policies and to deliver Defendant's "core messages" about the products during "calls." (R. 144, Pls.' Facts ¶¶ 4-5, 11, 41.) Representatives could use or distribute marketing material provided by Defendant but were "prohibited" from creating their own material. (*Id.* ¶¶ 6, 9; R. 162, Def.'s Resp. Facts ¶ 9.) Further, because Representatives could not prepare contracts or create an enforceable commitment by a doctor to write a particular prescription (R. 144, Pls.' Facts ¶ 19), they did not have the authority to negotiate and bind Defendant in significant matters or matters that had a significant financial impact. *See* 29 C.F.R. § 541.202(b).

Moreover, pursuant to the DOL's interpretation, duties similar to those of the Representatives in this case, "do[] not suffice to qualify for the administrative exemption." (R. 146-21, Ex. U - DOL Brief at 21.) In the *Novartis* brief, the DOL asserts that NPC's pharmaceutical sales representatives do not perform duties that require the exercise of discretion and independent judgment as contemplated by the regulations. (*Id.* at 21.) Rather, the DOL states:

> The facts are clear that, within the stringent restrictions on Reps' work activities, the Reps' discretion is limited to such matters as what time of day to visit a particular doctor, the manner in which to approach the doctor based on the doctor's personality, and how best to deliver (i.e., to 'fit in') the NPC's 'core message' for a particular drug given the time constraints of a visit.

*Id.* at 26. Accordingly, the DOL argues that the district court in *Novartis* erred in concluding that NPC's pharmaceutical sales representatives are administrative employees because they do not exercise discretion and independent judgment with respect to matters of significance. (*Id.* at 17.)

The DOL interpretation is consistent with previous agency decisions addressing the

17

discretion and independent judgment prong of the exemption. *See, e.g.,* DOL Opinion Letter, FLSA2006-27, 2006 DOLWH LEXIS 37, at *7 (July 24, 2006) (citation omitted) (stating that discretion and independent judgment requires more than "mak[ing] limited decisions, within clearly 'prescribed parameters'"); DOL Opinion Letter, 2000 DOLWH LEXIS 23, at *5 (July 17, 2000) ("An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . is not exercising discretion and independent judgment within the meaning of section 541.2, even if there is some leeway in reaching a conclusion.").

Accordingly, this Court finds that in light of the facts of this case, Representatives do not exercise discretion and independent judgment and thus do not meet the administrative exemption.[12] Therefore, summary judgment is granted to Plaintiffs on this issue.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (R. 143) is GRANTED and Defendant's motion for summary judgment (R. 147) is DENIED. The clerk of the Court is directed to enter judgment on all liability issues in favor of Plaintiffs and against Defendant. The Court will retain jurisdiction to award damages to the appropriate Plaintiffs.

The parties are requested to reevaluate their final settlement positions in light of this opinion.

Entered: _____
**Judge Ruben Castillo**
**United States District Court**

**Dated: June 10, 2010**

---

[12] Because Representatives do not exercise discretion and independent judgment, the Court need not address the second prong of the exemption and determine whether Plaintiffs performed work "directly related" to Defendant's management or business operations. *See* 29 C.F.R. § 541.200.